UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

RAFAT AMIROV,
  a/k/a "Farkhaddin Mirzoev,"
  a/k/a "Рим,"
  a/k/a "Rome," and
POLAD OMAROV,
  a/k/a "Araz Aliyev,"
  a/k/a "Novruz Novruzzade,"
  a/k/a "Polad Qaqa,"
  a/k/a "Haci Qaqa,"

        Defendants.

S8 22 Cr. 438 (CM)

## THE GOVERNMENT'S MOTIONS *IN LIMINE*

DANIELLE R. SASSOON
United States Attorney for the
Southern District of New York
26 Federal Plaza
New York, New York 10278

Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
    *Of Counsel*

## <u>TABLE OF CONTENTS</u>

BACKGROUND ................................................................................................................9

    I. Overview .............................................................................................................. 9

    II. Previous Plots Targeting Victim-1 ................................................................... 12

    III. The Murder-for-Hire Plot ............................................................................... 14

        A. The Bazghandi Network Continues to Monitor and Target Victim-1 ........ 14

        B. The Bazghandi Network Engages the Defendants, Members of the Russian Mob, to Murder Victim-1 .................................................................................. 14

        C. Amirov, Omarov, Mehdiyev, and Mamedov Attempt to Assassinate Victim-1 ......... 17

        D. Mehdiyev Is Arrested ................................................................................. 23

        E. The Bazghandi Network Monitors Victim-1 and the Fallout of Mehdiyev's Arrest ............................................................................................ 25

        F. Amirov and Forouzan Continue to Communicate about Victim-1 ............ 26

        G. The Bazghandi Network Continues its Efforts to Target Victim-1 ........... 27

        H. Amirov and Omarov are Arrested and the Plot is Exposed Publicly.......... 28

    IV. The Defendants' Post-Arrest Admissions ....................................................... 29

        A. Amirov ....................................................................................................... 29

        B. Omarov ...................................................................................................... 30

ARGUMENT ................................................................................................................ 32

    I. Evidence of the GOI's Involvement in Targeting Dissidents Outside Iran, Including Victim-1, is Admissible as Direct Evidence and Pursuant to Rule 404(b)..................... 32

        A. The Anticipated Evidence .......................................................................... 33

        B. Applicable Law .......................................................................................... 35

        C. Discussion .................................................................................................. 37

    II. Evidence of the Organization's Existence and Racketeering Activities Is Admissible Both As Direct Evidence of the Murder-for-Hire Plot and Pursuant to Rule 404(b) ............................................................................................... 40

        A. The Anticipated Evidence .......................................................................... 41

        B. Discussion .................................................................................................. 43

    III. Certain of Amirov's and Omarov's Post-Arrest Statements, Which Do Not Violate the *Bruton* Rule, Are Admissible .................................................. 45

A. Applicable Law ...................................................................................................... 46

B. Discussion .............................................................................................................. 48

IV. Statements Made by the Defendants, Other Members of the Organization, and Individuals Linked to the GOI Who Participated in the Plot to Murder Victim-1 and/or the Criminal Activities of the Organization Are Admissible Pursuant to Rules 801(d)(2)(A), 801(d)(2)(E), and 804(b)(3) ............................................. 49

A. Applicable Law ...................................................................................................... 49

B. Evidence of Statements Made by the Co-Defendants and Co-Conspirators Who Were Members of the Russian Mob and/or the Organization to Mehdiyev Is Admissible Under the Hearsay Rules ........................................................ 52

C. Evidence of Statements Made by Co-Conspirators Linked to the GOI Is Admissible Under the Hearsay Rules ........................................................ 57

V. Testimony from Amirov's Proposed Computer Experts Should Be Precluded................ 59

A. Relevant Facts ....................................................................................................... 59

B. Relevant Law.......................................................................................................... 61

C. Application ............................................................................................................. 62

CONCLUSION........................................................................................................................ 65

## **TABLE OF AUTHORITIES**

**Cases**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
    303 F.3d 256 (2d Cir. 2002) ........................................................................ 62,63

*Bourjaily v. United States*,
    483 U.S. 171 (1987) ........................................................................................ 50

*Bruton v. United States*,
    391 U.S. 123 (1968) ................................................................................... 46-47

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ........................................................................................ 61

*In re Pfizer Inc. Secs. Litig.*,
    819 F.3d 642 (2d Cir. 2016) ........................................................................... 61

*LVL Brands, Inc. v. Louis Vuitton Malletier S.A.*,
    209 F. Supp. 3d 612 (S.D.N.Y. 2016) ............................................................ 62

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008) ........................................................................... 62

*Ohio v. Clark*,
    135 U.S. 2173 (2015) ...................................................................................... 52

*United States v. Bankman-Fried, No. S6*
    22-CR-0673 (LAK), 2023 WL 6162865 at *1 (S.D.N.Y. Sept. 21, 2023) ...... 61, 64

*United States v. Beech-Nut Nutrition Corp.*,
    871 F.2d 1181 (2d Cir. 1989) ..................................................................... 55, 58

*United States v. Bick*,
    711 F. App'x 664 (2d Cir. 2017) .....................................................................52

*United States v. Cedeno*,
    756 F. App'x 24 (2d Cir. 2018) .......................................................................38

*United States v. Curley*,
    639 F.3d 50 (2d Cir. 2011) .............................................................................. 36

*United States v. Delligatti, No. 15 Cr. 491*
    (JSR), 2018 WL 1033242 (S.D.N.Y. Feb. 23, 2018) ................................. 38, 55

*United States v. Delva, No. 12 Cr. 802,*
    2014 WL 4460360 (S.D.N.Y. Sept. 10, 2014) ............................................................ 58, 76

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) .................................................................................... 41

*United States v. Doyle,*
    130 F.3d 523 (2d Cir. 1997) .................................................................................. 54

*United States v. Fiumano, No. 14 Cr. 518*
    (JFK), 2016 WL 1629356 (S.D.N.Y. Apr. 25, 2016) ............................................ 37

*United States v. Gigante,*
    166 F.3d 75 (2d Cir. 1999) ..............................................................................58, 61

*United States v. Gohari,*
    227 F. Supp. 3d 313 (S.D.N.Y. 2017) .............................................................. 37, 46

*United States v. Gonzalez,*
    110 F.3d 936 (2d Cir. 1997) ...........................................................................37, 46

*United States v. Gotti,*
    457 F. Supp. 2d 395 (S.D.N.Y. 2006) ................................................................ 51

*United States v. Jass,*
    569 F.3d 47 (2d Cir. 2009) .................................................................................... 48

*United States v. Kadir,*
    718 F.3d 115 (2d Cir. 2013) .................................................................................. 49

*United States v. Kuthuru,*
    665 F. App'x 34 (2d Cir. 2016) ........................................................................... 56

*United States v. Lang,*
    589 F.2d 92 (2d Cir. 1978) .................................................................................... 54

*United States v. Marin,*
    669 F.2d 73 (2d Cir. 1982) .................................................................................... 49

*United States v. Matthews,*
    20 F.3d 538 (2d Cir. 1994) .................................................................................... 54

*United States v. Molton,*
    743 F.3d 479 (7th Cir. 2014) ................................................................................ 45

*United States v. Nelson,*
    103 F. Supp. 2d 512 (N.D.N.Y. 1999) ................................................................ 45

*United States v. Paone*,
    782 F.2d 386 (2d Cir. 1986) ................................................ 52

*United States v. Persico*,
    645 F.3d 85 (2d Cir. 2011) ................................................ 53

*United States v. Pipola*,
    83 F.3d 556 (2d Cir. 1996) ................................................ 40, 46

*United States v. Rahme*,
    813 F.2d 31 (2d Cir. 1987) ................................................ 52

*United States v. Reyes*,
    2012 WL 3727995 (D. Conn. May 1, 2012) ........................ 45

*United States v. Robinson*,
    702 F.3d 22 (2d Cir. 2012) ................................................ 37

*United States v. Roldan-Zapata*,
    916 F.2d 795 (2d Cir.1990) ................................................ 41, 47

*United States v. Rosa*,
    11 F.3d 315 (2d Cir. 1993) ................................................ 57

*United States v. Russo*,
    302 F.3d 37 (2d Cir. 2002) ................................................ 49, 51

*United States v. Rutkoske*,
    506 F.3d 170 (2d Cir. 2007) ................................................ 38

*United States v. Saget*,
    77 F.3d 223 (2d Cir. 2004) ................................................ 59

*United States v. Sanders, S1*
    12 Cr. 574 (LAK), 2013 WL 1421487 (S.D.N.Y. Mar. 27, 2013) ........................................ 67

*United States v. Simmons,*
    923 F.2d 934 (2d Cir. 1988) ................................................ 52

*United States v. Ulbricht,*
    79 F. Supp. 3d 466 (S.D.N.Y. 2015) ................................................ 38

*United States v. Weiner, No. 22 CR. 19*
    (PGG), 2024 WL 82729 (S.D.N.Y. Jan. 8, 2024) ................................................ 65

*United States v. Wexler,*

522 F.3d 194 (2d Cir. 2008) ........................................................................................ 53

*United States v. Williams*,
506 F.3d 151 (2d Cir. 2007) ................................................................................48, 59

*United States v. Williams*,
936 F.2d 698 (2d Cir. 1991) ........................................................................................ 49

*United States v. Wilson*,
493 F. Supp. 2d 484 (E.D.N.Y. 2006) ...................................................................... 67

*Williamson v. United States*,
512 U.S. 594 (1994) .................................................................................................... 53

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA

    - v. -

RAFAT AMIROV,
  a/k/a "Farkhaddin Mirzoev,"
  a/k/a "Рим,"
  a/k/a "Rome," and
POLAD OMAROV,
  a/k/a "Araz Aliyev,"
  a/k/a "Novruz Novruzzade,"
  a/k/a "Polad Qaqa,"
  a/k/a "Haci Qaqa,"

        Defendants.

S8 22 Cr. 438 (CM)

---

The Government respectfully submits this memorandum in support of motions *in limine*

seeking the following rulings with respect to the upcoming trial of Rafat Amirov ("Amirov") and

Polad Omarov ("Omarov" and, with Amirov, the "defendants"):

1. Evidence relating to the Government of Iran's ("GOI") targeting dissidents outside Iran, including the individual identified as Victim-1 in the Indictment, is admissible as direct evidence and pursuant to Rule 404(b);

2. Evidence of the existence of a subset of the Russian Mob of which Amirov and Omarov were members, referenced in the Indictment and herein as the Organization, and of the Organization's racketeering acts, is admissible as direct evidence of both the murder-for-hire plot and the attempted murder in aid of racketeering, and pursuant to Rule 404(b);

3. Certain of Amirov's and Omarov's post-arrest statements, which do not violate the *Bruton* rule, are admissible;

4. Testimony regarding statements made by the defendants, other members of the Organization, and individuals linked to the GOI who participated in the murder-for-hire plot and/or who were the defendants' co-conspirators, is admissible pursuant to Rules 801(d)(2)(E), 804(b)(3), and/or 801(d)(2)(A);

    5.   The preclusion of the testimony of Amirov's proposed computer experts.[1]

## BACKGROUND[2]

### I.    Overview

In July 2022, Rafat Amirov and Polad Omarov, along with co-defendants Khaled Mehdiyev and Zialat Mamedov, a/k/a "Ziko"—all members of the *Vory v Zakone*, or the Russian Mob—sought to murder an Iranian-American author, journalist, and human rights activist residing in New York City ("Victim-1"). Amirov, Omarov, and Mamedov, residing in Iran and Europe at the time, provided targeting information, instructions, and operational funds to Mehdiyev, residing in New York City. Mehdiyev then surveilled Victim-1 and Victim-1's family members and residence; sent surveillance photographs and videos to Omarov and Mamedov, who, in turn, reported to Amirov; bought a semi-automatic AK-47-style assault rifle; and made plans to carry out the murder. The plot was disrupted by the July 28, 2022, arrest of Mehdiyev by officers with the New York City Police Department ("NYPD").

Amirov and Omarov sought to carry out this murder plot in return for payment from associates in the Iranian Islamic Revolutionary Guard Corps ("IRGC"), an Iranian military and intelligence organization that is under the direct control of the Supreme Leader of the Islamic

---

[1] The Government is submitting a single consolidated memorandum in support of its five motions *in limine*.

[2] The Government respectfully submits that all of the evidence described in this brief, including with respect to acts directed and/or taken by the GOI, the IRGC, and the Organization, is admissible as direct evidence. The Government hereby provides notice that it also intends to offer this evidence, in the alternative, pursuant to Rule 404(b). The Government will continue to meet with potential witnesses between now and trial, and will supplement this notice as necessary should the Government learn of any additional evidence that it may seek to offer pursuant to Rule 404(b).

