UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————————————x

UNITED STATES OF AMERICA,

      -against-

RAFAT AMIROV and POLAD OMAROV,

      Defendant.

——————————————————————————x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 2/28/2025

S8 22 Cr. 438 (CM)

DECISION ON THE GOVERNMENT AND DEFENSE MOTIONS *IN LIMINE*

McMahon, J.:

The superseding indictment, S8 22 Cr. 438 (CM), charges Defendants Amirov and

Omarov with murder for hire (Count One) and conspiracy to commit murder for hire (Count Two),

each in violation of 18 U.S.C. § 1958; conspiracy to commit money laundering, in violation of 18

U.S.C. § 1956 (Count Three); attempted murder in aid of racketeering, in violation of 18

U.S.C.§ 1959(a)(5) (Count Four); and aiding and abetting the use and possession of a firearm

during and in relation to and in furtherance of the attempted murder in aid of racketeering, in

violation of 18 U.S.C. § 924(c) (Count Five).

In anticipation of the trial of this matter scheduled for March 10, 2025, the Government

and defendants have filed various motions *in limine*. This decision disposes of most of those

motions.

### The Government's *In Limine* Motions

The Government asks that the Court rule in advance of trial that:

> I. Evidence relating to the Government of Iran's ("GOI") targeting of
> dissidents outside Iran, including but not limited to the individual identified
> as Victim-1 in the Indictment, is admissible as direct evidence and pursuant
> to Rule 404(b);

1

II. Evidence of the existence of a subset of the Russian Mob of which Amirov and Omarov were members, referenced in the Indictment and herein as "the Organization," as well as of the Organization's racketeering acts, is admissible as direct evidence of both the murder-for-hire plot and the attempted murder in aid of racketeering, and pursuant to Rule 404(b);

III. Amirov's and Omarov's post-arrest statements that do not violate the *Bruton* rule, are admissible;

IV. Statements made by the defendants, other members of the Organization, and individuals linked to the GOI who participated in the murder-for-hire plot and/or who were the defendants' co-conspirators, is admissible pursuant to Rules 801(d)(2)(E), 804(b)(3), and/or 801(d)(2)(A).[1]

The Government has proffered in connection with some of these motions, but in some cases not sufficiently to allow the court to make final decisions thereon.

### Amirov's *In Limine* Motions

Amirov asks for pretrial rulings by the Court excluding:

1. Evidence concerning any prior or subsequent Iranian Government plot or scheme to target Iranian political dissidents, including but not limited to Ms. Alinejad;

2. Testimony from the Government's Proposed Expert Dr. Matthew Levitt; and

3. Testimony from the Government's Proposed Expert Dr. Louise Shelley.

Amirov's motions *in limine* are essentially requests to preclude the evidence that the Government seeks to introduce in Government requests 1 and 2. Omarov joins in Amirov's motions.

### Omarov's *In Limine* Motions

Omarov asks the Court to:

---

[1] The Government's motion *in limine* to preclude testimony by two defense computer experts was disposed of in a separate order filed on February 27, 2025. See Dkt. #121.

1. Dismiss Counts Four, Five and Six of the Superseding Indictment, which has since been converted into a motion to dismiss or sever;

2. Adjourn the trial 90 days because of recent statements made by the President about Iran, which defendant believes would prejudice his case;

3. To suppress his post-arrest statements to law enforcement. (made as a separate motion, found at Dkt. 97).

Amirov joins in Omarov's motion to severance

### Omarov's Motion to Dismiss Counts Four and Five as to Him Is Denied; the Motion to Sever Those Counts is Held in Abeyance Pending Further Briefing

Omarov asks the Court to dismiss Counts Four, Five and Six of the Superseding Indictment, pursuant to the "doctrine of specialty." Alternatively, he seeks severance of those counts from Counts One, Two and Three, so that he will not be tried on Counts Four and Five at the upcoming trial. The former motion is denied; the latter motion was originally going to be granted, but will now be held in abeyance pending further briefing.

Omarov was extradited from the Czech Republic on or about February 21, 2024. The S4 superseding indictment was the operative accusatory instrument at the time of Omarov's extradition to the United States. The S4 indictment charges four Counts. Count One changes Murder for Hire in violation of Title 18 , United States Code, Sections 1958, 3238, and 2. Count Two charges Conspiracy to Commit Murder-for-Hire, a conspiracy which is alleged to have existed from in or about July 2022, up to and including in or about January 2023, in violation of Title 18, United States Code, Sections 1958 and 3238. Count Three charges a Money Laundering Conspiracy which is alleged to have existed in or about July 2022, up to and including in or about January 2023, in violation of Title 18, United States Code, Sections 1956 (h), (f). Omarov is not specifically named in Count Four of the S4 indictment. Count Four charges co-defendant,

3

Khalid Mehdiyev, with Unlawful Possession of a Defaced Firearm in July 2022, in violation of Title 18, United States Code, Sections 922(k) and 2.

The current superseding indictment (S8) charges six Counts. Counts One, Two and Three are essentially the same as the Counts in the S4 indictment. Count Four of the S8 indictment charges Omarov with Attempted Murder in Aid of Racketeering in violation of Title 18, United States Code, Sections 1959(a)(5) and 2. Count Five charges Omarov with the Use, Carrying, and Possession of a Firearm During and in Relation to Attempted Murder in violation of Title 18, United States Code, Sections 924(c)( 1 )(A)(i) and 2. Count Six of the S8 indictment alleges a Conspiracy to Violate the International Emergency Economic Powers Act— Omarov is **not** charged in Count Six of the S8 indictment.

