

*U.S. Department of Justice*

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

March 4, 2025

**BY ECF**

The Honorable Colleen McMahon
United States District Judge
Southern District of New York
Daniel Patrick Moynihan U.S. Courthouse
500 Pearl Street
New York, New York 10007

      Re:    <u>*United States v. Rafat Amirov et al.*</u>,
             **S8 22 Cr. 438 (CM)**

Dear Judge McMahon:

      The Government respectfully submits this letter in response to the Court's Order (Dkt. 125), directing, among other things, that the Government define precisely the scope and membership of the "association-in-fact" defined as the "Organization" in Count Four of the S8 Indictment (Dkt. 80, the "Indictment"). Relatedly, this letter further addresses certain aspects of the Court's ruling with respect to statements about the charged offenses made by Rafat Amirov to CW-1 while both were in custody at the Metropolitan Detention Center ("MDC").[1]

    **I.**    **The Organization**

      As described in the Indictment, Rafat Amirov and Polad Omarov (the "defendants"), along with Khalid Mehdiyev and Zialat Mamedov, among others, are members of the *Vory v Zakone*, also known as the Thieves-in-Law or the Russian Mob. The Russian Mob is not a centrally organized, monolithic entity; rather, as CW-1 and the Government's proposed expert witness, Dr. Louise Shelley, would describe, "Russian Mob" is a term that describes a criminal organization, one that has particular rules, structures, and practices, as described in more detail below. The highest status in the Russian Mob is that of *vor*, or Thief, and the Russian Mob is organized around

---

[1] The Government has proposed a stipulation to the defense encompassing evidence about the Government of Iran, in lieu of the noticed expert testimony of Dr. Matthew Levitt. (*See* Dkt. 125 at 12-13). The parties are also discussing stipulations on other matters, as noted in the Government's prior correspondence. (*See* Dkt. 94 at 2). The Government understands that the defense will stipulate to the authenticity of the content of electronic accounts and devices, as well as to the authenticity, dates, and participants of certain recorded calls; conversely, the Government is preparing to call witnesses from the Czech Republic and the MDC to establish the chain-of-custody of cellphones seized from Omarov in each location, as Omarov has indicated he will not stipulate to the relevant facts. The parties also continue to discuss other possible stipulations, such as to the accuracy of translations.

various *vors* of differing power and influence. The "Russian Mob," therefore, is best viewed as a criminal organization with various factions, some led by *vors*, collaborating and competing with one another, while all following common, recognized structures, practices, and customs.

The Organization is such a subset within the Russian Mob united by common history and allegiances, and engaging in common criminal activities, whose members form an association in fact. *See Boyle v. United States*, 556 U.S. 938, 946 (2009) (an association-in-fact enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct") (quoting *United States v. Turkette*, 452 U.S. 576, 583 (1981)); *see also United States v. Kelly*, --- F.4th ----, 2025 WL 466673, at *8 ("In keeping with the principle that courts should liberally construe the RICO statute, the Supreme Court has noted that the term 'any' ensures that the definition has a wide reach, and the very concept of an association in fact is expansive.") (cleaned up) (quoting *Boyle* at 944). The Government expects that CW-1 will testify that he joined the Organization, which CW-1 understood as a faction within the Russian Mob that followed its rules, under the authority of a particularly powerful, now deceased, *vor* named Nadir Salifov, a/k/a "Lotu Guli" or "Guli." Guli's notoriety, power, and authority drew a number of others engaged in crime who adhered to the principles of the Russian Mob into his orbit, including individuals like Amirov who were elevated to *vor* status, or "crowned," under Guli's patronage; and others, like Omarov and CW-1, who committed crime under Guli's "name," or authority, paid him respect and monetary tribute, and hoped eventually to receive his blessing to be crowned *vors*. After Guli's assassination in August 2020 as a result of a bloody war between Guli and another *vor*, Guli's acolytes lacked a strong leader but continued to associate with each other, including Guli's brother, the *vor* Namik Salifov, in a shifting array of criminal schemes while also vying for power in the vacuum left by Guli's death—all within the recognized structures and principles of the Russian Mob. The Organization, which had formed before Guli's death, persisted after it, through the continued association in fact of certain individuals, including CW-1, Omarov, Mamedov, and Amirov, to varying extents at different times. The Organization remained connected in this way, as well as through adherence to the structure, principles, and rules of the Russian Mob, of which the Guli-connected subset, was part.