Republic of Iran, the Ayatollah Ali Khamenei. The GOI and its intelligence agencies target expatriate Iranians and others living in the United States and around the world, who the regime views as enemies or hostile to its interests, for harassment, kidnapping, or execution. The regime has targeted Victim-1 for bringing international attention to the GOI's human rights abuses; discriminatory treatment of women; suppression of democratic participation and expression; and use of arbitrary imprisonment, torture, and execution to target its political opponents. Victim-1 has sought to mobilize public opinion in Iran and around the world to effect changes to the Iranian regime's laws and practices, including in connection with widespread anti-regime protests in Iran spurred by the September 2022 death of Mahsa Amini while in Iranian police custody.

In approximately 2017 and 2018, the GOI attempted to lure Victim-1 to travel abroad, where Victim-1 could be kidnapped and returned to Iran. Iranian intelligence services had successfully used this strategy to capture two Iranian dissidents residing in France and California. When that plot failed, the Iranian intelligence services arrested one of Victim-1's family members residing in Iran. In approximately 2020 and 2021, Iranian intelligence services plotted to kidnap Victim-1 from within the United States for rendition to Iran and likely execution. In July 2021, following an investigation of that plot, an indictment was unsealed charging an Iranian intelligence officer and three Iranian intelligence assets with kidnapping conspiracy and other offenses based on their participation in the plot. *See United States v. Farahani, et al.*, 21 Cr. 430 (RA) (S.D.N.Y.). As alleged in that indictment, between at least June 2020 and 2021, the defendants conducted online research regarding Victim-1's residence, hired a New York private investigator under false pretenses to procure photographs and video surveillance of Victim-1, Victim-1's home, and

Victim-1's household members on numerous occasions, and researched methods and routes of exfiltration out of New York to Venezuela and Iran.

Following the exposure of the *Farahani* kidnapping plot, a group of Iranian government-affiliated individuals began organizing Victim-1's murder inside the United States. Ruhollah Bazghandi is a Brigadier General in the IRGC who previously served as chief of an IRGC Intelligence Organization ("IRGC-IO") counterintelligence office and is a designated Specially Designated National by the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC").[3] In approximately July 2021, Bazghandi, along with FNU LNU, a/k/a "Haj Taher," Hossein Sedighi, and Seyed Mohammad Forouzan (collectively, the "Bazghandi Network")—each of whom resides in Iran and also has connections to the GOI—researched, monitored, and targeted Victim-1. This time, the GOI hired others to do their dirty work for them. More specifically, the Bazghandi Network contracted members of the Organization, including Amirov and Omarov, as well as co-defendants Mamedov and Mehdiyev, to murder Victim-1. The Organization's participation in the murder-for-hire plot was directed by Amirov, a leader of the Organization who was then residing in Iran. In furtherance of the plot, Amirov directed Omarov, a member of the Organization who was then residing in Eastern Europe; in turn, and together with Mamedov, Omarov directed and collaborated with Mehdiyev, another member of the Organization in the United States.

---

[3] In April 2023, the U.S. Secretary of State designated IRGC-IO as a Specially Designated Global Terrorist under Executive Order 14078, for hostage-taking and the wrongful detention of U.S. nationals abroad. On the same date, OFAC designated Bazghandi in connection with his involvement with the detention of foreign prisoners held in Iran. In June 2023, Bazghandi was again designated by OFAC, under Executive Order 13224, for his participation in IRGC-IO's lethal targeting operations.

On July 13, 2022, Amirov forwarded a targeting package to Omarov on an electronic messaging application, including the location of Victim-1's Brooklyn residence (the "Brooklyn Residence") and other information about Victim-1. Between that date and July 28, 2022, Mehdiyev repeatedly surveilled Victim-1's home, sending photographs and videos to Omarov, which Omarov in turn supplied to Amirov. Amirov and Omarov arranged the delivery of $30,000 in cash to Mehdiyev through an informal money transfer system, or *hawala* network, which Mehdiyev used, in part, to buy an AK-47-style assault rifle with an obliterated serial number. Mehdiyev was arrested on July 28, 2022, when he was stopped by members of the NYPD for a traffic violation and arrested for driving on a suspended license. The assault rifle, 66 rounds of ammunition, latex gloves, a ski mask, and $1,100 in cash were discovered during an inventory search of his car.

Following Mehdiyev's arrest, Omarov and Mamedov continued to communicate with Mehdiyev, and updated each other and Amirov as to the status of the plot against Victim-1 while Mehdiyev was in prison. In the days and months that followed Mehdiyev's arrest, Forouzan communicated with Amirov and, in turn, Forouzan, Sedighi, and Haj Taher communicated with one another about payment for the murder plot and continued to monitor Victim-1. Even following Amirov's and Omarov's arrests overseas in January 2023, the Bazghandi Network continued to monitor and target Victim-1.

## II.    Previous Plots Targeting Victim-1

Victim-1 hosts a Farsi-language news program on Voice of America, which Victim-1 records in Manhattan, and runs several social media activism campaigns focused principally on exposing abuses and repression of human rights, women's rights, and political freedoms by the

GOI, in addition to regularly speaking at conferences, appearing on news media, and meeting with U.S. and international political figures to discuss those topics. The GOI has long sought to retaliate against Victim-1 for her journalism and political activism and to reduce her influence in Iranian society, and for the past several years has pursued plots to kidnap Victim-1 for rendition to Iran or to assassinate Victim-1.

The GOI's efforts to target Victim-1, as well as Victim-1's family members, date back several years. For example, in approximately 2018, Iranian government officials attempted to induce relatives of Victim-1, who reside in Iran, to invite Victim-1 to travel to Turkey, for the apparent purpose of having Victim-1 arrested or detained and transported to Iran for imprisonment. Subsequently, on or about July 29, 2019, the Chief of the Revolutionary Courts in Iran[4] publicly stated that anyone who sends videos considered against the regime—particularly videos contrary to the GOI's criminal laws punishing women and girls who fail to wear mandatory head coverings in public—to Victim-1 is committing the crime of cooperating with a hostile foreign government and will be sentenced to one to 10 years' imprisonment. Later that year, in approximately September 2019, a relative of Victim-1 was arrested on charges based on the relative's purported support for Victim-1's advocacy. Victim-1's relative was later sentenced to eight years' imprisonment, then released on bail conditions. Then, as set forth above, in approximately 2020 and 2021, an Iranian government intelligence network plotted to kidnap Victim-1 from within the United States for rendition to Iran and likely execution. Those efforts resulted in

---

[4] The Revolutionary Courts were established to try ideological opponents of the regime for religious and national security crimes. There is no jury and defendants' access to counsel and evidence is severely limited.

criminal charges in this District.    *See United States v. Farahani, et al.,* 21 Cr. 430 (RA) (S.D.N.Y.)

## III.    The Murder-for-Hire Plot

### A.    The Bazghandi Network Continues to Monitor and Target Victim-1

During the period from approximately July 2021, when the *Farahani* plot was exposed, through at least in or about 2022, Brigadier General Bazghandi, Haj Taher, Sedighi, and Forouzan researched, monitored, and targeted Victim-1, in furtherance of the GOI's targeting efforts.  For example, on or about July 16, 2021—within days of the exposure of the kidnapping plot— Bazghandi watched a YouTube video, with the title, in Farsi, "The Islamic Republic of Iran plans to transfer [Victim-1] to Iran."    Between then and approximately July 2022, when Amirov, Omarov, Mehdiyev, and Mamedov were actively plotting to murder Victim-1, as described in more detail below, other members of the Bazghandi Network researched and gathered intelligence against Victim-1: Forouzan conducted numerous Internet searches for Victim-1, and for various aliases used by Amirov; Haj Taher searched for the price of dollars in the United States and the time difference between New York and Iran; and Sedighi saved screenshots of a Google search for "Liberty Chemist," a business located approximately a tenth of a mile from Victim-1's residence in Brooklyn, New York, which Mehdiyev later surveilled and near where he was later arrested.

### B.    The Bazghandi Network Engages the Defendants, Members of the Russian Mob, to Murder Victim-1

As part of this effort, members of the Bazghandi Network also researched the individuals they contracted to carry out the murder of Victim-1, including Amirov.   Amirov appears to have been selected based on his leadership position in the Russian Mob, connections with individuals

related to the Bazghandi Network, his Iranian residence. Amirov in turn recruited Omarov, who, along with Mamedov, conveyed instructions and intelligence to Mehdiyev in furtherance of the plot to murder Victim-1.

Amirov, Omarov, Mehdiyev, and Mamedov are part of an association-in-fact of various members of the Russian Mob—the Organization. Together, they engage in a variety of criminal activity in the United States and abroad, including theft, extortion, assault, kidnapping, and murder. Amirov is a *vor* or "Thief-in-Law," a high-ranking member of the Russian Mob. Omarov and Mehdiyev are *bradiyaga,* a leadership rank below *vor.* Mamedov is Omarov's close associate and bodyguard, and also a member of the Russian Mob. Amirov, Omarov, Mehdiyev, and Mamedov, along with others, comprise a sub-group within the Russian Mob based on shared loyalties, common rivals, and joint criminal efforts, and constitute the racketeering enterprise described in Indictment S8 22 Cr. 438 (CM). ( Dkt. Entry 80.)

Specifically, this subset of individuals comprising the Organization initially became associated through their shared loyalty to Nadir Salifov, a/k/a "Lotu Guli," a powerful and notorious *vor*.[5] Mehdiyev and Omarov became *bradiyaga* under Salifov; and Amirov was made a *vor* by Salifov. Mehdiyev came to the United States in approximately October 2017, and worked to establish a Russian Mob network in New York operating under Salifov's protection and authority. When Salifov was assassinated in August 2020, Mehdiyev allied with Salifov's brother,

---

[5] According to media reports, Salifov served approximately 15 years in an Azerbaijani prison following a murder conviction. Salifov reportedly continued to play a leadership role in the Russian Mob from prison and, in fact, grew in stature. Following his release in approximately 2017, Salifov reportedly relocated to Turkey, where he resided until his assassination on August 19, 2020.

Namik Salifov; and also formed alliances with other members of the Russian Mob loyal to Nadir Salifov, including Omarov.  Omarov and Mehdiyev participated in numerous kidnapping and murder plots in foreign countries to enrich themselves and to strengthen their reputations and standing within the Russian Mob, with the ultimate goal of elevating themselves to *vor* status.

Members of the Organization, including the trial defendants, Amirov and Omarov, frequently refer to each other as "Ogru," or "Thief," in Azeri; and mark themselves as members of the Organization with tattoos of eight-pointed stars and the use of symbols of eight-pointed stars in photographs, videos, and elaborate portrait cakes of members of the Organization, as shown in the pictures of Amirov (left) and Omarov (right) below.

  

Amirov                              Omarov

The Organization engaged in racketeering activities prior to and at the time of their attempted murder of Victim-1.   In particular, in approximately 2021 and 2022, Amirov, Omarov, Mehdiyev, and Mamedov participated in various extortion plots targeting restaurant and small business owners in Brooklyn. One of the targets of these extortion plots was an ethnic Azeri

grocery-store owner in Brooklyn ("Victim-2").[6]  In approximately 2021, another Russian Mob associate asked Mehdiyev to help pay off a debt he owed through extortion, and identified Victim-2 as the extortion target.   Mehdiyev asked Omarov to make the demand so that Mehdiyev was not exposed to the extortion plot.  While Omarov engaged in numerous phone calls and electronic communications threatening Victim-2 and demanding money, Mehdiyev and a co-conspirator ("CC-1") set fire to Victim-2's car and, on March 7, 2022, Mehdiyev and another associate of his ("CC-2") drove to Victim-2's grocery store where Mehdiyev shot Victim-2's parked car several times.

### C.   Amirov, Omarov, Mehdiyev, and Mamedov Attempt to Assassinate Victim-1

In approximately early June 2022, Omarov told Mehdiyev that he had a better job than the plot to extort Victim-2 that they should pursue, referring to the murder-for-hire plot targeting Victim-1.  According to Omarov, if successful, this murder could lead to additional lucrative murder jobs for the Organization, both enriching its members and increasing their status and influence within the Russian Mob.