The charges added in the S8 indictment alter the nature of the prosecution against Omarov by subjecting him to a mandatory minimum sentence, a lifetime maximum, and a significantly longer potential sentence. And while the new charges are premised on the same facts that underlie the earlier indictments, the S8 indictment also adds an entirely new theory of prosecution, namely attempted murder in aid of racketeering, which was completely absent from the S4 indictment that was presumably presented to Czech officials as a basis for the extradition of Omarov.

The doctrine of specialty has been recognized in the United States for over 100 years. *See*, *United States v. Rausher*, 119 U.S. 407 (1886). The principle of specialty means that an extradited defendant "can only be tried for one of the offences described in th[e] treaty [under which he is extradited], and for the offence with which he is charged in the proceedings for his extradition." *United States v. Rauscher*, 119 U.S. 407, 430, 7 S.Ct. 234, 30 L.Ed. 425 (1886). "'Based on international comity, the principle of specialty generally requires a country seeking

4

extradition to adhere to any limitations placed on prosecution by the surrendering country.' " *Suarez*, 791 F.3d at 366 (quoting *Baez*, 349 F.3d at 92). A country that consents to extradite a person has the right to enforce such limitations. *See, e.g., United States v. Garavito-Garcia*, 827 F.3d 242, 246-47 & n.33 (2d Cir. 2016) ("*Garavito*"); *Suarez*, 791 F.3d at 367; *Fiocconi*, 462 F.2d at 479 n.8, 481.

However, " '[a] treaty is primarily a compact between independent nations.' " *Mora v. New York*, 524 F.3d 183, 200 (2d Cir.) ("*Mora*") (quoting *Head Money Cases*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884)), *cert. denied*, 555 U.S. 943, 129 S.Ct. 397, 172 L.Ed.2d 285 (2008). "[I]nternational treaties establish rights and obligations between States-parties—and generally not between states and individuals, notwithstanding the fact that individuals may benefit because of a treaty's existence." *Mora*, 524 F.3d at 200; *see, e.g., Medellín v. Texas*, 552 U.S. 491, 506 n.3, 128 S.Ct. 1346, 170 L.Ed.2d 190 (2008) ("[e]ven when treaties are self-executing in the sense that they create federal law, the background presumption is that '[i]nternational agreements, even those directly benefiting private persons, generally do not create private rights' " (quoting 2 *Restatement (Third) of Foreign Relations Law of the United States* § 907 comment *a*, at 395 (1986))); *Garavito*, 827 F.3d at 247 n.33.

In sum, while "[t]he 'principle of specialty' reflects a fundamental concern of governments that persons who are surrendered should not be subject to indiscriminate prosecution by the receiving government," *Fiocconi*, 462 F.2d at 481, that principle can afford "the extraditee" himself a "remedy only if the surrendering government would object, since the underlying substantive wrong, which grows out of international law, is only to the latter," *id*. at 479-80 n.8. Accordingly, an extraditee lacks standing to complain of noncompliance with an extradition treaty unless the treaty [contains] language indicating 'that the intent of the treaty

5

drafters' was that such benefits 'could be vindicated' through private enforcement." *United States v. Barinas*, 865 F.3d 99, 104–05 (2d Cir. 2017).

Because the principle of specialty confers a right on the Czech Republic, not on Omarov individually, the latter's motion to dismiss Counts Four and Five as against him is DENIED, without prejudice to renewal if the Czech Government objects to prosecuting him on the added counts. It does not appear that that will occur.

In light of the Government's letter to the court of even date, I will hold in abeyance Omarov's motion to sever the trial of Counts 4 and 5 as to him pending further briefing.

With that out of the way we turn to the more customary motions *in limine*.

### Applicable Evidentiary Law

Direct evidence is "not confined to that which directly establishes an element of the crime." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). As the Second Circuit has explained, "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." *Id.* The Second Circuit has repeatedly held that actions and statements are admissible as direct evidence of the crimes charged, and are "not considered other crimes evidence under" Federal Rule of Evidence 404(b), if (a) they "arose out of the same transaction or series of transactions as the charged offense," (b) they are "inextricably intertwined with the evidence regarding the charged offense," or (c) they are "necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also United States v. Quinones*, 511 F.3d 289, 309

(2d Cir. 2007); *United States v. Baez*, 349 F.3d 90, 93-94 (2d Cir. 2003). Moreover, uncharged acts are admissible in a conspiracy case where they are used to (i) explain the development of

6

the illegal relationship between coconspirators; (ii) explain the mutual criminal trust that existed between coconspirators; and/or (iii) complete the story of the crime charged. *See United States v. Diaz*, 176 F.3d at 80; *United States v. Pipola*, 83 F.3d 556, 566 (2d Cir. 1996); *United States v. Rosa*, 11 F.3d 315, 334 (2d Cir. 1993).