The evidence at trial will include both testimony and video and photographic evidence of the relationships among the members of the Guli faction of the Russian Mob, *i.e.*, the Organization, including multiple gatherings of the members and the frequent exchange of tribute photographs of videos extolling the criminal *bona fides* of themselves and each other and their fealty to Guli. For example, CW-1 will describe a number of extortionate and kidnapping efforts that CW-1, Omarov, Mamedov, and various other Russian Mob associates engaged in both in the United States and in foreign countries as part of Omarov's and CW-1's efforts to raise their profile and status within the Russian Mob and eventually to demonstrate that they were worthy of being crowned *vors*. Following Guli's murder, CW-1, Omarov, Mamedov, and their associates initially aligned with Guli's brother, Namik Salifov. A falling out between Omarov and Namik led to a power struggle between the two, which was ongoing at the time of Omarov's arrest. Similarly, CW-1, Omarov, and Amirov were all part of the Guli faction and remained so after Guli's murder. At one point, CW-1 and Omarov were on the opposite side of a dispute with Amirov because of a falling out between Omarov and Amirov's close associate, Rafael, whom CW-1 and Omarov attempted to murder. After this episode, Omarov and Amirov grew close again, communicating regularly about Russian Mob matters throughout at least late 2021 and 2022, including with respect to the extortion of Victim-2 and the murder-for-hire plot against Victim-1.

The defendants' allegiance to Guli and membership in the Guli faction of the Russian Mob is corroborated by various social media posts, photographs, and tribute videos they share with each other and others, that extol their criminal acts and positions as "ogrus," or "thieves," in the Organization. For example, there is an image (below) contained on a cellphone seized from Omarov while in custody at the Metropolitan Detention Center ("MDC") picturing, from left, Amirov, Namik Salifov, Omarov, and Nadir Salifov, with a caption that, in substance, asks why members of the Salifov faction keep getting arrested.



This image also features, in the top right corner, an eight-pointed star. This is a symbol of the Russian Mob and illustrative of the intersection between the Organization, the specific group at issue in this case, and the broader criminal rubric to which it adheres—the Russian Mob. In addition to identifying particular members of the Organization, the Government anticipates that CW-1 also will testify about the tenets and characteristics of what CW-1 conceives of as the Russian Mob; including, for example, the use of symbols like eight-pointed stars, as in the image above. That testimony will also include the organization, structure, and history of the Russian Mob, including, among other things, the three levels of authority in that organization: *vor*, *bradiyaga*, and *Muzhik*. This is critical context to the crimes the defendants are alleged to have committed; demonstrating why, for example, Amirov (a *vor*) directed Omarov (an aspiring *vor*) to enlist CW-1, a *bradiyaga*, to kill Victim-1.

In addition to Amirov, Omarov, CW-1, Mamedov, and the Salifovs, there also were other members of the Organization who assisted in carrying out murders, kidnappings, and extortions, among other racketeering acts, in the United States and abroad. The Government anticipates that CW-1 may testify about certain of these fellow members of the Russian Mob, who also committed crimes with and/or at the behest of Amirov, Omarov, Mamedov, and CW-1, including: Fikret Dadashov, who murdered a rival mob member in Marneuli, Georgia, in coordination with Omarov, Mamedov, and CW-1; "Elmuraz," a friend of Mamedov's whom CW-1 recommended to murder an individual who had threatened Omarov's godson; "Pasha," who assisted CW-1 with a kidnapping in Ukraine; "Akhmed," whom Amirov directed CW-1 to contact when both were in custody at the Metropolitan Detention Center ("MDC"); and Zaur Abdullayev, a U.S.-based member of the Russian Mob who participated in the extortions, including of (i) a restaurant owner;

and (ii) a grocery store owner, identified in the Government's motions *in limine* as Victim-2 (*see* Dkt. 104 ("Gov't MILs") at 16-17, n.6).