On or about July 13, 2022, Amirov sent Omarov electronic communications, addressing Omarov as "Brother,"[7] which evidenced Amirov tasking Omarov to carry out the plot.   Those messages included a screenshot depicting a Google Maps image of Victim-1's residence, the message "New York", a photograph showing the address of the residence, a second screenshot of

---

[6] Omarov, Mamedov, and Mehdiyev are charged for this conduct in the U.S. District Court for the Eastern District of New York. *See United States v. Polad Omarov,* No. 22-CR-482 (PKC).

[7] Mehdiyev, Omarov, Mamedov, and Amirov's electronic communications were principally in Azeri, and descriptions and quotes in this memorandum reflect English translations prepared by FBI linguists.

a Google Maps image of the residence from a different angle, and two publicly available photographs of Victim-1.   The images Amirov sent to Omarov were forwards, that is, Amirov received the messages from another WhatsApp account and forwarded them to Omarov.   The screenshots of the Google Maps images of Victim-1's residence show the date, time, and battery level of the capturing device in Farsi—the language spoken in Iran.

After sending these messages and images, Amirov sent Omarov a message that "They did not get in touch."   Omarov responded that "They will send me pictures in 2-3 hours from there." Omarov informed Amirov that "I have sent them, they are on their way.   There are 2 hours distance between them."   During these communications, Mehdiyev primarily resided in Yonkers, which is approximately a one-and-a-half to two hours' drive from Victim-1's residence in normal traffic.   A few hours after these messages, on July 14, 2022 at approximately 1:40 a.m., Omarov received two photographs from Mehdiyev showing Victim-1's home at night from a vantage point across the street, and a video showing the front yard and exterior of Victim-1's home taken by Mehdiyev as he walked down the sidewalk.   A few hours later, Omarov forwarded these initial surveillance images and video to Amirov.

After receiving the surveillance images and video, Amirov texted Omarov directing him to get in touch urgently.   Omarov and Amirov then arranged to deliver $30,000, representing partial payment for the planned attack on Victim-1, to Mehdiyev.   On or about July 15, 2022, Mehdiyev sent Omarov a message containing a phone number used by Mehdiyev and a picture of another individual's driver's license and name, who would help Mehdiyev collect the money.   Omarov sent this information to Amirov.  On July 18, 2022, Amirov sent Omarov a phone number with a New York City mobile area code, along with two voice notes with instructions that the money was

ready and to call the phone number in order to get it.   The messages were forwards: Amirov had received the number and voice note messages from another WhatsApp account and then forwarded them to Omarov.   Omarov then forwarded the messages to Mehdiyev, who travelled to Brooklyn and collected $30,000 in cash.   Afterward, Mehdiyev sent Omarov a photograph showing several rubber-banded bundles of U.S. currency partially removed from a black plastic bag.   Omarov then informed Amirov that they had picked up the money.   Amirov replied, "Let God help him, Amen, God willing!"—an expression of hope that Mehdiyev would have success in carrying out the operation.



On or about July 18 and 19, 2022, at Omarov's instruction, Mehdiyev sent approximately $10,000 to Bulgaria by way of two $5,000 transfers and also sent $1,500 to Mehdiyev's brother in Azerbaijan.   Mehdiyev also procured a Norinco AK-47-style semiautomatic assault rifle using some of the remaining $18,500.

The following week, between July 20 and 28, 2022, Mehdiyev traveled repeatedly between his Yonkers residence and Brooklyn to surveil Victim-1, Victim-1's family members, and the

residence.    During this time, Mehdiyev communicated regularly with Omarov and Mamedov, reporting on his surveillance and transmitting videos and photographs of Victim-1's house and Mehdiyev's surveillance activities.    Omarov, in turn, forwarded Mehdiyev's reports, photographs, and videos to Amirov.

The Organization's efforts to target Victim-1 intensified in the days that followed.    On or about July 23, 2022, Mehdiyev sent Mamedov a video taken on the front porch of Mehdiyev's Yonkers residence, showing the assault rifle located inside a suitcase and displaying two loaded magazines of ammunition, pictured below:

 

Also that day, the morning of July 23, 2022, Omarov instructed Mehdiyev to "Say God's name and go after your business."    Mehdiyev replied that he was leaving to go to the Brooklyn Residence and, approximately two-and-a-half hours later, sent Omarov Google Maps images of the neighboring house to the Brooklyn Residence.    Omarov sent the pictures to Amirov, who

replied, "God willing we will hear some good news."   The next morning, July 24, 2022, Omarov sent a message to Mehdiyev asking where Mehdiyev was.   Mehdiyev responded, "crime scene." Omarov responded, "Ok. You are the man"   Mehdiyev sent Omarov the message, "We blocked it from both sides, it will be a show once she/he[8] steps out of the house."   Omarov forwarded this message to Amirov, who replied, "God willing."   Omarov also messaged Mehdiyev, "God willing."   However, on that day, July 24, Victim-1 and Victim-1's household members were out of town.  Mehdiyev returned to Victim-1's neighborhood again on July 25, 26, 27, and 28, 2022, reporting on household activity.  Omarov relayed these reports to Amirov.

In the days prior to Mehdiyev's July 28, 2022 arrest, Omarov told Mehdiyev that he (Omarov) had spoken with Iran and that high-level people were waiting and were expecting something to happen; indeed, at one point, Omarov told Mehdiyev that "they" were getting Victim-1's location from Victim-1's phone.   Members of the Bazghandi Network were assisting the surveillance efforts during this time.   For example, on or about July 26, 2022, Forouzan conducted repeated Internet searches for the local time in New York and image searches for Victim-1's spouse, which resulted in numerous images of Vicitm-1 and Victim-1's spouse and other family members.   Some of these same images were forwarded by Amirov to Omarov, apparently to assist Mehdiyev in determining whether other individuals in the area around Victim-1's residence were household members.  On July 27, 2022, Amirov messaged Omarov that "he/she was talking on the phone from 5:40 till 5:50 in the morning, Iranian time, by the door," consistent with Omarov's statement that their Iranian co-conspirators had access to information

---

[8] Azeri has one third-person singular pronoun that does not distinguish between masculine and feminine.  In context, this and other similar references described herein plainly refer to Victim-1.

from or about Victim-1's cellphone.

Amirov also proposed strategies to lure Victim-1 to the door, suggesting that if Mehdiyev was at the Brooklyn Residence with a girl (as Mehdiyev had suggested in an earlier message), that the girl should take a flowerpot from the front porch.    Later on July 27, Amirov confirmed to Omarov that Victim-1 was home, again suggesting that Amirov had access to other sources of information about Victim-1's whereabouts.    Omarov assured Amirov that "[t]he matter will be over today, brother.  I told them to make a birthday present for me. I pressured them. They will sleep there this tonight. In the car."[9]    Amirov sent Omarov an image of two hands pressed together in prayer, as well as links to Victim-1's social media accounts and screenshots of an online live stream Victim-1 was conducting at that time.    Later the evening of July 27, Mehdiyev reported there was no more activity inside the house, and Omarov instructed Mehdiyev to go get some rest and return the next day.    Omarov told Mehdiyev that Victim-1 would go to the studio that day (referring to Victim-1 recording Victim-1's news program for Voice of America) and "we will be informed."

The next day, on July 28, the next day, Mehdiyev returned to the area outside Victim-1's residence.  Throughout the morning and early afternoon, Mehdiyev and Omarov exchanged messages about who was at the house that day and Mehdiyev asked if he should confirm Victim-1's identity by sending Omarov a picture.  In the afternoon, Mehdiyev sent Omarov a video recording of a view through the window of the car Mehdiyev was driving, showing a suitcase in the back seat.  Mehdiyev pulled the front flap of the suitcase open to display the AK- 47-style assault rifle, and sent the video (a still image is below) to Omarov with a caption stating, "I am ready" and that

---

[9] Omarov's birthday is July 30.

"he/she should just come out[,] that's it."



Omarov forwarded the video to Amirov, who replied that Mehdiyev should "keep the car clean," apparently meaning that Mehdiyev should not conduct the shooting from inside the car in order to prevent forensic evidence of the murder.    On the same date, prior to Mehdiyev's arrest, Haj Taher searched for, "voa offices in Brooklyn," an apparent reference to "Voice of America," where Victim-1 records.

**D.   Mehdiyev Is Arrested**

During the course of that day, July 28, Victim-1 observed a man outside Victim-1's house and was alarmed by his behavior.    Victim-1 left the residence at approximately 2:40 p.m.    Mehdiyev left the area approximately 15 minutes later.    While driving away from the

house, Mehdiyev was stopped by NYPD officers after failing to stop at a stop sign.[10]    NYPD

officers determined that Mehdiyev was driving with a suspended license and arrested him on

that basis.    During an inventory search of the car at the 70th Precinct, the apprehending

officers found the assault rifle inside the suitcase, along with approximately $1,100 in cash

consisting of eleven $100 bills.    The assault rifle was loaded and had two magazines with a

total of approximately 66 rounds of ammunition.    The serial number was obliterated, as shown

in the lighter-colored abraded metal portion of the photograph below.    A black ski mask was

also inside the car.



Following his arrest, Mehdiyev was detained pending trial and held at the Metropolitan

Detention Center in Brooklyn, New York (the "MDC").

---

[10] The FBI, which had become aware during the day of Mehdiyev's concerning behavior, notified the precinct covering Victim-1's home about the situation.    The officers conducted the stop following the moving violation in order to learn the driver's identity, and proceeded to arrest Mehdiyev when learning that he was driving on a suspended license.

Amirov and Omarov were not immediately aware of Mehdiyev's arrest, and the two exchanged messages expressing concern about the lack of news from Mehdiyev.    Omarov and Mamedov threatened Mehdiyev and his family members in Azerbaijan if Mehdiyev did not contact them.    In response to explicit threats to Mehdiyev's parents and brother, Mehdiyev obtained access to a contraband cellphone at the MDC and sent photographs and videos from inside his jail cell, including his prison identification card, to Mamedov, who forwarded them to Omarov.    On August 3, 2022, Mamedov also forwarded to Omarov several voice notes about Mehdiyev, saying that Mehdiyev "went to kill the journalist" but "they caught him" and "now they will fuck him."    A second voice note continued, "No, no, bro, there is an Iranian journalist in America, a girl.    He went after her."    In another voice note, the speaker said, "I sent it to them, he went after the Iranian journalist.    He can't even hit a girl but when he speaks … I swear, what a miserable person." Shortly after receiving these, Omarov in turn forwarded them to Amirov.

On August 7, 2022, Amirov and Omarov exchanged messages about press coverage of Mehdiyev's arrest.    Amirov wrote to Omarov, "He has become popular, brother."    Omarov responded, "I hope he will not make trouble for me."

### E.    The Bazghandi Network Monitors Victim-1 and the Fallout of Mehdiyev's Arrest

The Bazghandi Network's intense interest in seeing the murder plot to fruition was further demonstrated by its members' activity in the immediate aftermath of Mehdiyev's July 28, 2022, arrest.    On or about August 1, 2022, Forouzan searched for a video titled, in Farsi, "Khamenei's envoy to [Victim-1], who was caught by the American police."    "Khamenei" is an apparent reference to the Supreme Leader of Iran, Ayatollah Ali Khamenei, who ultimately controls the IRGC.    In the days and weeks that followed, Forouzan, Sedighi, and Haj Taher conducted

similar searches about Victim-1, the status of Mehdiyev's prosecution, information about Amirov, and, tellingly, the defendants charged in *Farahani*.    For example, on or about August 13, 2022, Forouzan conducted Internet searches for Mehdiyev's court proceedings and viewed a social media post by Victim-1 discussing Mehdiyev's arrest.

### F.   Amirov and Forouzan Continue to Communicate about Victim-1

From in or about September through December 2022, Forouzan was in regular contact with Amirov.    On September 17, 2022, Amirov and Forouzan had a phone call which lasted for approximately six minutes.    Approximately five minutes later, Forouzan sent an image to Amirov.[11]  Less than a minute later, Amirov forwarded to Omarov a message containing a screen capture of Victim-1's face taken from a video stream of an online appearance by Victim-1, which occurred near the time the image was forwarded.  That message was the only image file exchanged between Amirov and Omarov on September 17, 2022.    Amirov had phone calls with both Forouzan and Omarov following the image exchanges on or about September 17, 2022.