Evidence of "other acts" is also admissible under Rule 404(b) if it (i) is advanced for a proper purpose, "such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident," Fed. R. Evid. 404(b)(2); (ii) is relevant to the crime for which the defendant is on trial; (iii) has probative value that is not substantially outweighed by any unfair prejudicial effect; and (iv) is admitted with a limiting instruction to the jury, if requested. *See Huddleston v. United States*, 485 U.S. 681, 691-92 (1988); *United States v. LaFlam*, 369 F.3d 153, 156 (2d Cir. 2004); *United States v. Ramirez*, 894 F.2d 565, 568-69 (2d Cir. 1990). The Second Circuit "follows the 'inclusionary' approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403, or not relevant under Fed. R. Evid. 402." *United States v. Pascarella*, 84 F.3d 61, 69 (2d Cir. 1996) (internal citation omitted); *see also United States v. Paulino*, 445 F.3d 211, 221 (2d Cir. 2006); *United States v. Zackson*, 12 F.3d 1178, 1182 (2d Cir. 1993). The Second Circuit has confirmed that Rule 404(b) permits the admission of evidence of prior criminal activity to provide context "to 'help[] explain to the jury how the illegal relationship between [participants in the crime] developed.'" *United States v. Rolan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990) (alterations in original) (quoting *United States v. Brennan*, 798 F.2d 581, 589 (2d Cir. 1986)).

7

Of course, other acts evidence is, like all other evidence, inadmissible under Rule 403 if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Fed. R. Evid. 403. Evidence is unfairly prejudicial, however, "only when it tends to have some adverse effect upon a defendant beyond tending to prove the fact or issue that justified its admission into evidence." *United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980). Other acts evidence is typically not unfairly prejudicial where it is not "any more sensational or disturbing than the crimes" with which the defendant has been charged. *United States v. Roldan-Zapata*, 916 F.2d 795, 804 (2d Cir. 1990); *see also United States v. Smith*, 727 F.2d 214, 220 (2d Cir. 1984).

### I. Government Motion to Introduce Evidence of the GOI's Involvement in Targeting Victim-1 and Dissidents Outside Iran as Direct Evidence and Pursuant to Rule 404(b) is Granted in Part and Denied in Part

The Government says that it intends to introduce lay witness and expert witness testimony, as well as documentary and electronic evidence, demonstrating the long history of the GOI's targeting of political dissidents located outside Iran; similar to the targeting of the victim in this case (Victim-1). This evidence falls broadly into three categories: *first*, evidence of the GOI's involvement in the July 2022 murder-for-hire plot -- specifically, evidence of the Bazghandi Network's role in arranging for the attempted murder; *second*, evidence of the GOI's longstanding targeting of Victim-1; and, *third*, evidence of the GOI's broader policy history and of targeting dissidents and foreign nationals for intimidation, kidnapping, and murder. The first two categories of evidence are admissible; the third, for the most part, is not.

*GOI's and Bazghandi Network's Role in the July 2022 Murder-for-Hire Plot*

Evidence about the Bazghandi Network's involvement in the murder-for-hire plot is directly relevant to the scope and nature of the charged conspiracies. The Bazghandi Network

defendants allegedly arranged with Amirov to have him and his associates (including Omarov, Mehdiyev and Mamedov) carry out the murder of Victim-1. The Bazghandi Network defendants are charged along with Omarov, Mehdiyev and Mamedov in the murder for hire plot in Count 1, and are co-conspirators of Amirov and Omarov in connection with the murder for hire conspiracy that is the subject of Count 3. Thus, evidence of the Bazghandi Network defendants' role in the charged offenses is directly relevant to the existence and nature of the murder-for-hire conspiracy with which Amirov and Omarov, are charged.[2] Evidence obtained from searches of Amirov's, Omarov's, and the Bazghandi Network defendants' cloud accounts, as well as pen register data from electronic communication applications used by the co-conspirators, will be admitted for this purpose. This evidence tends to demonstrate, among other things, (1) the Bazghandi Network's interest in targeting Victim-1, (2) the hiring of Amirov and Omarov to carry out her murder, (3) that the Bazghandi Network supplied Amirov and Omarov with targeting information and intelligence about Victim-1 as the Organization defendants attempted to carry out that murder. This does not involve any expert testimony.

*Evidence of the GOI's History of Targeting Victim-1*

Evidence of the GOI's history of targeting Victim-1 is similarly admissible, both as background to and the completion of the narrative surrounding the charged conspiracy and to demonstrates the GOI's motive for engaging in the murder-for-hire plot. The jury is entitled to hear that Victim 1 was the subject of repeated threats from the GOI, if only to understand why Iranian nationals residing in Iran and affiliated with intelligence services would target her, a resident of the United States. It is necessary and appropriate background information and so is relevant to the crimes charged. As the Second Circuit states in *United States v. Rosa*, 11 F.3d

---

[2] The Iranian defendants are not in the United States and are not being tried next month.

315 (2d Cir.1993), "it is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators." *Id.* at 334; *see United States v. Pipola*, 83 F.3d 556, 566 (2d Cir.1996). Again, this is fact testimony and should not involve any of the proposed expert testimony.

*Expert & Lay Testimony about GOI's History of Targeting Dissidents/Foreign Nationals*

The Government asks that it be permitted to elicit testimony from an expert witness about the GOI's history of targeting dissidents other than Victim-1, unrelated to the crimes charged in the present indictment. Specifically, the Government wants to introduce evidence about the history of the Islamic Republic of Iran and its efforts over the past 45 years – since the Khomeni government came to power – to suppress dissent, both at home and abroad, using violent means if necessary. The Government proposes to offer expert testimony on the following topics:

1. The GOI's post-1979 history of assassinating Iranian dissidents, from its beginnings as a campaign against former Iranian officials to who served the Shah of Iran, through targeting opponents of the Islamic regime wherever they might be found, anywhere in the world.

2. This campaign has been carried out, in significant part, by the IRGC, an Iranian military and intelligence agency under the authority of Iran's Supreme Leader. The IRGC and its affiliate, the IRGC-IO (IRGC Intelligence Office), have been designated by the USG as supporting terrorism and human rights abuses.