In short, the principal members of the Organization at issue in this trial are Amirov, Omarov, CW-1, Mamedov, and the Salifovs. They are associated based on a shared loyalty to the Salifov name; by their history of criminal activities together; and their shared adherence to the precepts of what CW-1—and Dr. Shelley—describes as the "Russian Mob." Additional members include Fikret Dadashov, Zakir Danilov, Zaur Abdullayev, "Aref," "Ahmed," and others.

## II. Amirov's Statements to CW-1

In the context of this clarification about the Organization and its activities, the Government respectfully addresses the Court's ruling about the admissibility of Amirov's statements to CW-1 while both were in custody at the MDC. (*See* Dkt. 125 at 20-22; *see also* Gov't MILs at 30-31; Gov't Reply, Dkt. 117 at 4-6). Amirov's statements to CW-1 are understood not only as admissions from one defendant to another; more than that, they are statements from a *vor* in the Organization, Amirov, to a trusted former lower-ranking member, CW-1, about himself and about other members of the Organization. Amirov's statements are therefore best understood in the context of a conversation of their shared guilt as members of the Organization in connection with its prior criminal activities—including the attempted murder of Victim-1 and the attempted extortion of Victim-2.

Amirov's statements to CW-1 are described, in substance, in the Government's Reply Brief. (*See* Dkt. 117 and 4-6). In addition to the statements described therein, the Government also expects that CW-1 will testify that CW-1 told Amirov that Omarov had threatened CW-1 following CW-1's arrest. Amirov then responded to CW-1, in substance, that Amirov already knew that because Amirov had been listening to the calls CW-1 had with Omarov from the MDC in the immediate aftermath of CW-1's arrest, and heard Omarov tell CW-1 that "they" wanted their money back and that another individual could finish the job of killing the journalist. This statement, like the others described in the Government's Reply, do not just implicate Omarov—the squarely inculpate Amirov. This is true both as to the murder-for-hire plot and the earlier attempted extortion of Victim-2.

The Court ruled that Amirov's statements about Omarov "do not fall within the exception in Rule 804(b)(3) (declaration against penal interest), because . . . Amirov's statements to CW-1 about Omarov tend to exculpate Amirov while inculpating Omarov[.]" (Dkt. 125 at 22). The Court provided as specific examples Amirov blaming Omarov for Amirov's arrest, insisting that Omarov extorted Victim-2 while Amirov merely tried to solve the issue, and implicating Omarov in the money laundering conspiracy. (*Id.*). Respectfully, and with the additional context about the Organization described above, the Government submits that each of these statements by Amirov is inculpatory *as to Amirov*, not just Omarov, and respectfully requests that the Court reconsider its prior ruling in light of the Government's clarifications about the Organization and additional proffers of CW-1 anticipated testimony.

*First*, Amirov's statement that he "blames" Omarov for Amirov's arrest was not a claim of innocence; rather, Amirov blamed Omarov for failing to delete evidence of their shared crime. Amirov's statement acknowledges that the electronic communications recovered from Omarov's

cloud accounts and devices implicate Amirov. The significance of that admission, and the extent to which it is against his penal interest, is highlighted by Amirov's expert notices. The Court excluded Amirov's proposed experts, but the intended purpose of the proposed experts plainly was to attempt to establish grounds to argue that the evidence recovered from Omarov's accounts and devices relates to someone other than Amirov; Amirov's admission contradicts that effort and shows that the evidence implicates him. Amirov did not attempt to ascribe responsibility for the offenses to Omarov to diminish Amirov's responsibility, he criticized his co-conspirator keeping the evidence and getting them both caught.

This is consistent with Amirov's statement that keeping all this information on his cellphone, as Omarov did, was inappropriate behavior for a *vor*; and with CW-1's anticipated testimony that, as a matter of course, he routinely deleted evidence relating to criminal activities and the Russian Mob from his phone and even attempted to do so when he was apprehended in the present case. Indeed, in his post-arrest statement, Amirov claimed to have "dropped" his phone and that it was broken. Substantial electronic communications documenting Amirov, Omarov, and CW-1's involvement in the plot to murder Victim-1 *was* in fact found in Omarov's cloud accounts and devices. The data retention settings on Amirov's cloud account, however, were much more limited and FBI digital forensic experts have not been able to extract data from the cellphone Amirov was using that is registered to that account. The Government therefore respectfully submits that Amirov's statement that Omarov is a "singer" who, because of his carelessness, got them all caught for their shared criminal activity, is inculpatory as to Amirov.