A few days later, on or about September 21, 2022, Amirov and Forouzan exchanged several phone calls.   During the overlapping time period, Forouzan sent an image file to Amirov.  Shortly after receiving the image file, Amirov sent Omarov a forwarded four-part composite image which included a still image of Mehdiyev on Victim-1's porch, shortly before he intended to murder Victim-1; a cover of a news publication depicting Victim-1, with the headline, "'Terror' Plot in B'klyn"; a still image from a media interview of Victim-1 which appended Farsi text; and a

---

[11] The evidence of Forouzan's communications with Amirov is derived a pen register data, which reflects the time and type of the communication but does not include the content. From the circumstances, however, it is clear that the image Forouzan sent Amirov is the image Amirov then forwarded to Omarov.

screenshot of a web service purporting to monitor a web site containing information about the charges against Mehdiyev.  Amirov did not received any other image files between the time he received the image file from Forouzan and the time he sent the forwarded composite image to Omarov.

In addition to Amirov and Forouzan's communications exchanging images of Victim-1's and information about Mehdiyev's arrest, Forouzan's electronic accounts contained multiple contact entries for Amirov, as well as a number of photographs that appear to be travel documents—including airplane tickets to and from Iman Khomeini International Airport, the primary airport of Tehran—for "Farkhaddin Mirzoev," one of Amirov's aliases.

### G.  The Bazghandi Network Continues its Efforts to Target Victim-1

In or about September and October 2022, Haj Taher, Sedighi, and Forouzan exchanged electronic messages about payment for the murder:

- On or about September 27, 2022, Sedighi sent an electronic message, in Farsi, asking whether Haj Taher received a number used by Forouzan on the electronic messaging system WhatsApp, and stating, "If they contact them directly, it is much better[.]"

- On or about October 4, 2022, Sedighi sent an electronic message, in Farsi, that read, "Hello Seyed, this is addressed to you, your masters and your mafia.    If until Saturday this does not get concluded, then there is nothing left between us to discuss and it will be out of our hands.   You must return the deposit amount, otherwise the consequences will affect all of you.   Until Saturday then.   With thanks, Sedighi." This message, addressed to [Seyed] Forouzan and signed by Sedighi, was sent to Haj Taher.   The Saturday following October 4, 2022, was October 8, 2022.   On or about  October  7,  2022,  Haj Taher conducted  a  Google  search,  in Farsi,  for Victim-1's name.

- On or about October 9, 2022, Sedighi sent an electronic message to Haj Taher, in Farsi, which read, "Hello Haj Taher, thank you for taking this load off of my shoulders for the time being, because I have not had a peaceful day due to your money.   I don't want to be in your debt."    Later that day, also on or about October 9, 2022, Haj Taher

responded, writing to Sedighi, in Farsi, "Hello, don't worry, our load is on your shoulders.    I am sorry.  May God be kind to you and yours."

### H.    Amirov and Omarov are Arrested and the Plot is Exposed Publicly

On or about January 4, 2023, authorities in the Czech Republic arrested Omarov and Mamedov.    On January 26, 2023, Amirov was taken into custody in this District.    On or about January 27, 2023, Indictment S4 22 Cr. 438 (CM), Dkt. 22, was unsealed, publicly charging Amirov, Omarov, and Mehdiyev for their roles in the plot to assassinate Victim-1.

In the months following the arrests of Amirov, Omarov, and Mamedov, and the public exposure of the Organization's plot, at the direction of the GOI, to assassinate Victim-1, members of the Bazghandi Network continued to monitor the prosecution of the Organization defendants and continued to target Victim-1.   For example, on or about January 28, 2023, the day after charges against Amirov, Omarov, and Mehdiyev relating to the murder-for-hire plot were unsealed, Bazghandi searched for a phrase, in Farsi, which translates to, "The moment of the arrest of the accused [Mehdiyev]."   Approximately two months later, between on or about March 8 through 11, 2023, Haj Taher conducted Internet searches for Victim-1's family members; on or about March 15, 2023, Sedighi sent an image of Victim-1's address; and, on or about May 1, 2023, Bazghandi conducted an Internet search, in Farsi, for, "a person in the house of [Victim-1] movie," and, on the same date, watched a video with the title, "A video of the arrested gunman in front of [Victim-1]'s home in New York received by VOA."

IV.    **The Defendants' Post-Arrest Admissions**[12]

A.    **Amirov**

On January 25, 2023, Amirov was taken into custody, waived his *Miranda* rights, and made incriminating statements to law enforcement.  For example, when asked to provide his name, Amirov initially resisted providing his name, indicated that he used multiple names and passports, and ultimately acknowledged that his true name is Rafat Amirov and that his passport has a false name, "Mirzoev."  Amirov also admitted that he was "wanted" in Russia for murder, but denied coming any such act and theorized that Russian authorities were "just suspecting me" because he looked like someone else and that it was "[j]ust my luck."  Amirov acknowledged having been arrested in the past, but he was released when the arresting authorities looked at his passport, bearing a false name, and let him go because that name was "clean." Among other things, Amirov also resisted identifying the phones he used, claimed that he broke his phone during his arrest, claimed he had a lot of "acquaintances" in the United States but denied knowing Mehdiyev, and claimed that he was not involved in the plot to murder Victim-1.

After Amirov arrived in the United States, he was ordered detained pending trial. While in custody, Amirov made statements to another inmate, who is a cooperating witness ("CW-1"). Amirov acknowledged to CW-1 that he (Amirov) was involved both in the effort to extort Victim-2 and the murder-for-hire plot against Victim-1.  Amirov told CW-1, among other things, that Victim-2 had offered to pay Amirov $200,000 to solve Victim-2's issues with Omarov, and that

---

[12] The post-arrest interviews of both Amirov and Omarov were conducted in Russian.  At trial, the Government expects to seek to admit portions of translations of the recordings of those interviews, completed by a Federally Certified Russian linguist.

Victim-2 had been making payments to Omarov in the amounts of approximately $10,000 to $15,000. Amirov further told CW-1, among other things, that the contract for killing Victim-1 was worth $500,000, and that Amirov had been paid $100,000 before he was arrested. Amirov also told CW-1 that, when Omarov caused money to be transferred from the United States to Bulgaria, it was for Omarov's girlfriend. Amirov also blamed Omarov for his arrest because Amirov believed Omarov had recorded everything on his cellphone. Amirov claimed that he was trying to engineer criminal charges against himself in Azerbaijan so that he could be extradited back to Azerbaijan, apparently based on the belief that he would not be held in prison in Azerbaijan. Amirov later contacted CW-1 using contraband cellphones and told CW-1, among other things, that he (Amirov) knew that someone was telling on him, implying that he believed it was CW-1.

### B. Omarov

On February 7, 2024, after Czech authorities granted an extradition request made by the United States. Omarov was subsequently taken into custody by FBI agents in the Czech Republic. During a flight from the Czech Republic to the United States, Omarov waived his *Miranda* rights, and made incriminating statements to law enforcement.

In particular, Omarov made numerous statements indicating his close association with members of the Russian Mob generally and the Organization specifically; his own status as a "thief": his relationship with co-conspirators, including Mehdiyev and Mamedov; and that he participated in the extortion of Victim-2. For example, Omarov described his close relationship with Nadir Salifov, a/k/a "Guli," describing Nadir Salifov as "my brother," who was a "high level thief" killed in Turkey and that Omarov "was the closest person to him." Similarly, Omarov made

numerous statements about other members of the Organization, including Mamedov and Murad Akhundzada. Further, Omarov described himself as, an "Azerbaijani thief," claiming that he had attained that status from Nadir Salifov. During the course of the interview, Omarov also demonstrated his knowledge of common terms and concepts used in the Russian Mob, such as ranks, like *vor* and *bradiyaga*, and the use of initiation ceremonies called *skhodkas* to elevate members of the Russian Mob to *vor* status.

## V.    The Charges

The superseding indictment, S8 22 Cr. 438 (CM) ("Indictment") charges Amirov and Omarov with murder for hire (Count One) and conspiracy to commit murder for hire (Count Two), each in violation of 18 U.S.C. § 1958; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956 (Count Three); attempted murder in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(5) (Count Four); and aiding and abetting the use and possession of a firearm during and in relation to and in furtherance of the attempted murder in aid of racketeering, in violation of 18 U.S.C. § 924(c) (Count Five).

After Omarov was extradited to the United States, superseding indictments S7 22 Cr. 438 and S8 22 Cr. 438 were filed, adding attempted murder in aid of racketeering (Count Four) and firearms use and possession in connection with that (Count Five) to the charges against Omarov and Amirov. (*See* Dkt. 71). Because Omarov was extradited on the charges in an underlying indictment, the Government has asked the Czech Republic to waive the Rule of Specialty as to Counts Four and Five. The Czech Republic has not yet granted the waiver, and if the waiver is not granted prior to trial the Government may seek to sever Counts Four and Five as to Omarov from the trial of the remaining charges against both defendants. The evidence described in this

memorandum remains admissible against Omarov with respect to the other counts with which he is charged.

## ARGUMENT

### I.    Evidence of the GOI's Involvement in Targeting Dissidents Outside Iran, Including Victim-1, is Admissible as Direct Evidence and Pursuant to Rule 404(b)

The evidence at trial will establish that the motivation for the murder-for-hire plot against Victim-1 was the GOI's long-standing desire to silence and kill Victim-1. Individuals affiliated with the GOI hired Amirov to complete that mission, which the GOI had failed to accomplish in its prior efforts through other means. Amirov engaged another member of the Organization, Omarov; who in turn worked with Mamedov to task Mehdiyev to assassinate Victim-1. Amirov, Omarov, Mehdiyev, and Mamedov participated in the plot for financial gain and also because they hoped to maintain or increase their standing in the Russian Mob writ large—in the case of Amirov, maintaining and protecting his *vor* status; and, for Omarov, Mehdiyev, and Mamedov, enhancing their reputation and standing with the ultimate goal of becoming *vors*, and to gain additional lucrative opportunities in the future. And the reason the Organization was hired to kill Victim-1 was clear: the GOI's desire for Victim-1 to be silenced and killed.

Accordingly, evidence of the GOI's animus toward Victim-1 and prior targeting of Victim-1, including attempting to lure Victim-1 to a third country for kidnapping, targeting Victim-1's family, the *Farahani* kidnapping plot, and, ultimately, the GOI's direction of the murder-for-hire plot, is admissible at trial, as direct evidence and pursuant to Rule 404(b), in order to establish the nature of the murder-for-hire conspiracy and the attempted murder in aid of racketeering and Amirov's and Omarov's roles in those efforts, the relationship between co-conspirators, and Amirov's and Omarov's motive and intent.

The Government also intends to offer expert testimony about the GOI's targeting of dissidents and enemies outside of Iran, which is a systematic part of the GOI's foreign and domestic policy. As described below, this evidence is relevant and probative because it explains the scope and nature of the conspiracies charged in this case; explains why the Organization was attempting to murder Victim-1, which otherwise would be a source of confusion and mystery to the jury and is an essential part of the Government's narrative at trial; and will help the jury to understand that an intelligence agency-driven plot to murder a journalist in the United States— which might otherwise sound far-fetched to a lay jury—is, in fact, entirely consistent with the GOI's demonstrated history of using violence and threats of violence against dissidents and perceived enemies, and of using criminal cut-outs to preserve a patina of deniability for its conduct.

### A.  The Anticipated Evidence

The Government expects to introduce lay witness and expert witness testimony, as well as documentary and electronic evidence, demonstrating the GOI's targeting of dissidents outside Iran, including Victim-1.  This evidence falls broadly into three categories: first, evidence of the GOI's involvement in the July 2022 murder-for-hire plot, specifically, evidence of the Bazghandi Network's role in the attempted murder; second, evidence of the GOI's longstanding targeting of Victim-1; and, third, evidence of the GOI's broader policy history and of targeting dissidents and foreign nationals for intimidation, kidnapping, and murder.

Expert testimony will establish that, shortly after the 1979 Islamic Revolution in Iran, the revolutionary leadership embarked on a campaign to assassinate Iranian dissidents and former Iranian officials who served under the Shah of Iran, the leader of the previous, monarchical regime. Since then, the GOI has engaged in assassination, abduction, and intimidation plots targeting

regime opponents across the world. The GOI does that, in part, through the IRGC. The IRGC is an Iranian military and intelligence agency under the authority of Iran's Supreme Leader and is composed of ground, naval, and air forces, as well as other components, including an internal militia (the "Basij") and the IRGC-IO. The IRGC and the IRCG-IO have been designated by OFAC and the U.S. Secretary of State in connection with, among other things, their support of terror and human rights abuses. The IRGC-IO, in particular, operates as a domestic and international unit focused on targeting journalists, activists, dual Iranian nationals, and others who oppose the abuses and human rights violations perpetrated by the Iranian regime—people like Victim-1. The IRGC views Victim-1, and individuals like Victim-1, as threats to undermine the legitimacy and authority of the IRGC and the Islamic Revolutionary GOI. For example, Victim-1's support for women's rights, including opposition to compulsory hijab laws, and condemnation of the regime's human rights abuses generally, in the IRGC's view, empowers Iranians to oppose the government's theocratic dictatorship and undermines the authority of the regime.