3. The IRGC-IO specifically targets journalists, activists and other who oppose abuses and human right violations in Iran – including dual nationals like Victim 1. The IRGC views Victim 1 and individuals like her as threats to undermine the legitimacy and authority of the regime, in view of, for example, her support for women's rights and opposition to compulsory hijab laws.

10

4. The IRGC accomplishes its goal of silencing dissidents living abroad through intimidation and harassment, rendition, and assassination.

5. Recent IRGC-led plots include not just the one against Victim 1, but against two specific individuals, Ruhollah Zam and Jamshid Sharmahd. The Government would have its expert share the details of the campaigns that resulted in the kidnapping, rendition and execution of these two men, who have apparently been depicted in Iranian media alongside Victim 1.

6. Finally, the expert would testify about the targeting of Victim-1, including a failed attempt to lure her to travel to a place from which she could be kidnapped and taken to Iran (as occurred with Zam and Sharmahd); media blasts concerning Victim 1, including specifically cartoons that appear to equate her with Zam and Sharmahd; the arrest of a member of her family; a public announcement by the head of Iran's Revolutionary Courts that Victim 1 is an agent of a hostile power; threats made against supporters of Victim 1; and the denouncing of Victim 1 by Iran's Supreme Leader. This testimony would presumably include the fact that Victim 1 has received death threats and been the subject of smear campaigns has and public abuse.

The Government "is conscious of the potential undue prejudice to the defendants from this evidence," but insists that its probative value outweighs any potential for unfair prejudice, especially as the proposed evidence about the violent policies and actions of the GOI's intelligence services (with which neither defendant is alleged to have been affiliated) is not substantially more inflammatory than the conduct involved in the specific plot against Victim-1 (in which defendants are alleged to have been involved). The Government promises not to "belabor the point" on its case in chief.

The Government summarizes the probative value of this evidence in the following terms:

> A jury comprised of average New Yorkers may well struggle to accept the plausibility of a foreign government intelligence plot to murder a journalist living in the United States and a foreign government's use of a criminal network to carry out that murder. That kind of plot is entirely foreign to the American system of government and common experience. But what sounds fantastical to our ears is tragically commonplace for the GOI and its intelligence services. This evidence will help to contextualize

11

> the evidence of the charged plot and assist the jury in
> understanding how and why the plot unfolded as it did. It is the
> Government's position that evidence of the GOI's history of
> targeting dissidents and its *modus operandi* is relevant and
> helpful for the jury to understand the charged murder-for-hire
> plot.

Govt Memo at 39. This is the one and only reason cited by the Government for offering the

extensive evidence summarized above.

The Government's suggestion that a foreign government's plot to kill one of its citizens

abroad would be incomprehensible to the average New York juror is unconvincing to the point

of being ludicrous, and I reject it as justification for the introduction of this evidence. The

probative value of reams of evidence about forty five years of Iranian state-sponsored vendettas

against its citizens abroad is substantially outweighed by the potential undue and unfair

prejudice to Amirov and Omarov -- neither of whom is alleged to be a citizen of Iran or a

member of Iranian intelligence, both of whom are alleged to have been involved in exactly one

such plot, about which the jury will hear a substantial amount of very inflammatory evidence

that is not unduly prejudicial, because it is direct evidence of the crimes charged.

However, a modicum (and I do mean a modicum) of the expert's proposed testimony is

admissible, in order to provide the jury with some background to the plot in suit. The

Government's expert can testify, in the most general terms, about the fact that (1) for the past

forty-five years, the GOI has pursued opponents of the regime and its policies, both inside and

outside of Iran; (2) GOI agencies, including specifically the IRGC (an entity likely unknown to

the average lay juror), are involved in these efforts, which are designed to silence dissent against

the regime and its policies, including, *inter alia*, dissent over Iran's treatment of women; and

(3) the regime has on occasion used tactics ranging from media smear campaigns to kidnapping

and rendition to execution in order to silence those it views as enemies of the regime. An

individual with a solid grounding in the recent history of Iran would be competent to testify about that history, some of which may well be familiar to lay jurors, some of which may not be.

But that is all. The jury will hear factual evidence about the GOI's repeated efforts to capture or kill Victim 1 over a span of years from Victim 1 herself. There is no need to reinforce her testimony with some "expert's" opinion and it presents a significant danger of unnecessarily lending credibility to a key Government fact witness.

Similarly, I see no need to get into the details about what happened to any other Iranian dissident, especially given the acknowledged prejudice resulting from the introduction of such evidence. This includes specifically Zam and Shahmad. The fact that Victim 1 was depicted in a cartoon along with these two individuals does not make evidence about the gory details of their respective renditions, show trials and executions admissible. The jury can be shown the cartoon and told nothing more than that the other two people depicted were other Iranian dissidents who were executed by Iran. That is all they need to know.

I cannot imagine that the expert testimony I view as admissible should take more than about 15 minutes, given the level of generality at which I would expect the expert to testify. Indeed, it is quite possible that the defense would be willing to stipulate that the GOI has targeted dissidents in the past, including women's rights activists and dissidents living abroad – which would obviate the need for any expert testimony at all. I don't understand that particular point to be in dispute. Disabuse me of this notion if I am wrong.

This ruling disposes of both the Government's motion for permission to introduce evidence about the matters just discussed and the defendants' cross motion to exclude it.