*Second*, Amirov's statement that Victim-2 had offered to pay Amirov $200,000 to "solve Victim-2's issues with Omarov," is similarly inculpatory, because it directly implicates Amirov in Omarov, Mamedov, and CW-1's efforts, on behalf of the Organization, to extort Victim-2. Amirov, who was not then in the United States, received an offer of $200,000 from Victim-2 to "solve" Victim-2's problems with Omarov. Viewed in the context of the Organization's activities, this is best seen as Victim-2 offering to pay a Amirov (a *vor*) $200,000 to get *another* member of that same criminal organization, Omarov, to stop threatening and extorting Victim-2. This is, as the Government expects CW-1 to testify, a classic example of how the Organization worked to extort victims, with one member of the Organization demanding a large amount of money and threatening severe violence while another member of the Organization pretends to play the role of a sympathetic intercessor. Omarov and CW-1, in fact, engaged in precisely such schemes themselves. Moreover, simply the fact of Amirov's awareness of the Organization's attempts to extort Victim-2 is inculpatory as to him, as, but for his membership in the enterprise, he would otherwise have no reason to know about this effort. In short, Victim-2 did not offer Amirov $200,000 because Amirov was simply trying to help; rather, Victim-2 did so because of Amirov's position and involvement in the Organization.

*Third*, Amirov's statement to CW-1 that Omarov directed CW-1 to wire a portion of the $30,000 sent by Amirov and Omarov to CW-1 to Omarov's girlfriend also is inculpatory as to Amirov. CW-1 received a different description of the recipient of the money from Omarov at the time of the transfer, and Amirov's admission that he knew the true purpose of the transfer, which is consistent with other evidence about the transfer, implicates Amirov by showing that (a) Amirov was, in fact, involved in transferring $30,000 to CW-1; (b) that the payment was in furtherance of the murder-for-hire plot; and (c) Amirov and Omarov's relationship was close enough that Omarov disclosed the true recipient to Amirov. At the time of CW-1's transfer, Omarov told CW-1 the

payment was to help another member of the Organization, Fikrat Dadashov, flee from a murder Dadashov had committed on CW-1's and Omarov's behalf. In fact, the funds went to Omarov's girlfriend in Bulgaria, and Amirov's awareness of this fact implicates Amirov in the transfer of the $30,000 in furtherance of the murder-for-hire, attempted murder, and money-laundering charges.

*Finally*, Amirov's admission to CW-1 that Amirov was listening while Omarov threatened CW-1, after CW-1's arrest, seeking the return of the $30,000, implicates Amirov in the murder-for-hire and money-laundering charges. This admission further ties Amirov to the initial payment of the money in furtherance of the attempted murder and the threats made against CW-1 after his arrest. None of these admissions by Amirov attempt to diminish his responsibility or shift blame to someone else; rather, they reveal Amirov's knowledge of specific details of how the offense was committed, including details CW-1 was not privy to; show that the evidence recovered from a co-conspirator's accounts and devices is about Amirov; and acknowledge Amirov's participation in the post-arrest threats against CW-1.

Accordingly, for the reasons set forth above and in the Government's prior motions (*see* Gov't MILs at 30-31; Gov't Reply at 4-6), the Government respectfully requests that the Court reconsider its rulings as to Amirov's statements to CW-1 in the MDC. The Government will be prepared to further address any questions the Court may have at the conference scheduled today.

Respectfully submitted,

MATTHEW PODOLSKY
Acting United States Attorney

By:     /s/
Jacob H. Gutwillig / Michael D. Lockard
Matthew J.C. Hellman
Assistant United States Attorneys
(212) 637-2215 / 2193 / 2278

cc: Defense Counsel (by ECF)