The IRGC accomplishes its goal of silencing dissidents living outside Iran through a spectrum of activity, including intimidation and harassment, rendition, and assassination. IRGC-led plots against dissidents in recent years include, for example, those against prominent regime critics Ruhollah Zam and Jamshid Sharmahd. In October 2019, Iranian national Ruhollah Zam, a resident of France with refugee status, was lured by Iranian intelligence services to leave France. While traveling abroad, Zam was captured by Iranian intelligence services, and, thereafter, imprisoned in Iran and executed by the GOI in December 2020. The GOI and IRGC have publicly acknowledged responsibility for capturing Zam. Jamshid Sharmahd, a lawful resident of the United States, was similarly captured by Iranian intelligence services while traveling abroad. In a

broadcast on Iranian state-owned television on or about August 1, 2020, the Iranian Minister of Intelligence and head of the Iranian Ministry of Intelligence ("MOIS"), Mahmoud Alavi, publicly claimed MOIS's responsibility for Sharmahd's capture, describing it as one of many "complex operations in striking dissidents." Sharmahd was imprisoned in Iran and convicted, in a show trial, of terrorism offenses. He was executed by Iran in October 2024, approximately a week after Indictment S8 22 Cr. 428 (CM) was unsealed, charging the Bazghandi Network defendants as part of the murder-for-hire plot targeting Victim-1.

The GOI's targeting of Victim-1 specifically has included, as described above, a failed attempt to lure Victim-1 to travel that occurred during the same time period the GOI successfully captured Zam and Sharmahd. At the time, Iranian state-owned media publicly and explicitly linked Zam and Sharmahd to Victim-1 and advocated for Victim-1's capture as well. That targeting also included the arrest of a family member for charges based on the family member's supposed support for Victim-1's advocacy campaigns; the public announcement by the head of Iran's Revolutionary Courts that Victim-1 is an agent of a hostile power (*i.e.*, an agent of an enemy nation) and that Iranians who provide Victim-1 with photographs or videos depicting individuals resisting compulsory hijab laws or other oppressive laws will be imprisoned; and even the Supreme Leader of Iran publicly denouncing Victim-1. Victim-1 regularly suffers death threats, smear campaigns, and abuse levied on social media and in Iranian television and newspapers from GOI officials and individuals affiliated with the GOI.

## B.  Applicable Law

### 1.  Direct Evidence of the Defendants' Guilt

Relevant evidence "need only tend to prove the government's case," such as "evidence that

adds context and dimension to the government's proof of the charges." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, background evidence is relevant and admissible, pursuant to Rule 401, where it tends "to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." *Id.* (internal quotation marks omitted). Evidence is also admissible if it relates to conduct that: (i) "'arose out of the same transaction or series of transactions as the charged offense'"; (ii) "'is inextricably intertwined with the evidence regarding the charged offense'"; or (iii) "'is necessary to complete the story of the crime on trial.'" *United States v. Gohari*, 227 F. Supp. 3d 313, 317 (S.D.N.Y. 2017) (quoting *United States v. Robinson*, 702 F.3d 22, 36-37 (2d Cir. 2012)). "Evidence fitting within one of these three categories is considered direct evidence and Rule 404 is not applicable." *United States v. Fiumano*, No. 14 Cr. 518 (JFK), 2016 WL 1629356, at *3 (S.D.N.Y. Apr. 25, 2016).

### 2. Other Acts Evidence Pursuant to Rule 404(b)

Under Rule 404(b), courts "may allow evidence of other acts by the defendant if the evidence is relevant to an issue at trial other than the defendant's character and if the risk of unfair prejudice does not substantially outweigh the probative value of the evidence." *United States v. Ulbricht*, 79 F. Supp. 3d 466, 479 (S.D.N.Y. 2015). "This Circuit follows the inclusionary approach, which admits all other act evidence that does not serve the sole purpose of showing the defendant's bad character and that is neither overly prejudicial under Rule 403 nor irrelevant under Rule 402." *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011) (internal quotation marks omitted). In general, evidence is admissible under Rule 404(b) "if (1) it is introduced for a proper purpose, (2) it is relevant to the charged offense, (3) its prejudicial effect does not substantially

outweigh its probative value and (4) is admitted with a limiting instruction if requested." *United States v. Rutkoske*, 506 F.3d 170, 176-77 (2d Cir. 2007).

## C. Discussion

Each of these is relevant and probative of the charges against Amirov and Omarov. Indeed, this evidence is necessary in order for the jury to make any sense of why members of the Russian Mob living in Europe and Iran sought to murder a journalist and human rights activist residing in New York city and to contextualize evidence of how that plot was carried out, including the use of intelligence and targeting information supplied by Iranian sources and the enormous $500,000 bounty placed on Victim-1.

*First,* evidence of the Bazghandi Network's involvement in the murder-for-hire plot is directly relevant to the scope and nature of the charged conspiracies. The Bazghandi Network defendants are charged co-conspirators of Amirov and Omarov, and evidence of their roles in the charged offenses is directly relevant to the existence and nature of the murder-for-hire conspiracy with which Amirov, Omarov, and the Bazghandi Network defendants all are charged. Evidence obtained from searches of Amirov's, Omarov's, and the Bazghandi Network defendants' cloud accounts as well as pen register data from electronic communication applications used by the co-conspirators will demonstrate, among other things, that the Bazghandi Network's interest in targeting Victim-1 and using Amirov's organization as the tool for carrying out that targeting was the background for Amirov's and Omarov's hiring into the plot; and will further show that the Bazghandi Network continued to supply Amirov and Omarov with targeting information and intelligence about Victim-1 as the Organization defendants attempted to carry out that murder. After the murder-for-hire plot was disrupted and exposed through the arrests of Mehdiyev,

Amirov, and Omarov, members of the Bazghandi Network continued to research Victim-1 as well as news coverage of the arrests and prosecution.

*Second*, evidence of the GOI's history of targeting Victim-1 is, similarly, directly relevant to the motive for the murder-for-hire plot. *See, e.g.*, *United States v. Cedeno*, 756 F. App'x 24, 28 (2d Cir. 2018) (summary order) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) ("[e]vidence of uncharged criminal activity can be admitted as direct evidence under Rule 403 . . . if it is inextricably intertwined with evidence regarding the charged offenses, or if it is necessary to complete the story of the crime at trial."). Without that history, the jury is likely to be just as confused about why Iranian nationals residing in Iran and affiliated with intelligence services would target Victim-1 as they would be by why Russian Mobsters would target Victim-1. This history is relevant because it explains why the Bazghandi Network was involved in the murder-for-hire plot and why the GOI used the Russian Mob to try to carry out that murder. The GOI's prior efforts to intimidate, kidnap, or kill Victim-1 all had failed, and several of its efforts had been publicly exposed, including the GOI's attempt to execute a lure and arrest operation against Victim-1 similar to the successful captures of Zam and Sharmahd; the GOI's arrest of Victim-1's family member; and the Iranian intelligence-driven kidnapping plot in *Farahani*. The GOI's use of a criminal network as a tool of violence in order to insulate itself from responsibility for the murder, should the attempt fail, represents a response to those prior, publicly exposed, failures. *See, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491, 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[W]here potential evidence explains the development of the illegal relationship . . . and explains the mutual trust that existed between the coconspirators, it will be plainly admissible." (internal quotation marks omitted)); *cf. United States v. Robles*, 193 F.3d 519, 1999 WL 707902,

at *7 (5th Cir. 1999) (finding evidence sufficient in drug-trafficking case where jury could infer that defendant "intend[ed] to pay bribes or otherwise provide protection to the [drug-trafficking organization] by finding out whether members of the organization were targets of police investigations"); *see also United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust").

*Finally*, evidence of the GOI's history of targeting dissidents and its *modus operandi* is relevant and helpful for the jury to understand the charged murder-for-hire plot. *See, e.g.*, *United States v. Diaz*, 176 F.3d 52, 79-80 (2d Cir. 1999) ((evidence of "uncharged acts may be admissible as direct evidence of the conspiracy itself") (quoting *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997)). A jury comprised of average New Yorkers may well struggle to accept the plausibility of a foreign government intelligence plot to murder a journalist living in the United States and a foreign government's use of a criminal network to carry out that murder. That kind of plot is entirely foreign to the American system of government and common experience. But what sounds fantastical to our ears is tragically commonplace for the GOI and its intelligence services. This evidence will help to contextualize the evidence of the charged plot and assist the jury in understanding how and why the plot unfolded as it did.

The Government is conscious of the potential undue prejudice to the defendants from this evidence, and will take steps to ensure that the presentation of that evidence does not belabor the point. But the probative value outweighs any potential for unfair prejudice, particularly where the charged offenses already involve the very same kinds of conduct: Amirov and Omarov are charged, not only a murder plot; and not only a murder plot targeting a journalist and human rights

activist; but a murder plot targeting a journalist and human rights activist instigated and paid for by a foreign government. Evidence of the violent policies and actions of that foreign government's intelligence services targeting similar victims is not substantially more inflammatory than the conduct involved in the specific plot against Victim-1, and the probative value of that evidence is, for the reasons outlined above, substantial. *See, e.g.*, *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir.1990) (404(b) evidence not unfairly prejudicial where it "did not involve conduct any more sensational or disturbing than the crimes with which [the defendant] was charged") (citation omitted).

## II.    Evidence of the Organization's Existence and Racketeering Activities Is Admissible Both As Direct Evidence of the Murder-for-Hire Plot and Pursuant to Rule 404(b)

The Government expects to introduce evidence of Omarov's and Amirov's membership in the Russian Mob and crimes they committed with each other and with Mehdiyev and Mamedov as part of their membership in the Russian Mob, including acts of extortion, kidnapping, murder and attempted murder committed overseas; and acts of racketeering committed in the United States, specifically, extortion plots against business owners in Brooklyn and the extortionate arson and shooting targeting Victim-2. The Government also expects to introduce expert testimony about the Russian Mob and its history, organization, and structure, as well as particular prominent members of the Russian Mob with whom the defendants are associated. This evidence is admissible both as direct evidence of the existence of the charged conspiracies and the charged racketeering offense, as well as pursuant to Rule 404(b) to explain the background of the relationships among the co-conspirators leading the murder-for-hire plot targeting Victim-1, the trust among the co-conspirators to work together to attempt to carry out the murder, and their motivations for accepting the murder-for-hire commission.

The existence of the Organization as an enterprise, that is, an association-in-fact, and its engagement in a pattern of racketeering activity prior to the attempted murder of Victim-1 are elements of the offense charged in Count Four, attempted murder in aid of racketeering. That evidence, including background and context of the Russian Mob generally and racketeering acts committed by members of the Organization—including Amirov and Omarov—specifically, is, like that of the GOI's involvement and direction in the murder-for-hire plot, also inextricably intertwined with the murder-for-hire counts. Evidence relating to the background and criminal activities of the Organization is therefore admissible as to Counts One and Two, as well as the associated money laundering conspiracy charged in Count Three.

### A. The Anticipated Evidence

The Government expects to introduce lay witness and expert witness testimony, as well as electronic communications, photographs, videos, and other evidence, showing that Amirov and Omarov, along with Mehdiyev, Mamedov, and others, were members of the Russian Mob. Even more specifically, they were members of the Russian Mob who rose to positions of power through their association with Nadir Salifov, a powerful and prominent *vor* prior to his death in 2020. Following Salifov's murder, Amirov, Omarov, Mehdiyev, and Mamedov continued to be associated with Salifov's brother, Namik Salifov, and with each other, through a series of sometimes cooperative and sometimes adversarial ventures. The Russian Mob has a particular culture, hierarchy, and system of organization, and the defendants and other members of the Organization worked within that culture and system in order to try to advance their status and influence within the Russian Mob as well as to enrich themselves through the typical economy of

Russian Mob, namely, kidnapping and extortion, as well as through murders and attempted murders of rivals within the Russian Mob.