## II. Evidence of the "Russian Mob's" Existence and Racketeering Activities

In connection with Counts 1, 2 and 3, the Government seeks to introduce lay and expert

13

witness testimony, as well as electronic communications, photographs, videos, and other evidence to demonstrate, *inter alia*, that: Amirov and Omarov, along with Mehdiyev, Mamedov, and others, were members of a criminal organization known as Vory v Zakone,[3] which is alleged to be a loose subsidiary, or perhaps more accurately, an affiliate of something called the "Russian Mob," which I understand to be the Government's shorthand for organized crime elements operating out of Russia. Vory v Zakone (or, as we will refer to it, Thieves in Law) is alleged to operate within Russia and former Soviet states, as well as here in the United States. According to the Government, Thieves in Law was recently run by one Nadir Salifov, a notorious criminal who was assassinated in 2020. The Government further proffers that this organization engages in crimes like the attempted murder that is the subject of this prosecution; and that "vor" members and budding criminals hoping to become vors (thieves) agree to commit heinous crimes to enhance their position in, or gain membership in the organization.

The Government also wishes to introduce evidence about various criminal incidents in which Amirov and/or Omarov took part, either with one another or with another defendant or alleged member of the conspiracy charged in Counts 1 and 2. In particular, the Government wishes to introduce evidence that, in 2021 and 2022, Amirov, Omarov, and Mehdiyev participated in various extortion plots targeting restaurant and small business owners in Brooklyn. One of the targets of these extortion plots was an ethnic Azeri grocery-store owner in Brooklyn ("Victim-2"). According to the Government, in approximately 2021, a Russian Mob associate asked Mehdiyev to help him pay off a debt that he (the associate) owed as result of being extorted. The associate, apparently, suggested that Mehdiyev could help him pay the debt by, in

---

[3] The Vory v Zakone (or "thieves in law") is alleged to be a criminal organization spawn from the disorder of the Russian Revolution of 1917. The group evolved over the Soviet and post-Soviet eras. It is alleged that Vory v Zakone currently asserts its criminal influence inside Russia, neighboring states, and as this case would suggest, around the world.

turn, extorting Victim-2 to pay "protection" money to the mob. Mehdiyev allegedly agreed to help, but asked Omarov to make the actual demand for money from Victim-2, ostensibly, so that Mehdiyev would not be seen as being involved in the extortion. However, while Omarov allegedly threatened and demanded money from Victim 2 in numerous phone calls and electronic communications, Mehdiyev and a co-conspirator ("CC-1") set fire to Victim-2's car, while Mehdiyev and another associate of his ("CC-2") drove to Victim-2's grocery store on March 7, 2022, where Mehdiyev shot Victim-2's parked car several times.

Amirov is not alleged to have had any involvement in this particular plot. I am not sure what, if any, evidence of joint actions by Amirov and any of his co-defendants in furtherance of the business of Thieves in Law the Government intends to offer.

Evidence that the defendants belonged to the same criminal gang tend to show that they had a relationship and had reason to trust one another – evidence relevant to proving the existence of the conspiracy to commit a murder. Evidence about uncharged crimes, while ordinarily inadmissible, is also admissible -- especially when those crimes were committed with co-defendants -- to explain the loyalty and trust that are hallmarks of a co-conspirator relationship. It is also admissible to establish the fact that this group of people was operating in the Southern District of New York. Finally, evidence about how participation in a crime could enhance one's position in a criminal gang is admissible as proof of motive to commit the charged crimes.

For this reason, evidence of the sort described in the first paragraph of this Section II will be admitted -- some of it with a limiting instruction about the reasons for which it may be considered. The jurors will of course be told that they may not rely on evidence about the commission of other crimes in the past as proof that the defendants committed the charged

crimes. I cannot tell at this time whether the jury will need to hear a limiting instruction about the Victim 2 evidence, given that this incident did not involve Amirov; that will depend on what other evidence the Government introduces in order to link Amirov to the charged conspiracies in Counts 1, 2 and 3.

However, to the extent that the Government may seek to introduce evidence about the practices of Russian organized criminal gangs generally, or about something the Government calls "the Russian mob" (of which Vory v Zakone, or "thieves in law," is identified as just one subgroup), it goes beyond the bounds of what is appropriate and necessary to prove either the existence of the conspiracy charged in Counts 1 and 2 -- which is the conspiracy among defendants (including Mehdiyev and Mamedov) and the Bazghani Defendants to murder Victim 1 – or to provide a motive for why Omarov and Amirov would join such a conspiracy. It is therefore not admissible in connection with those counts.

We turn now to how this evidence relates to Counts Four and Five. These two counts, which were added to the original indictment in a superseder, charge the defendants with being members of a racketeering enterprise (Count 4), and aiding and abetting the use of a firearm in aid of the racketeering enterprise (Count Five). The scope of the Count 4 racketeering enterprise is poorly defined in the indictment and remains unclear to me. I originally thought that the charged enterprise was "the Russian Mob" (i.e., Russian organized crime, broadly speaking), but the Government has recently represented the racketeering enterprise to be an association in fact, the precise contours of which I confess I do not understand. It is either the Vory v Zakone or (based on statements made at the February 26 pre-trial conference) some sub-group of the Thieves in Law consisting of the defendants and a few other people – not sure who. In order to allow me to address the motion *in limine* insofar as it is addressed to Counts 4 and 5, the

Government is directed to define for the court the precise scope of the enterprise it is alleging, and specifically to identify its members. Who, exactly, are the members of this "association in fact?" And how are they associated?

### III. The Bruton Motion

Both Amirov and Omarov made post-arrest statements to law enforcement, portions of which the Government intends to seek to admit at trial. It is the Government's position that these statements were lawful obtained after the men were *Mirandized*. It is also the Government's position that the admission of those statements would not violate the *Bruton* rule. This aspect of the Government's motions *in limine* concerns only that latter issue.