Mehdiyev was sent to the United States by Nadir Salifov to establish Russian Mob operations in New York. After his arrival, Mehdiyev, Omarov, and Mamedov worked together on a variety of extortionate schemes, some targeting victims in New York and some targeting victims in foreign countries, particularly in the Ukraine. Particularly after Salifov's death, Omarov, Mehdiyev, and Mamedov allied themselves to try to advance their reputation and status within the Russian Mob by committing extortion and violence. The men hired lower level members of the Russian Mob to extort businessmen and carry out the murders or attempted murders of at least four members of the Russian Mob, including an attempt to murder a close associate of Amirov's. Omarov, Amirov, Mehdiyev, and Mamedov settled the dispute and, as described above, Amirov collaborated with Omarov in the extortion of Victim-2 and recruited Omarov into the murder-for-hire of Victim-1.

As described above, in the months prior to the murder-for-hire plot against Victim-1, the defendants and other members of the Organization engaged in an extortionate scheme targeting Victim-2. This extortion plot included committing arson to burn Victim-2's car, and later committing a shooting against another of Victim-2's cars. When this extortion did not pay off as easily or quickly as the Organization members had hoped, they shifted their focus to the lucrative contract to carry out the murder of Victim-1.

## B. Discussion[13]

Amirov, Omarov, Mehdiyev, Mamedov, and others were part of an association-in-fact of various members of the Russian Mob, referenced herein as the Organization. The evidence summarized above concerning the co-conspirators' membership in the Russian Mob, their association in a subgroup of the Russian Mob characterized by their common loyalty to Nadir Salifov, their continued association with each other after his death, and the various criminal ventures and disputes that the group engaged in over time, are all directly relevant to show the existence of an enterprise, an element of Count Four. *See United States v. Reyes*, 2012 WL 3727995, at *2 (D. Conn. May 1, 2012) ("After weighing the evidence, the Court finds that the relevance of evidence demonstrating that the defendants were members of a gang to demonstrating the existence of a joint venture or conspiracy and explaining the relationship between the defendants and cooperating witnesses outweighs that evidence's potential for unfair prejudice, primarily because it tends to prove an element of the charged offense."); *see also United States v. Molton*, 743 F.3d 479, 482-83 (7th Cir. 2014) (affirming admission of gang membership because it was relevant to, among other things, "the overarching factual scenario at issue"); *United States v. Nelson*, 103 F. Supp. 2d 512, 513 (N.D.N.Y. 1999) (noting that "this Court's research found few instances where a circuit has reversed a trial court's decision to admit such evidence," and reserving judgment until trial). Similarly, the pattern of racketeering activity that the Organization engaged in prior to the Victim-1 murder-for-hire plot, namely, the extortionate acts committed

---

[13] The "Applicable Law" section from Section I, above, applies here as well.

against Victim-2 and others in the United States, is directly relevant to show that the enterprise engaged in a pattern of racketeering activity, also an element of Count Four.

This evidence is also admissible with respect to the other offenses charged against Amirov and Omarov. It is critical background to understanding the relationship between and among co-conspirators and how the murder-for-hire plot targeting Victim-1 arose and was carried out. Omarov and Mehdiyev, along with Mamedov, engaged in various racketeering acts prior to their involvement in the murder-for-hire plot, including assassination, extortion, assault, kidnapping, and others, in an effort to increase their standing within the Russian Mob, with the goal of ultimately becoming *vors* themselves, and the murder-for-hire plot was an extension of this effort. Evidence of the existence of the Organization and its racketeering activities is therefore admissible as direct evidence as to the existence of the murder-for-hire and money-laundering conspiracies, and the defendants' participation in those conspiracies, charged in Counts Two and Three, as well as the substantive murder-for-hire charged in Count One. The prior criminal activities of the Organization "arose out of the same transaction or series of transactions as the charged offense . . . [are] inextricably intertwined with the evidence regarding the charged offense . . . [and] [are] necessary to complete the story of the crime on trial." *Gohari*, 227 F. Supp. 3d at 317. The Organization and the defendant's activities in connection with the Organization explains, among other things, the relationships between and among the co-conspirators, including their prior criminal association; their motivations for becoming involved in the effort to kill Victim-1; and, in general, "furnish[es] an explanation of the understanding or intent with which certain acts were performed." *Gonzalez*, 110 F.3d at 941.

This Organization-related evidence is also admissible pursuant to Rule 404(b). This evidence describes the relationships between Amirov, Omarov, Mehdiyev, and other members of the Organization, and explains the context and motivation for their involvement in the plot to murder Victim-1. It is plainly probative of the defendants' motives and intent in joining the conspiracy, including in gaining money and status within the Organization and Russian Mob writ large. *See United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996) (noting that evidence is admissible under Rule 404(b) "to explain how a criminal relationship developed" and "help the jury understand the basis for the co-conspirators' relationship of mutual trust").

Finally, this evidence is not unduly prejudicial relative to other proof the Government expects to offer. The core allegation in this case, which the Government will prove at trial, is that individuals associated with the GOI hired members of the Russian Mob to murder Victim-1; more specifically, that Mehdiyev intended to kill Victim-1 in cold blood, with an AK-47, in New York City. Amirov's and Omarov's prior criminal associations, including their involvement with the Organization and previous racketeering acts—including the extortion of multiple restaurant owners in Brooklyn—is no more prejudicial than core conduct relating to the murder-for-hire conspiracy. Accordingly, evidence of the full breadth of the Organization's activities and racketeering acts prior to the murder-for-hire plot is admissible, both as evidence of the elements of Count Four and as direct evidence of the murder-for-hire plot. *See Roldan-Zapata*, 916 F.2d at 804.

## III. Certain of Amirov's and Omarov's Post-Arrest Statements, Which Do Not Violate the *Bruton* Rule, Are Admissible

As set forth above, both Amirov and Omarov made *Mirandized*, post-arrest statements to law enforcement, portions of which the Government intends to seek to admit at trial. The

Government expects to elicit testimony from law enforcement witnesses about certain portions of both statements. During his post-arrest interview, Amirov did not make statements about Omarov; therefore, there is no potential prejudice as to Omarov in admitting relevant portions of Amirov's statements.[14] Omarov made limited references to Amirov during his post-arrest interview; those statements were minimal and, to the extent they implicate Amirov, can be redacted so as not to run afoul of *Bruton*.[15] Further, the defendants should be precluded from eliciting any testimony, including through cross-examination, about other of Amirov's and/or Omarov's post-arrest statements not offered by the Government, which constitute inadmissible hearsay if offered by the defendants.

### A. Applicable Law

Where the Government seeks to offer a co-defendant's statement to law enforcement when the co-defendant will not testify at trial and the statement specifically inculpates a co-defendant, courts "cannot accept limiting instructions as an adequate substitute for [the co-defendant's] constitutional right of cross-examination." *Bruton v. United States*, 391 U.S. 123, 135-37 (1968). In such circumstances, courts generally have three options: (1) careful redaction of the out-of-court statement such that all references to the co-defendant are eliminated; (2) severance; or (3)

---

[14] Amirov also made post-arrest admissions to CW-1. Those statements were not made to law enforcement officials in response to interrogation and *Bruton* does not apply. *See United States v. Williams*, 506 F.3d 151, 156 (2d Cir. 2007) (affirming admission of a co-defendant's self-inculpatory, out-of-court, nontestimonial statement that also implicated the defendant because "the Confrontation Clause simply has no application to nontestimonial statements") (internal citation omitted).

[15] Omarov has moved to suppress his post-arrest statement. (Dkt. Entry 97.) The Government will respond to the suppression motion separately.

exclusion of the statement at the joint trial. *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009). The Second Circuit has approved two types of redaction to address *Bruton* concerns: (1) a redaction that eliminates all reference to a co-defendant's existence; and (2) a redaction that replaces a co-defendant's name with a neutral pronoun such that the statement, standing alone, cannot be understood to refer to the co-defendant. *Id.* at 56. "The critical inquiry is always whether introduction of a confession at a joint trial presents an 'overwhelming probability' that the jury will not be able to follow an instruction limiting consideration of the confession to the declarant defendant." *Id.* at 56 n.5 (citation omitted). Where a redacted statement utilizing neutral pronouns passes this test, "it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant." *United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991).

Further, a "party's own statement, if offered against him, is not hearsay." *United States v. Marin*, 669 F.2d 73, 84 (2d Cir. 1982); *United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party." (citing Fed. R. Evid. 801(d)(2)(A))). The defendant, however, does not have a parallel ability to offer his statements into evidence. When a "defendant seeks to introduce his own prior statement for the truth of the matter asserted, it is hearsay, and it is not admissible." *Marin*, 669 F.2d at 84; *see also United States v. Kadir*, 718 F.3d 115, 124 (2d Cir. 2013) ("A defendant may not introduce his own prior out-of-court statements because they are hearsay, and . . . not admissible.") (quotation marks omitted).

### B. Discussion

As discussed above, Amirov did not refer to Omarov in his post-arrest statement, and accordingly any portions of that post-arrest interview the Government seeks to arrest do not require *Bruton*-izing. Omarov did refer to Amirov during his post-arrest statement, but the Government does not intend to offer those portions of the interview. Specifically, the Government presently intends to offer the following portions of Omarov's statement:

- Omarov admitted to being "an Azerbaijani thief" and that "we have our own law." Additionally, Omarov described general concepts and terms used within the Russian Mob, such as *vor*, *bradiyaga*, and *skhodka*.

- Omarov described his close relationship with Nadir Salifov, including that Nadir Salifov made Omarov a thief, and that Omarov was "the closest person to" Nadir Salifov. In addition, Omarov also stated that Nadir Salifov had been in jail and, ultimately, was assassinated. Omarov also explained that he knows other members of the Organization, including Mamedov, Mehdiyev, Akhunzada, and Namik Salifov. Omarov also stated that, because of his status in the Russian Mob, he and Nadir Salifov had many enemies.

- Omarov admitted his involvement and guilt in the Organization's extortion of Victim-2, specifically that, "concerning [Victim-2], yes, I can say, somewhere I consider myself guilty."

- Omarov's false claims that he had nothing to do with the plot to murder Victim-1; that the $10,000 payment sent by Mehdiyev overseas, which Omarov knew was sent via Western Union, was for Omarov's birthday; that Omarov did not know how an iCloud works; and that he did not work with Mehdiyev and believed that Mehdiyev was working on selling pizza in America.

- Omarov admitting to using burner phones.

Each of the statements above are relevant and probative of Omarov's involvement in the murder-for-hire plot, as well as to the existence of the Organization and its racketeering activities. Further, none of these statements mentions or inculpates Amirov, such that redaction is unnecessary, and the statements do not violate the *Bruton* rule.

IV.    **Statements Made by the Defendants, Other Members of the Organization, and Individuals Linked to the GOI Who Participated in the Plot to Murder Victim-1 and/or the Criminal Activities of the Organization Are Admissible Pursuant to Rules 801(d)(2)(A), 801(d)(2)(E), and 804(b)(3)**

The Government also seeks to admit at trial statements made by the defendants, other members of the Organization, and GOI-linked co-conspirators, which are admissible pursuant to the hearsay rules for the reasons set forth below.

A.    **Applicable Law**

1.    **Rule 801(d)(2)(A): Statement of a Party Opponent**

Federal Rule of Evidence 801(d)(2)(A) provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party in an individual or representative capacity." Fed. R. Evid. 801(d)(2)(A); *see also United States v. Russo*, 302 F.3d 37, 43 (2d Cir. 2002) ("Statements made by the defendant may be introduced by the government in a criminal trial to prove the truth of the facts stated in them because they are admissions of an adverse party."). Moreover, statements made by a defendant are admissible under this exception even if the statement, on its face, is not incriminating. *See, e.g.*, *United States v. Gotti*, 457 F. Supp. 2d 395, 401-402 (S.D.N.Y. 2006) ("Cases explaining that an admission must be contrary to a position taken by the party at trial do so to distinguish Rule 801(d)(2)(A) from the more limited exception for statements against interest under Rule 804(b)(3), which must be against the declarant's interest at the time when made.").

2.    **Rule 801(d)(2)(E): Co-Conspirator Statements**

Rule 801(d)(2)(E) of the Federal Rules of Evidence provides in relevant part that "[a] statement is not hearsay if . . . the statement is offered against an opposing party and was made by the party's co-conspirator during and in furtherance of the conspiracy." To admit a statement

pursuant to this Rule, the Court must find two facts by a preponderance of the evidence: *first*, that a conspiracy that included the declarant and the defendant existed; and *second*, that the statement was made during the course and in furtherance of that conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175 (1987).