Where the Government seeks to offer a co-defendant's statement to law enforcement when the co-defendant will not testify at trial and the statement specifically inculpates a co-defendant, courts "cannot accept limiting instructions as an adequate substitute for [the co-defendant's] constitutional right of cross-examination." *Bruton v. United States*, 391 U.S. 123, 135-37 (1968). In such circumstances, courts generally have three options: (1) careful redaction of the out-of-court statement such that all references to the co-defendant are eliminated; (2) severance; or (3) exclusion of the statement at the joint trial. *United States v. Jass*, 569 F.3d 47, 56 n.5 (2d Cir. 2009). The Second Circuit has approved two types of redaction to address *Bruton* concerns: (1) a redaction that eliminates all reference to a co-defendant's existence; and (2) a redaction that replaces a co-defendant's name with a neutral pronoun such that the statement, standing alone, cannot be understood to refer to the co-defendant. *Id.* at 56. "The critical inquiry is always whether introduction of a confession at a joint trial presents an 'overwhelming probability' that the jury will not be able to follow an instruction limiting consideration of the confession to the declarant defendant." *Id.* at 56 n.5 (citation omitted). Where a redacted

statement utilizing neutral pronouns passes this test, "it may be admitted with a proper limiting instruction even though other evidence in the case indicates that the neutral pronoun is in fact a reference to defendant." *United States v. Williams*, 936 F.2d 698, 700-01 (2d Cir. 1991).

According to the Government, Amirov did not refer to Omarov in his post-arrest statement. Therefore, his statement presents no *Bruton* issue. And while Omarov did refer to Amirov during his post-arrest statement, there is no *Bruton* issue for the Court to resolve because the Government represents that it does not intend to offer those portions of the interview at trial.[4]

## IV.    Rulings Pursuant to Hearsay Exceptions 801(d)(2)(A), 801(d)(2)(E) and 804(b)(3)

The Government seeks to introduce at trial statements made by the defendants, other members of the Organization, and GOI-linked co-conspirators, pursuant to the hearsay rules 801(d)(2)(vA) (Statements of a Party Opponent), 801(d)(2)(E) (Co-Conspirator Statements), and 804(b)(3) (Statements Against Interest).

---

[4] The Government says that presently intends to offer only the following portions of Omarov's statement:

• Omarov admitted to being "an Azerbaijani thief" and that "we have our own law." Additionally, Omarov described general concepts and terms used within the Russian Mob, such as vor, bradiyaga, and skhodka.

• Omarov described his close relationship with Nadir Salifov, including that Nadir Salifov made Omarov a thief, and that Omarov was "the closest person to" Nadir Salifov. In addition, Omarov also stated that Nadir Salifov had been in jail and, ultimately, was assassinated. Omarov also explained that he knows other members of the Organization, including Mamedov, Mehdiyev, Akhunzada, and Namik Salifov. Omarov also stated that, because of his status in the Russian Mob, he and Nadir Salifov had many enemies.

• Omarov admitted his involvement and guilt in the Organization's extortion of Victim-2, specifically that, "concerning [Victim-2], yes, I can say, somewhere I consider myself guilty."

• Omarov's false claims that he had nothing to do with the plot to murder Victim-1; that the $10,000 payment sent by Mehdiyev overseas, which Omarov knew was sent via Western Union, was for Omarov's birthday; that Omarov did not know how an iCloud works; and that he did not work with Mehdiyev and believed that Mehdiyev was working on selling pizza in America.

• Omarov admitting to using burner phones.

*Statements by Co-Defendants/Co-Conspirators/Members of the Russian Mob or a Subgroup Thereof*

The Government expects to introduce testimony from CW-1, as well as records of electronic communications, concerning statements made by Amirov, Omarov, Mehdiyev, Mamedov, and others during the course of their involvement in the Organization and the commission of the charged offenses. Those statements generally fall into the following categories:

1. Statements made by Nadir Salifov, as well as other members of the Russian Mob, including co-conspirators identified as "Terlan" and "Vahid," about Mehdiyev's joining the Russian Mob; and how the Russian Mob worked, including terminology and general background on initiation, membership, and criminal activities.

2. Statements made by Nadir Salifov, Namik Salifov, Omarov, Mehdiyev, and others specifically about the activities of the Organization, a subset of the Russian Mob that was based on allegiance to Nadir Salifov, and, after Salifov's murder, to Namik Salifov. This will include statements made to Mehdiyev by other members of the Russian Mob about Nadir Salifov's murder and the subsequent realignment of the Organization under the authority of Namik Salifov.

3. Statements by Omarov, Mehdiyev, Mamedov about the Organization's racketeering acts outside the United States, including about murders, assaults, extortions, and kidnappings, which were intended to increase Omarov, Mamedov, and Mehdiyev's status within the Russian Mob, so that they could become *vors*. This will include specific acts of assassination, kidnapping, assault, and extortion, in, among other places, the Ukraine, Georgia, and Azerbaijan.

4. Statements by Namik Salifov, Omarov, Mehdiyev, Mamedov, and others about the Organization's efforts to extort at least two owners of grocery stores in Brooklyn, including Victim-2. These include, among other things, explicit instructions from Omarov and conversations with Namik Salifov about these extortions, as well as Mehdiyev's conversations with U.S.-based co-conspirators about completing these extortions.