Once a conspiracy is shown to exist, the "evidence sufficient to link another defendant to it need not be overwhelming," and "the 'in furtherance' requirement of Rule 801(d)(2)(E) is satisfied" when, for example, "a co-conspirator is apprised of the progress of the conspiracy, or when the statements are designed to induce his assistance." *United States v. Paone*, 782 F.2d 386, 390 (2d Cir. 1986) (internal quotation marks omitted). Statements between co-conspirators that "provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy," further the conspiracy, *United States v. Simmons*, 923 F.2d 934, 945 (2d Cir. 1988), as do statements "that apprise a co-conspirator of the progress of the conspiracy," *United States v. Rahme*, 813 F.2d 31, 36 (2d Cir. 1987).

### 3. Rule 804(b)(3): Statements Against Interest

Under Rule 804, if a declarant is "unavailable," there is an exception to the hearsay rule where:

> (A) a reasonable person in the declarant's position would have made [the statement] only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability; and
>
> (B) is supported by corroborating circumstances that clearly indicate its trustworthiness, if it is offered in a criminal case as one that tends to expose the declarant to criminal liability.

Fed. R. Evid. 804(b)(3). This rule "is founded on the commonsense notion that reasonable people,

even reasonable people who are not especially honest, tend not to make self-inculpatory statements unless they believe them to be true." *Williamson v. United States*, 512 U.S. 594, 599 (1994).

To satisfy Rule 804(b)(3), the proponent of the statement must show by a preponderance of the evidence: "(1) that the declarant is unavailable as a witness, (2) that the statement is sufficiently reliable to warrant an inference that a reasonable man in [the declarant's] position would not have made the statement unless he believed it to be true, and (3) that corroborating circumstances clearly indicate the trustworthiness of the statement." *United States v. Wexler*, 522 F.3d 194, 202 (2d Cir. 2008) (internal quotation marks omitted). A declarant is unavailable for purposes of Rule 804 if, as relevant here, the declarant is "exempted from testifying about the subject matter of the declarant's statement because the court rules that a privilege applies," Fed. R. Evid. 804(a)(1), or "is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance or testimony," *id.* 804(a)(5)(B).

"A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." *United States v. Persico*, 645 F.3d 85, 102 (2d Cir. 2011) (internal quotation marks omitted). Moreover, a declarant need not "be aware that the incriminating statement subjects him to immediate criminal prosecution," but instead, that the "incriminating statement sufficiently tended to subject the declarant to criminal liability so that a reasonable man in his position would not have made the statement unless he believed it to be true." *United States v. Lang*, 589 F.2d 92, 97 (2d Cir. 1978) (internal quotation marks and citation omitted).

Finally, the Second Circuit requires corroboration of both the declarant's and the

statement's trustworthiness.  *United States v. Doyle*, 130 F.3d 523, 543-44 (2d Cir. 1997).

Statements made to co-conspirators, not in response to questioning, and not made in coercive

atmospheres are sufficiently reliable for purposes of this Rule.  *See, e.g.*, *United States v. Matthews*,

20 F.3d 538, 546 (2d Cir. 1994).

### 4.   Confrontation Clause

Where hearsay is admissible under the Federal Rules of Evidence, it may nevertheless be

prohibited by the Confrontation Clause of the Sixth Amendment.   "But a statement 'cannot fall

within the Confrontation Clause unless its primary purpose was testimonial'—that is, unless the

statement, viewed objectively in light of all the relevant circumstances, was made or procured with

a primary purpose of 'creating an out-of-court substitute for trial testimony.'"  *United States v.*

*Bick*, 711 F. App'x 664, 666  (2d Cir. 2017) (summary order) (quoting *Ohio v. Clark*, 135 U.S.

2173, 2180 (2015)).

### B.   Evidence of Statements Made by the Co-Defendants and Co-Conspirators Who Were Members of the Russian Mob and/or the Organization to Mehdiyev Is Admissible Under the Hearsay Rules

The Government expects to introduce testimony from CW-1, as well as records of

electronic communications, concerning statements made by Amirov, Omarov, Mehdiyev,

Mamedov, and others during the course of their involvement in the Organization and the

commission of the charged offenses. These statements are admissible as co-conspirator statements

in furtherance of the charged murder-for-hire and money laundering conspiracies, as well as to

prove the existence and racketeering acts of the Organization in connection with the attempted

murder in aid of racketeering.   Those statements generally fall into the following categories,

referenced below as "Statement [number]":

1. Statements made by Nadir Salifov, as well as other members of the Russian Mob, including co-conspirators identified as "Terlan" and "Vahid," about Mehdiyev's joining the Russian Mob; and how the Russian Mob worked, including terminology and general background on initiation, membership, and criminal activities.

2. Statements made by Nadir Salifov, Namik Salifov, Omarov, Mehdiyev, and others specifically about the activities of the Organization, a subset of the Russian Mob that was based on allegiance to Nadir Salifov, and, after Salifov's murder, to Namik Salifov. This will include statements made to Mehdiyev by other members of the Russian Mob about Nadir Salifov's murder and the subsequent realignment of the Organization under the authority of Namik Salifov.

3. Statements by Omarov, Mehdiyev, Mamedov about the Organization's racketeering acts outside the United States, including about murders, assaults, extortions, and kidnappings, which were intended to increase Omarov, Mamedov, and Mehdiyev's status within the Russian Mob, so that they could become *vors*. This will include specific acts of assassination, kidnapping, assault, and extortion, in, among other places, the Ukraine, Georgia, and Azerbaijan.

4. Statements by Namik Salifov, Omarov, Mehdiyev, Mamedov, and others about the Organization's efforts to extort at least two owners of grocery stores in Brooklyn, including Victim-2. These include, among other things, explicit instructions from Omarov and conversations with Namik Salifov about these extortions, as well as Mehdiyev's conversations with U.S.-based co-conspirators about completing these extortions.

5. Statements by Omarov, Mehdiyev, and Mamedov about the Organization's efforts to kill Victim-1. These include, for example, Omarov's tasking of Mehdiyev to kill Victim-1, which Omarov stated would be more lucrative than the extortion of Victim-2; Omarov's initial statements to Mehdiyev that the job for this was coming from the president of Azerbaijan, who wanted to do a favor for the GOI, and that if they successfully killed Victim-1, that would result in a "green light" for Omarov, Mehdiyev, and Mamedov to be able to go to a new country with a brand new passport and receive lucrative assignments to kill other journalists residing outside Azerbaijan; and numerous statements made by Omarov to Mehdiyev containing specific efforts and instructions to murder Victim-1, captured both in contemporaneous electronic communications and conversations, including, as described above, that "high-level" people in Iran were standing by to see whether Mehdiyev would succeed in carrying out the murder.

6. Statements by Omarov and Mamedov, following Mehdiyev's arrest, in which Omarov and Mamedov threatened Mehdiyev and his family, based on their belief that Mehdiyev was cooperating with law enforcement authorities.

7. Statements by Amirov, described above, following his arrest, when he was detained. These include statements about Amirov's participation in the plot to murder Victim-1, as well as Amirov's efforts to engage with Mehdiyev while both were in custody at the MDC.

The Statements are relevant and admissible. As an initial matter, insofar as any of the Statements within these categories reflect questions, requests, instructions, or demands, such as, among others, Nadir or Namik Salifov, Omarov's, Mehdiyev, or others co-conspirators' requests to commit racketeering acts on behalf of the Organization, including the extortion of Victim-2, and, later the plot to murder Victim-1, they are not hearsay. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay [.]"). Moreover, as set forth below, each of the Statements is admissible for multiple independent reasons under the hearsay rules.

First, Statements by Amirov and Omarov in categories 2, 3, 4, 5, 6, and 7 referenced above are admissible against Amirov and Omarov as admissions of a party opponent under Rule 801(d)(2)(A) and are not unduly prejudicial under Rule 403. The statements made by Amirov and Omarov are highly probative of the charged conduct, relating to their membership in and racketeering acts of the Organization and, specifically, their participation in the Organization's participation in the plot to murder Victim-1. These statements directly identify Amirov as a *vor*, member of the Russian Mob *writ large* and the Organization specifically; and his direction of the plot to murder Victim-1, including, explicitly, that Amirov was to be paid $500,000 for murdering Victim-1 and that, prior to Amirov's arrest, he already had received $100,000. Similarly, Omarov's statements identify him as a *bradiyaga* and aspiring *vor*, an associate of Nadir and Namik Salifov's and member of the Organization, and his direction of numerous of the Organization's racketeering acts, both in and outside the United States, including his participation

in the plot to murder Victim-1 and his tasking Mehdiyev with doing so.  These statements are relevant to relationship of the co-defendants and co-conspirators, and the motivation and execution of the conduct underlying both the murder-for-hire and violent crime in aid of racketeering charges.  *See United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ("[I]t is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

Second, all of the Statements described above are admissible against Amirov and Omarov as co-conspirator statements under Rule 801(d)(2)(E).  The Government will establish that Nadir and Namik Salifov, "Terlan" and "Vahid" were members of the Russian Mob and its subset constituting the Organization.  There are therefore co-conspirators, as proof of the existence and racketeering acts of the Organization is an element of Count Four; and, regardless and in the alternative, evidence relating to the Organization and its members is relevant to the background and motive for the plot to murder Victim-1, relevant additionally to Counts One, Two, and Three.  *See, e.g.*, *United States v. Delligatti*, No. 15 Cr. 491 (JSR), 2018 WL 1033242, at *6 (S.D.N.Y. Feb. 23, 2018) ("[S]tatements that convey information about others in the same organized crime syndicate are considered to be during and in furtherance of a conspiracy").  Additionally, the Government will establish, as is outlined in the Background, above, that Amirov, Omarov, and Mamedov were Mehdiyev's principal co-conspirator in the plot to murder Victim-1, and that their statements about the tasking, planning, and execution of that plot are admissible as co-conspirator statements.  *See United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (finding "in furtherance" requirement met where statements "induce a coconspirator's assistance"); *United States v. Beech-*

*Nut Nutrition Corp.*, 871 F.2d 1181, 1199 (2d Cir. 1989) (finding "in furtherance" requirement met where statements "prompt the listener to respond in a way that facilitates the carrying out of criminal activity" (internal quotation marks omitted)); *see also United States v. Delva*, No. 12 Cr. 802, 2014 WL 4460360, at *10 (S.D.N.Y. Sept. 10, 2014) ("Statements made to hide the existence or activities of a conspiracy are made in furtherance of it."). The Statements, which concern the motivation to murder Victim-1 and the plans to do so, also are not unduly prejudicial under Rule 403.

All of these categories of Statements, on their face, expose the declarant—and, specifically, Amirov and Omarov—and his co-conspirators to criminal liability, and therefore also are admissible as statements against penal interest. These statements also bear the requisite indicia of reliability because they were made between co-conspirators engaged in joint criminal conduct, *i.e.*, "to a person whom the declarant believe[d] was an ally," rather than to "curry favor with authorities." *See United States v. Saget*, 77 F.3d 223, 230 (2d Cir. 2004); *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007). The nature, in particular, of explicit communications by Amirov and Omarov, as well as Mamedov, with Mehdiyev during the period in or about July 2022 clearly implicate them in the plot to murder Victim-1. Similarly, their communications and statements in the immediate aftermath of Mehdiyev's arrest further demonstrate their partaking in the plot and fear that Mehdiyev will expose them. The same is true of Amirov's statements to Mehdiyev in MDC, in which, among other things, Amirov explicitly states that he was to receive $500,000 for successfully killing Victim-1. And aside from the defendants, Amirov and Omarov, the other co-conspirators who made these relevant statements are unavailable: Nadir Salifov is, as set forth

above, deceased; Mamedov, who is charged as a co-defendant remains at large; and Namik Salifov,

remains an active figure in the Russian Mob, who is not in the United States or available to testify.

Finally, the Statements are admissible under Rule 403.  The Statements are not unduly

prejudicial because they relate to the same plot to murder Victim-1, and the background and

activities of the Organization leading to that, described above.  According, and for the reasons set

forth above, the Government seeks an *in limine* ruling that categories of Statements described

above are admissible at trial.

### C. Evidence of Statements Made by Co-Conspirators Linked to the GOI Is Admissible Under the Hearsay Rules

As set forth above, as well as in Indictment S8 22 Cr. 438 (CM), the plot to murder Victim-

1 was directed by individuals linked to the GOI; including, specifically, Bazghandi, Haj Taher,

Sedighi, and Forouzan.  Their actions targeting Victim-1 and engaging Amirov, Omarov, and the

Organization to kill her, provide the "why" for the plot.  The Government expects to establish that

the four members of the Bazghandi Network, who are at-large and charged co-defendants, were

co-conspirators in the plot to murder Victim-1, and to seek to admit certain of their statements—

to one another and to Amirov—as co-conspirator statements.  In particular, and as outlined above,

the Government respectfully submits that statements included in the following categories,

referenced below as "Statement [number]," are admissible.