5. Statements by Omarov, Mehdiyev, and Mamedov about the Organization's efforts to kill Victim-1. These include, for example, Omarov's tasking of

Mehdiyev to kill Victim-1, which Omarov stated would be more lucrative than the extortion of Victim- 2; Omarov's initial statements to Mehdiyev that the job for this was coming from the president of Azerbaijan, who wanted to do a favor for the GOI, and that if they successfully killed Victim-1, that would result in a "green light" for Omarov, Mehdiyev, and Mamedov to be able to go to a new country with a brand new passport and receive lucrative assignments to kill other journalists residing outside Azerbaijan; and numerous statements made by Omarov to Mehdiyev containing specific efforts and instructions to murder Victim-1, captured both in contemporaneous electronic communications and conversations, including, as described above, that "high-level" people in Iran were standing by to see whether Mehdiyev would succeed in carrying out the murder.

6. Statements by Omarov and Mamedov, following Mehdiyev's arrest, in which Omarov and Mamedov threatened Mehdiyev and his family, based on their belief that Mehdiyev was cooperating with law enforcement authorities.

7. Statements by Amirov, described above, following his arrest, when he was detained. These include statements about Amirov's participation in the plot to murder Victim-1, as well as Amirov's efforts to engage with Mehdiyev while both were in custody at the MDC.

I have no idea whether the Government can introduce some of these statements, because the statements themselves have not been proffered. I can say the following:

The statements in paragraph 5 above are obviously admissible, once the Government has laid the groundwork for the existence of the murder for hire conspiracy. Many of them are not even hearsay (for example, orders given by Omarov to Mehdiyev), and all statements on the topics listed were made in furtherance of that conspiracy.

With respect to Amirov's statements to CW-1 following his arrest and extradition to the United States (*see* Brief on the Government's Motion in Limine at pages 29-30): They are not hearsay insofar as they relate to Amirov himself; they are party admissions and (to the extent he refers to himself) declarations against penal interest. Fed. R. Ev. 801(d)(2)(A), 804(b)(3).

However, to the extent these statements refer to Omarov, these statements are hearsay, *United States v. Pike*, 292 F. Appx 112 (2d Cir. 2008), and they cannot be admitted as against Omarov unless they fall within some recognized exception to the hearsay rule. They do not.

They do not qualify as co-conspirator statements made in furtherance of an ongoing conspiracy (Fed. R. Ev. 801(d)(2)(E)) because, as far as I know, at the time they were made, none of the charged conspiracies were still ongoing. I can say with certainty that the conspiracies Charged in Counts One, Two and Three were not ongoing at that time; by the time Amirov arrived in the United States and was in a position to speak with CW-1[5] (whom I believe but do not know to be Mehdiyev), the conspiracies to use the "organization" to kill Victim 1 and to launder money paid in connection with that murder were long in the rear view mirror. I know of no evidence that would allow me to conclude, by a preponderance, that this conspiracy was still in effect at the time Amirov's statements were made.

The Government has not proffered any evidence tending to show that the conspiracy charged in Count 4 (which I presently do not understand to be "Thieves in Law," but rather an association in fact consisting of the defendants and others whom the Government has yet to identify) was in existence when these statements were made. However, Rule 801(d)(2)(E) limits admissibility to those statements "during and in furtherance of" specific criminal conspiracies; the mere existence of an organized crime group is not enough. *See United States v. Gigante*, 166 F.3d 75, 82–83 (2d Cir. 1999). The usual rule is that, once the conspirators are under arrest, the statements they make to one another are not made *in furtherance of* their conspiracy. And neither "idle chatter" nor "merely narrative" description by one coconspirator of the acts of another meets the Rule 801(d)(2)(E) test. *See Beech–Nut*, 871 F.2d at 1199 (citing *United States v. Lieberman*, 637 F.2d 95, 103 (2d Cir.1980); *United States v. Heinemann*, 801 F.2d 86, 95 (2d Cir.1986) (Winter, J.)).

---

[5] Amirov was arrested on January 23, 2023; his post-arrest conversations with CW-1 necessarily occurred after that date. Mehdiyev was arrested on July 29, 2022; any conversations following Mehdiyev's arrest that Amirov had about completing the job occurred in the late summer and autumn of 2022.

Amirov's statements about payments made by Victim 2 to Omarov are not in furtherance of any conspiracy; they are statements about things that happened in the past. The same is true of statements by Amirov about Omarov's transferring money to Bulgaria; about Omarov's having recorded "everything" on his cellphone during the course of the murder for hire conspiracy, which led to Amirov's arrest; and about offering Victim 2's offer to pay Amirov $200,000 to "solve his problems with Omarov." Nothing in these statements Amirov made to CW-1 about Omarov appears to be "in furtherance" of any conspiracy; these statements appear to be about acts that took place in the past.[6]

Amirov's statements about Omarov also do not fall within the exception in Rule 804(b)(3) (declaration against penal interest), because I agree with Omarov's counsel that Amirov's statements to CW-1 about Omarov tend to exculpate Amirov while inculpating Omarov – by blaming Omarov for Amirov's arrest; by insisting that Omarov extorted Victim 2 while Amirov did not, but merely tried to "solve Victim s's issues with Omarov;" and by implicating Omarov (through his girlfriend) in the money laundering conspiracy charged in Count 3 while not implicating Amirov in that conspiracy at all. Of course, Amirov made statements to CW-1 about his own participation in the Victim 2 affair; those statements are admissible as against the speaker, but no one else.

Therefore, Amirov's hearsay statements to CW-1 *about Omarov* will not be admitted. This may require some redacting of portions of Amirov's statements to CW-1 that refer to them both.