1. Pen register data reflecting and contents of communications between Amirov and
   Forouzan.  From in or about September through December 2022, Forouzan was in
   regular contact with Amirov.  During these communications, Forouzan forwarded
   certain images to Amirov, including (i) an image of Victim-1 taken from an online
   appearance by Victim-1; (ii) the four-part composite image described above, *see supra*
   Section III.F.

2. Electronic communications, dated in or about September and October 2022, between and among Forouzan, Sedighi, and Haj Taher, concerning payment for the murder of Victim-1.

These statements are relevant and admissible as co-conspirator statements under Rule 801(d)(2)(E). As described in the Background section, and as the Government intends to show through the electronic evidence described herein, members of the Bazghandi Network engaged Amirov, who was then in Iran, to murder Victim-1. Their actions were meant to induce Amirov's—and, through him, the Organization's—cooperation in carrying out the murder of Victim-1. *See Gigante*, 166 F.3d 82; *see also Beech-Nut Nutrition Corp.*, 871 F.2d at 1199. The communications between Forouzan and Amirov reflect Forouzan's tasking Amirov with the murder of Victim-1, including by providing him with images of Victim-1 and information about Victim-1. And the communications described in Statement 2, between and among Forouzan, Sedighi, and Haj Taher, explicitly reference payment to procure Victim-1's murder. These communications were in the period following Mehdiyev's arrest, but before Amirov and Omarov were themselves apprehended. One message, addressed to Forouzan, read, "this is addressed to you, your masters and your mafia"—apparently referencing higher-level individuals within the GOI (*"your masters"*) and Amirov and other members of the Organization tasked with carrying out the murder (*"your mafia"*), before going on in the message to discuss "return[ing] the deposit amount" if the matter "does not get concluded." These electronic communications, as well as contemporaneous relevant Internet searches by members of the Bazghandi Network, are corroborated by the anticipated testimony of Mehdiyev, described above. In particular, and as detailed herein, the Government anticipates that Mehdiyev will testify that, following their arrests and before a joint court appearance together, Amirov told Mehdiyev that the total payment for

Victim-1's assassination was $500,000 and that Amirov had received $100,000 before he was arrested. This, as well Mehdiyev's testimony about Omarov's statements that individuals in Iran were standing by to see whether he would successfully carry out the plot to murder Victim-1, further demonstrates that Statements 1 and 2 were made in furtherance of the murder-for-hire plot. Finally, the Statements, which concern information and payment for murdering Victim-1, are not unduly prejudicial under Rule 403.

## V.    Testimony from Amirov's Proposed Computer Experts Should Be Precluded

### A.  Relevant Facts

On January 24, 2025, Amirov provided notice of his intent to call two witnesses to provide expert testimony: Clark C. Walton, Managing Director of a cybersecurity and digital forensics company in North Carolina, and Edgar Fritz, a digital forensic examiner at that company. Amirov's Rule 16(b)(1)(C) disclosure is attached hereto as Exhibit A ("Amirov Expert Notice").[16]

The Amirov Expert Notice does not identify any opinions that Mr. Walton or Mr. Fritz will offer; rather, the notice describes topics about which they will testify, without identifying what the proposed experts will say about those topics. The notice provides that Mr. Walton is expected to testify about the following:

- his network and mobile telecommunications forensics analyses pertaining to access by others to the iPhone, iCloud account, and WhatsApp account allegedly belonging to the Defendant;

- the functionality and security of iPhone devices, iCloud accounts, and WhatsApp accounts, including WhatsApp Business accounts; and

---

[16] The Government included Amirov's proposed experts' disclosures and omitted their resumes, which also were provided.

- the functionality and security of virtual private network (VPN) services for purpose of identifying sources and recipients of communications.

Ex. A at 2.  This testimony will "will be based on, including but not limited to, his review of the discovery evidence provided, his technical expertise and experience in network and mobile telecommunications forensics, and any additional evidence presented by the government at trial." *Id.*

The Amirov Expert Notice provides that Mr. Walton will further testify about "his understanding of the current leading cyber intelligence and counterintelligence capabilities, practices, and programs of those with active, sophisticated cyber intelligence and counterintelligence programs," which will be based on "regular monitoring of technical and press reports, as a network and mobile telecommunications forensics expert would ordinarily rely on, to understand current events, developments, and trends in the industry." *Id.*

The Amirov Expert Notice provides that Mr. Fritz will testify about similar topics. The notice provides that Mr. Fritz will testify about:

- his mobile telecommunications forensics analyses pertaining to access by others to the iPhone, iCloud account, and WhatsApp account allegedly belonging to the Defendant;

- the functionality and security of iPhone devices, iCloud accounts, and WhatsApp accounts;

- issues concerning the technical nature of WhatsApp Business Accounts, including differences between WhatsApp Business Accounts and regular personal accounts.

Ex. A at 3.  Mr. Fritz's testimony will be based on ("but not limited to") "his review of the discovery evidence provided, his technical expertise and experience in mobile telecommunications forensics, and any additional evidence presented by the government at trial."  *Id.*

Following receipt of the Amirov Expert Notice, the Government advised counsel for

Amirov that the Amirov Expert Notice did not identify the proposed experts' opinions or the bases for any such opinions and asked whether Amirov intended to supplement the disclosure. Counsel responded that Amirov intends to call the experts "in rebuttal," citing *United States v. Bankman-Fried*, No. S6 22-CR-0673 (LAK), 2023 WL 6162865 at *1 (S.D.N.Y. Sept. 21, 2023), and did not intend to provide supplemental disclosures.

### B. Relevant Law

Federal Rule of Evidence 702 provides that expert testimony that "assists the trier of fact to understand the evidence or to determine a fact in issue," may be admitted if "the testimony is based on sufficient facts or data," and "is the product of reliable principles and methods" that have been reliably applied "to the facts of the case."

The party proffering the expert's opinions "has the burden to establish the [Rule 702] admissibility requirements, with the district court acting as a 'gatekeeper' to ensure that the expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *In re Pfizer Inc. Secs. Litig.*, 819 F.3d 642, 658 (2d Cir. 2016) (cleaned up). In particular, as the Second Circuit has noted, "[u]nder Rules 701 and 702 [of the Federal Rules of Evidence], opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence that wastes time." *Hygh*, 961 F.2d at 363 (internal quotation omitted).

In fulfilling this gatekeeping role, the Court should first determine whether the proffered expert testimony is relevant: whether it "has any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Next, the court must determine "whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered." *Daubert v. Merrell*

*Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993).  In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, "(1) that the testimony is grounded on sufficient facts or data; (2) that the testimony is the product of reliable principles and methods; and (3) that the witness has applied the principles and methods reliably to the facts of the case." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) (cleaned up). Expert testimony should be excluded if it is "speculative or conjectural" or is "conclusory." *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008). The testimony must also "fit" the facts of the case at issue. *See, e.g.*, *LVL Brands, Inc. v. Louis Vuitton Malletier S.A.*, 209 F. Supp. 3d 612, 641-42 (S.D.N.Y. 2016) (Noting that "the testimony must be both reliable *and* relevant in that it 'fits' the facts of the case" and finding proposed expert testimony "fails the *Daubert* 'fit' requirement.") (emphasis in original).

Rule 16(b)(1)(C) requires the defendant to disclose, for any expert testimony the defendant intends to elicit in the defendant's case-in-chief, "a complete statement of all opinions that the defendant will elicit from the witness in the defendant's case-in-chief" and "the bases and reasons for them," among other things.   *See, e.g.*, *United States v. Weiner*, No. 22 CR. 19 (PGG), 2024 WL 82729, at *6 (S.D.N.Y. Jan. 8, 2024) (rejecting as deficient defense's expert disclosures where they did not adequately disclose the "bases and reasons" for the conclusions set forth therein).

### C.  Application

Mr. Walton's and Mr. Fritz's proposed opinion testimony should be excluded. The Amirov Expert Notice does not provide any statement of the "opinions the defendant will elicit from the witness in the defendant's case in chief" for either of Mr. Walton or Mr. Fritz.  Accordingly, the disclosure does not indicate, and the Court cannot evaluate, the "principles and methods" that the

proposed experts used to reach any of those opinions, or how they "applied those principles and methods . . . to the facts of the case." *Amorgianos*, 303 F.3d at 265. The Court cannot evaluate whether "the testimony is grounded on sufficient facts or data," the testimony "is the product of reliable principles and methods," or "the witness has applied the principles and methods reliably to the facts." *Id.*[17]

Amirov's suggestion that Mr. Walton and Mr. Clark need not disclose their opinions, analyses, and methodologies, because they are testifying "in rebuttal" does not excuse Amirov from the obligation to make sufficient notice. The Government has provided ample discovery about the phones, cloud accounts, and WhatsApp accounts at issue, including search warrant results, subpoena results, and pen register data; as well as search warrant affidavits and other materials describing that data. The notice indicates that both Mr. Walton and Mr. Clark already have performed analyses of the evidence relating to "the iPhone, iCloud account, and WhatsApp account" used by Amirov and alleged access by individuals other than Amirov. The notice states generally that the opinions of Mr. Walton and Mr. Fritz may also be based on "any additional evidence presented by the government at trial," but there is no reason why they should not be required to provide their opinions and analyses based on the evidence. The testimony should be precluded.

_____

[17] The Government notes that Mr. Walton also anticipates relying on, among other things, "press reports" to testify about the capabilities of "sophisticated cyber intelligence and counterintelligence programs." It is unclear what cyber intelligence and counterintelligence programs Mr. Walton is referring to or how press reports might be a reliable basis upon which to form expert opinions about those programs. But since Mr. Walton's disclosure does not identify what his opinions are or how he reached them, the Government and the Court are not in a position to evaluate that issue.

Judge Kaplan's decision in *Bankman-Fried* is not to the contrary. In that case, the Court precluded proposed testimony by several proposed defense experts on the grounds that the disclosures for those witnesses were inadequate and that the topics of testimony, even if disclosure were sufficient, were inadmissible. 2023 WL 6162865, at *1-3. Judge Kaplan provided the defense an opportunity to provide a disclosure for some of the proposed experts for the limited purposes of "respond[ing] to a government witness" at least three days prior to the date of the proposed testimony.[18] This Court need not, and should not, adopt that practice here, where the Amirov Expert Notice makes clear that Amirov's proposed expert witnesses can, and have, analyzed the relevant device and cloud account data and have formed opinions about potential third-party access to those devices and accounts. *See United States v. Delva*, 12 Cr. 802 (KBF), 2014 WL 4460360, at *6 (S.D.N.Y. Sep. 9, 2014) ("Courts have precluded expert testimony disclosed too close to trial to allow a party properly to prepare, or when disclosures made are inadequate.") (collecting cases); United States v. Sanders, S1 12 Cr. 574 (LAK), 2013 WL 1421487, at *1-2 (S.D.N.Y. Mar. 27, 2013) (precluding proposed defense expert where, *inter alia*, initial disclosure was inadequate and aggregate disclosure was untimely); *United States v. Wilson*, 493 F. Supp. 2d 484, 487-88 (E.D.N.Y. 2006) (precluding proposed defense expert for lack of adequate notice). Moreover, delaying adequate expert notice until mid-trial risks leaving the Court and the parties to address *Daubert* issues, including potentially hearings, mid-trial, causing substantial disruption and delay of the trial proceedings; and would preclude the Government from addressing Amirov's proposed

---

[18] Ultimately, the defense called only one of the proposed expert witnesses after identifying specific witness testimony to which the opinion testimony would respond. *United States v. Bankman-Fried*, No. 22 Cr. 674 (LAK), Dkt. Enty No. 328 (S.D.N.Y. Oct. 23, 2023).

expert testimony through the testimony of its own proposed expert. *See* Rule 16, Fed. R. Crim. P., Advisory Notes – 2022 Amendment (Expert disclosures "must be sufficiently before trial to provide a fair opportunity for each party to meet the other side's expert evidence[,]" including potentially "secur[ing] its own expert to respond to expert testimony disclosed by the other party.").

Accordingly, Mr. Walton and Mr. Clark should be precluded from testifying.

## **CONCLUSION**

For the foregoing reasons, the Government respectfully submits that the Court should grant the relief requested herein.

Dated:  New York, New York
February 7, 2025

Respectfully submitted,

DANIELLE R. SASSOON

United States Attorney for the
Southern District of New York

By: _____/s/_____
Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
212-637-2215 / 2278 / 2193

Cc:    Defense Counsel
(Via ECF & Email)