As for the rest of the proposed hearsay statements: The Government will have to make a *prima facie* case that the charged conspiracies exist (and show who their members are alleged

---

[6] I note that the Government has ample admissible evidence from Omarov's own mouth about his participation in the shakedown of Victim 2.

to be) before I can evaluate whether the statements arguably qualify as co-conspirator hearsay. Assuming arguendo that the Government satisfies this burden, then as to any individual for whom there is evidence that he belonged to any charged conspiracy that is the subject of the upcoming trial, statements made in furtherance of said conspiracy will be admitted. The Salifovs are, I assume, considered to be co-conspirators with Amirov and Omarov in the conspiracy charged in Count 4; the Government needs to confirm that.

When evaluating specific statements, the usual rules will apply about what does and does not constitute hearsay. So, for example, out of court statements that consist of questions, requests, instructions, or demands, are not hearsay and so are admissible. *See, e.g.*, *United States v. Kuthuru*, 665 F. App'x 34, 38 (2d Cir. 2016) ("Questions and commands are ordinarily not hearsay [.]").

Party opponent admissions and admissions against interest by Amirov and Omarov generally will be admitted; those statements are highly probative and not unduly prejudicial. Once I hear these statements, I can reach a conclusion about whether they are relevant to establish the relationship of the co-defendants and co-conspirators, and the motivation and execution of the conduct underlying both the murder-for-hire and violent crime in aid of racketeering charges. *See United States v. Rosa*, 11 F.3d 315 (2d Cir. 1993) ("[I]t is within the [trial] court's discretion to admit evidence of prior acts to inform the jury of the background of the conspiracy charged, in order to help explain how the illegal relationship between participants in the crime developed, or to explain the mutual trust that existed between coconspirators.").

I imagine that most, if not all, of the statements described in Paragraph 4 above will be admitted, because I have ruled that the targeting of Victim 2 (the Brooklyn grocer) can be introduced into evidence in order to prove the existence of the murder for hire conspiracy and

23

to explain the relationship of trust among the defendants.

The statements described in Paragraph 6 above will be admitted because they are statements of a party opponent, coconspirator statements, and statements against penal interest. They expose the declarant—specifically, Amirov and Omarov—and their alleged co-conspirators to criminal liability. They appear (on paper) to bear the requisite indicia of reliability because they were made between co-conspirators engaged in joint criminal conduct, *i.e.*, "to a person whom the declarant believe[d] was an ally," rather than to "curry favor with authorities." *See United States v. Saget*, 77 F.3d 223, 230 (2d Cir. 2004); *United States v. Williams*, 506 F.3d 151, 155 (2d Cir. 2007). If either defendant has an objection to some specific statement, his counsel will raise it at trial.

Finally, assuming all the other conditions for admissibility are met, admission of these statements would not run afoul of Fed. R. Evid. 403, because they relate to the plot to murder Victim-1, and the background and activities of the Organization that facilitated that murder.

I will have to rule on the statements described in Paragraphs 1, 2 and 3 above when the Government tries to introduce them. I don't know what these statements are.

*Evidence of Statements Made by Co-Conspirators Linked to the GOI*

The Government expects to establish that the four members of the Bazghandi Network, who are at-large and charged co-defendants—Bazghandi, Haj Taher, Sedighi, and Forouzan—were co-conspirators in the plot to murder Victim-1. The Government asks that it be permitted introduce their statements—to one another and to Amirov—as co-conspirator statements. In particular, the statements included in the following numbered categories:

1. Pen register data reflecting and contents of communications between Amirov and Forouzan. From in or about September through December 2022, Forouzan was in regular contact with Amirov. During these communications, Forouzan forwarded certain images to Amirov, including (i) an image of Victim-1 taken

24

from an online appearance by Victim-1; and (ii) a four-part composite image which included a still image of Mehdiyev on Victim-1's porch.

2. Electronic communications, dated in or about September and October 2022, between and among Forouzan, Sedighi, and Haj Taher, concerning payment for the murder of Victim-1.

Assuming the Government establishes that Bazghandi, Haj Taher, Sedighi, and Forouzan were co-conspirators in the plot to murder Victim-1, their statements are relevant and admissible under Rule 801(d)(2)(E). They will be admitted.

### V. Remaining Defense *In Limine* Motions

The decisions above dispose of most of the defense in limine motions, which are the mirror image of the Government's motions.

Amirov's motion to exclude evidence concerning any prior or subsequent Iranian Government plot or scheme to target political dissidents, including Ms. Alinejad, is granted in part and denied in part. *See supra.* at 8-13.

Amirov's motion to exclude testimony from the Government's Proposed Expert Dr. Matthew Levitt and Dr. Louise Shelley is granted in part and denied in part, in accordance with the court's opinion limiting the Government's expert testimony, which is set forth above. *See supra.* at 8-16

Finally, Omarov's motion to adjourn the trial for 90 days because of recent statements made by Donald Trump is denied. The Court will deal with any statements/media coverage touching on matters possibly related to this trial during *voir dire*. Additionally, the jurors will be instructed during *voir dire*, during the trial, and in the court's final instructions, that to render a just and impartial verdict they must decide this case based solely on the evidence they hear in the courtroom and the instructions on the law that they receive from the Court. I find that jurors follow that instruction.

This represents the decision and order of the Court. I will see the parties on Tuesday, March 4, at 11:00 AM for our final pre-trial conference and an evidentiary hearing on Omarov's motion to suppress.


Dated: February 28, 2025

Colleen McMahon

BY ECF TO ALL COUNSEL