UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————————————x

UNITED STATES OF AMERICA,

          -against-                              S8 22 Cr. 438 (CM)

RAFAT AMIROV and POLAD OMAROV,

          Defendant.

—————————————————————————————x

**DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS AND
FURTHER TO LAST WEEK'S DECISION ON THE MOTIONS *IN LIMINE***

McMahon, J.:

      This decision addresses defendant Omarov's motion to suppress statements that he made

to law enforcement after his arrest and during his extradition to the United States. (Dkt. # 97). It

is also further to the court's omnibus decision on the motions *in limine*, which was filed on Friday,

February 28, 2025 (Dkt. # 125).

**I.    Omarov's Motion for Severance is Denied**

      For substantially the reasons articulated in the Government's letter to the court dated March

1, 2025, defendant Omarov's motion to sever Counts 4 and 5 is at this time DENIED, as is

Amirov's joinder in that motion.

      Pursuant to the extradition treaty between the United States and the Czech Republic and in

accordance with what I understand to be Czech domestic law, the United States, not the Czech

Government, gets to decide whether crimes charged following an extradition from the Czech

Republic do or do not arise out of the same facts. (*See* Exhibit B to Dkt. No. 126 (filed under seal)).

The Government has concluded that the crimes charged in Counts 1, 2 and 3 do arise out of the

same facts as the crimes charged in Counts 4 and 5. That appears to be conclusive – at least as far

as the Czechs are concerned. If the Government wants to go ahead and try Omarov on Counts 4 and 5, it simply runs the risk that some higher authority than me will conclude that this was error.

However, given United States rules for factual overlap, the Government appears to be correct. The Government has now (finally) identified what I will refer to as "Guli's Vor" – a gang, led by one Nadir Salifov ("Guli"), which is affiliated with a larger criminal gang known as Vory v Zakone ("Thieves in Law") – as the racketeering enterprise charged in Count 4 of the indictment. It has also clarified that members of Guli's Vor, including the defendants, are the alleged non-Iranian members of the conspiracies charged in Counts 1, 2 and 3. Specifically, the Government alleges that the Government of Iran reached out to Amirov and Omarov, in their capacity as members of Guli's Vor within Thieves in Law, and engaged them to perform the murder-for-hire of Victim-1, an Iranian dissident journalist/activist living in the United States. The Government further alleges that Amirov and Omarov and their "Guli's Vor" co-conspirators accepted the commission in order to advance their position in Guli's Vor. This means that membership in Guli's Vor both (1) provides a motive for the alleged murder-for-hire and subsequent money laundering, and (2) makes the murder-for-hire a "racketeering act" in furtherance of the alleged Count 4 enterprise. With this explanation, I am constrained to agree that Counts 1, 2 and 3 (the counts that were the subject of the extradition request) and Counts 4 and 5 (the counts which had not been charged when Omarov was extradited) arise out of the same operative facts.

I am issuing this decision because given the imminent start date of our trial, a ruling must be made, based on the information I have available to me. I recognize that Omarov's counsel are consulting with Czech counsel, and if they have any additional information for me to consider, the fact that I am issuing this ruling should not constrain them from sending it to me.

2

II.    **The Motion to Preclude Expert Testimony about The Russian Mob Is Granted in Part and Denied in Part**

The Government has engaged in an extensive (if belated) proffer about the evidence that CW-1 will provide concerning the members of Guli's Vor, their hierarchy and relationship, their gang signs and insignia, the rules under which they operate – all of which is standard, not to say classic, evidence introduced in the prosecution of gang members. As a fact witness who is alleged to have been a member of Guli's Vor, and to have participated in the murder for hire plot and other criminal acts undertaken on behalf of the enterprise, CW-1 is well placed to provide this sort of testimony; if the jury believes him, the Government will have made out several important elements of its case. And if CW-1 thinks of himself and other affiliates of Guli's Vor as members of the "Russian mob," far be it from me to order him to tailor his testimony to avoid that term.

The Government nonetheless renews its request to be allowed to introduce expert testimony from Dr. Shelley about what it continues to refer to as "the Russian mob," which the Government concedes is nothing more than an agglomeration of various organized criminal elements within Russia and certain former Soviet states that adhere to common hierarchical practices and use common devices. The Government understands that the court does not believe there is any relevance to this evidence aside from providing context for CW-1's testimony, and again promises that the testimony it offers will be brief – on the order of what the court ruled admissible as background information about certain activities of the Government of Iran. (*See* Dkt. # 125, at 11-13).

I will allow the Government to offer brief (and I do mean brief) testimony from Dr. Shelley on the following topics only:  the fact that various criminal gangs operate within Russia and the former Soviet Union; the fact that a number of such gangs are loosely affiliated under the "Thieves in Law" rubric, which designation has existed for a very long time; the fact that gangs affiliated

3

with Thieves in Law are hierarchically organized, and the names of the various levels of that hierarchy and who outranks whom; the fact that gangs associated with Thieves in Law use various common symbols (the eight pointed star) or identifying insignia; and how a gang member works his way up in his particular organization. That general information is sufficient to give the jury context for CW-1's testimony about his own membership in Guli's Vor and the activities of that Vor. I will not allow Dr. Shelley to testify more generally about the activities of Guli's Vor – she is not a member of Guli's Vor, but CW-1 allegedly is – or of the "Russian mob" or the gangs that make it up. Any such testimony would be both irrelevant and unduly prejudicial. Fed. R. Ev. 401, 403. I strongly suggest that the use of the term "Russian mob" be kept to a minimum, although I gather that CW-1 describes his own affiliation that way, and I will not force him to change how he speaks.

### III. Omarov's Motion to Preclude Amirov's Post-Arrest Statements Made to CW-1, Which Was Previously Granted, is Denied Upon Reconsideration

Accompanied by yet another belated proffer, the Government asks the Court to reconsider its original ruling that certain statements about Omarov that Amirov made to CW-1 following his arrest are not admissible. In addition to the statements that were discussed in the original *in limine* decision (see Dkt. # 125, at 20-22), the Government adds another statement made by Amirov about Omarov – this one in response to CW-1's testimony that Omarov had threatened CW-1 following CW-1's arrest. The Government argues that all of Amirov's statements are admissible as against him because they are self-inculpatory – and goes on to explain in detail why that is the case.

However, the Government's desire "to introduce . . . hearsay statement[s] which [are] against [Amirov's] penal interest and which also inculpate[] [Omarov]" presents a more "troublesome evidentiary question." *United States v. Katsougrakis*, 715 F.2d 769, 774 (2d Cir. 1983). For this reason, "each particular hearsay statement offered under Rule 804(b)(3) must be

4

separately parsed and must, itself, be self-inculpatory," *United States v. Jackson*, 335 F.3d 170, 179 (2d Cir. 2003), – precisely because it is often the case that "while some parts of a declarant's statement may be clearly self-incriminatory, 'other parts, . . . *especially the parts that implicated [the defendant*, and] did little to subject [the declarant] himself to criminal liability,' are not within the scope of Rule 804(b)(3)(A)." *United States v. Ojudun*, 915 F.3d 875, 886 (2d Cir. 2019) (quoting *Williamson v. United States*, 512 U.S. 594, 604 (1994) (emphasis added)). In many cases involving such "dual inculpatory" statements, courts also look to corroborating evidence that would bolster the trustworthiness of the declarant's statements, such as the declarant "ma[king] these statements to [a] friend and fellow inmate, rather than to law enforcement agents 'whose favor [the declarant] might be expected to curry.'" *United States v. Pastore*, 2022 WL 2068434, at *4 (2d Cir. June 8, 2022) (quoting *Katsougrakis*, 715 F.2d at 775).

Each of Amirov's statements to CW-1 implicating Omarov is individually inculpatory as to Amirov:

- The fact that Amirov blamed Omarov for Amirov's arrest because of Omarov's failure to delete evidence of their shared crime was inculpatory as to Amirov's activities in Guli's Vor and as to his involvement in the murder-for-hire plot;

- The fact that payment on the contract to kill Victim-1 was distributed to Amirov and Omarov's was inculpatory as to Amirov's involvement in the murder-for-hire plot;

- The fact that Amirov acted to identify potential government informants, including his refusal to give his new phone number to Omarov, was inculpatory as to Amirov's attempts to avoid further detection;

- The fact that Victim-2 had offered to pay Amirov to solve Victim-2's issues with Omarov and that Victim-2 made payments to Omarov was inculpatory as to Amirov's efforts to extort Victim-2 and engage in activities in Guli's Vor;

- The fact that, in this new statement, Amirov allegedly told CW-1 that he knew of Omarov's threats against CW-1, had been listening to phone calls between Omarov and CW-1 following the latter's arrest, and heard Omarov tell CW-1 that "they" wanted their money back so someone else could finish the job of killing the journalist was inculpatory as to Amirov's involvement in the murder-for-hire plot.

With the benefit of the additional information provided in the Government's March 4, 2025 letter, I agree that all of the above statements – including the statements that implicate Omarov – are inculpatory as to Amirov. Additionally, as in the cases described above, the fact that Amirov's post-arrest statements were made to a man he believed to be a "friend and fellow inmate," corroborates the trustworthiness of his statements against interest. *Pastore*, 2022 WL 2068434, at *4. As a result, each of these statements is admissible as against Amirov and, where relevant, as against Omarov.

### IV.   Omarov's Motion to Suppress His Statements Made To Law Enforcement During His Extradition is Denied

On February 6, 2025, Omarov moved to suppress statements that he made to law enforcement after his arrest and during his extradition to the United States. (Dkt. # 97). Omarov's motion is accompanied by the following: (i) a signed affidavit, (Dkt. # 97-1, Exhibit A (the "Affidavit")); (ii) a four-and-a-half-hour audio recording of his post-arrest conversation with law enforcement, (Dkt. # 97-1, Exhibit B (the "Audio Recording")); (iii) a Russian transcription of the first six minutes of the post-arrest questioning, including Russian-to-

English translations, (Dkt. # 97-1, Exhibit C); and an advice of rights form, printed in Russian and signed by Omarov, (Dkt. # 97-1, Exhibit D (the "Advice of Rights Form")).

The Government opposes suppression. (Dkt. # 114). Accompanying the Government's opposition was the same audio recording of the post-arrest conversation, (Dkt. # 114, Exhibit A) and an English translation of the full four-and-a-half-hour post-arrest questioning, (Dkt. # 114-1, Exhibit B). Omarov's counsel raised what they allege to be "critical mistakes" in the Government's translation, (*see* Dkt. # 124), and submitted a version of the Government's translation with some in-line edits via a March 4, 2025 email. During the March 4, 2025 Suppression Hearing, the Government offered into evidence the version of its translation that includes Defense counsel's in-line edits. Although the Government did not concede the validity of Defense counsel's edits, it argued that, even if they are correct, the substance of the translation remains unchanged, as do the Government's arguments concerning the Mirandizing of Omarov. I am inclined to agree, and will therefore rely on Defense counsel's edits as incorporated into the Government's full translation for the purposes of this decision (the "Full Transcript").

The Government alleges that Omarov, along with his co-defendants, made plans to murder an Iranian-American journalist ("Victim-1") in New York City – a plot that was apparently disrupted by the July 28, 2022 arrest of one of Omarov's co-conspirators. (Dkt. # 114 at 1-2). Omarov was arrested by authorities in the Czech Republic on January 4, 2023. (*Id.* at 2). Following the Government's unsealing of Indictment S4 22 Cr. 438 (CM), Czech authorities granted the United States's February 7, 2024 request to extradite Omarov to the United States. (*Id.*)

7

According to the Affidavit, on the morning of February 22, 2024, Omarov was removed from Ruzyně Prison in Prague, Czech Republic, where he had been held since his January 2023 arrest. (Affidavit ¶¶ 2, 5). Following a strip search and medical testing at a Czech airport, Omarov was placed on an airplane with Special Agents Mossad and Keiper of the Federal Bureau of Investigations, (the "Agents"), at least two members of the U.S. military,[1] and a man described by Omarov as a Russian-speaking interpreter – whom he originally believed to be a "linguist" before learning he was Special Agent Daniel Mardakhayev, another employee of the FBI. (*Id.* ¶¶ 9-12).

During the flight from the Czech Republic to the United States, Omarov spoke extensively with the agents, answering their questions about his involvement in the alleged plot to murder Victim-1. Omarov alleges that, prior to answering the Agents' questions, he was not adequately apprised of his *Miranda* rights, that he did not knowingly waive those rights, and that questioning occurred and continued after he repeatedly invoked his right to counsel. (Dkt. # 97 at 1).

On February 25, 2025, Omarov's counsel submitted a letter to the Court stating (i) "The Government claims, without any sworn statements of fact in support of the assertion, that '[d]uring a period of relative quiet reflected in the recording at timestamps 2:00 to 3:18, during which Omarov did not speak, Omarov read the Advice of Rights Form,'" adding that the Government "fails to proffer any evidence that Mr. Omarov was able to read and understand the document written in Russian as opposed to staring at the document;" and (ii) "since the filing of the Defense motion to suppress, facts about Mardakhayev's proficiency, or lack thereof, in both reading and speaking Russian have come to light." (Dkt. # 118).

---

[1] The Government's witness at the March 4, 2025 Suppression Hearing, Special Agent Christopher Keiper, testified that no members of the U.S. military were involved in the extradition.

The Court held a hearing on March 4, 2025 to address these issues. At that hearing, the Government called Special Agent Christopher Keiper, one of the Agents on the extradition flight, to testify that Omarov had "engaged with" the document during the period of silence in the Audio Recording. SA Keiper does not speak, read or understand Russian; he was not able to testify about either Omarov's proficiency in reading Russian or SA Mardakhayev's ability to accurately translate between Russian and English.

During the Hearing, the Government also submitted eight documents (designated Exhibits 163-170) that it alleges show Omarov could read and understand the Russian language written in the Cyrillic alphabet.

At the hearing Omarov relied on argument, principally concerning a failure of proof by the Government, and introduced no evidence of its own about SA Mardakhayev's language proficiency, which it had raised in its February 25 letter.

### A. *Miranda* **Warnings and Waiver**

A statement by the accused "during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused in fact knowingly and voluntarily waived [*Miranda*] rights when making the statement." *Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (internal quotation marks omitted). "To prove a valid waiver of *Miranda* rights, the government must show (1) that the relinquishment of the defendant's rights was voluntary, and (2) that the defendant had a full awareness of the rights being waived and of the consequences of waiving those rights." *United States v. Yilmaz*, 508 F. App'x 49, 52 (2d Cir. 2013). The Government does not dispute that Omarov was in custody during the extradition flight. (*See* Dkt. # 97 at 11-12; Dkt. # 114 at 2).

According to the Affidavit, Omarov does not speak, write, or read English. (Affidavit ¶ 29). He was raised speaking Azeri, the official language of his native Azerbaijan. (*Id.* ¶ 27). Although he never formally studied Russian, Omarov's Affidavit affirms that he can speak it, because Azerbaijan's prior membership in the USSR led to many interactions with Russian speakers over the years. (*Id.* ¶ 28). During the extradition flight, Mardakhayev, as the Russian-to-English interpreter, was able to facilitate the more than four-hour conversation between the Agents asking questions in English and Omarov giving answers in Russian that were, on their face, responsive to the questions being posed to him.

Before questioning began, SA Mardakhayev told Omarov that the first thing they needed was for him to sign a document "*about the lawyer.*"[2] (Full Transcript, at 2). The document was an Advice of Rights Form written in Russian, which is attached as Exhibit D to Docket No. 97-1. At the 00:00:46 timestamp in the Audio Recording, Mardakhayev asked Omarov if he could read Russian, and Omarov responded "*Yes, of course.*" (*Id.*). Now, however, Omarov's Affidavit states that, while he can read Russian in part due to the similarities between the Azeri and Russian alphabets, he cannot do so "very well," and many written words exceed his fluency. (Affidavit ¶ 28). Omarov did not tell the agents anything about purported deficiencies in his ability to read Russian. After confirming that he could "*of course*" read Russian, Omarov remained largely silent for the two-and-a-half minutes (through 00:03:23 of the Audio Recording). The sound of paper rustling can be heard during this period. During the March 4, 2025 Suppression Hearing, Agent Keiper testified that he witnessed Omarov spend this silent time looking at and "engaging with" the Advice of Rights Form. No other document was on the table in front of him. I credit this testimony.

---

[2] Italics will be used throughout to reflect statements made in Russian that have been subsequently translated into English.

The one occasion when Omarov does speak during this period of silence is to ask a question about the current time, (Full Transcript, at 3). One of the Assistant United States Attorneys on this case has proffered that the Russian word for "time" appears in the upper right-hand corner of the document.

When SA Mardakhayev confirmed where on the form Omarov should place his signature, he asked if Omarov had any questions. Omarov responded, "*There is no question,*" in Russian, an answer suggesting that he could both understand Russian as spoken to him by Mardakhayev and speak it well enough to answer a question. (Full Transcript, at 4).

Omarov contends that because (i) he was never orally advised of his rights and (ii) "absolutely nothing from the audio recorded interview demonstrates that [he] read and understood the advice of rights form that he signed," (Dkt. # 114 at 14-15), his statements must be suppressed.

The Government admits that Omarov was not orally administered his *Miranda* rights, but argues that, because he read, understood and signed the Advice of Rights Form, he was adequately informed of those rights and knowingly and voluntarily waived them. (*See* Dkt. # 114 at 18). It is puzzling that Omarov's rights were not read to him in English and translated into Russian, because it is apparent from the transcript that SA Mossad suggested that he read Omarov his rights in English and that SA Mardakhayev translate those rights into Russian, but Mardakhayev waved that suggestion off in favor of simply having Omarov read his rights – saying something I find confusing about how Omarov "doesn't understand" something. (Full Transcript, at 4).

Although the Second Circuit does not appear to have directly addressed the issue, other courts both within and outside of this Circuit have held that verbal administration of the

11

*Miranda* rights – while undoubtedly best practice – is not required if the court can otherwise ascertain that the defendant "had his *Miranda* rights brought home to him in an intelligible fashion." *United States v. Anderson,* 929 F.2d 96, 98 (2d Cir.1991); *see also United States v. Suarez*, 2006 WL 3543616, at *4 (S.D.N.Y. Dec. 7, 2006); *United States v. Johnson*, 289 F. Supp. 2d 151, 159 (D. Conn. 2003); *United States v. Sledge*, 546 F.2d 1120, 1122 (4th Cir. 1977) (noting agreement among 1st, 3rd, 9th, and 10th circuits).

"In general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014). Against this presumption is Omarov's contention that "he attempted to read the Russian document, but did not understand many of the words." (Affidavit ¶ 18). Instead, he explains that he "signed it after [he] was told by the agent interpreter that it was 'about an attorney.'" (*Id.*).

"[A] lack of fluency in [a language] does not automatically preclude a defendant from executing a knowing and voluntary waiver of rights in that language." *United States v. Ocasio*, 80 F. App'x 127, 129 (2d Cir. 2003). Instead, courts use a "totality of the circumstances" approach to determine whether the defendant's interaction with law enforcement evinced "both an uncoerced choice and the requisite level of comprehension." *United States v. Male Juvenile (95-CR-1074)*, 121 F.3d 34, 40 (2d Cir. 1997) (internal quotations omitted). For instance, the Second Circuit has affirmed a district court's judgment that a *Miranda* waiver was knowing and voluntary, despite the defendant's professed "limited ability to understand" the language in which the rights were presented, where the defendant spoke that same language throughout the interaction, had no difficulty answering questions posed in that language, and never stated that he could not understand that language. *United States v. Yilmaz*, 508 F. App'x 49, 53 (2d

Cir. 2013). Here, as was the case in *Yilmaz*, Omarov's affirmation that he could read Russian was coupled with an obvious proficiency in spoken Russian, which was evident throughout the interview. A demonstrated inability to understand SA Mardakhayev likely would have presented as repeated requests by Omarov to have Mardakhayev repeat or rephrase questions, but the Full Transcript does not reveal that to have been the case – Omarov rarely asked for questions or phrases to be repeated. Nor did Omarov give answers that were not responsive to the questions he was asked. And of course Omarov confirmed that he had no questions about the Advice of Rights Form prior to signing it. All of these things are persuasive indicia that he made a knowing and voluntary waiver. *Id.* And they are strong evidence that, whether or not Markadayev could pass an examination to serve as an interpreter in a court of law, his spoken Russian was sufficient to allow him to converse with Omarov in an understandable way.

At the March 4, 2025 Suppression Hearing, Omarov's counsel observed that, in one of the text message chains introduced into evidence by the Government – a chain in which Omarov both received and sent messages in Russian – Omarov said that he was using a voice-to-text iPhone program, which was why his Russian responses were more grammatically correct than usual. (Exhibit 164, at 1). She argued that this was evidence that Omarov was less than fluent in Russian. Use of a voice to text program might be relevant to Omarov's ability to *write* in grammatically correct Russian, but it has no bearing on his ability to *understand* either spoken or written Russian, which is the issue in dispute here.

A defendant's conduct during an interrogation that is consistent with an understanding of the *Miranda* rights can also be "strong evidence" that the defendant understood those rights. *United States v. Suarez*, 2006 WL 3543616, at \*5 (S.D.N.Y. Dec. 7, 2006). Immediately after signing the Advice of Rights Form, Omarov was adamant that he "*can speak*" to the Agents,

and that while he would "*discuss all questions*," he would "*respond to some questions and not respond to others.*" (Full Transcript, at 6). This is consistent with an understanding that he had a right not to speak that he was choosing to exercise in some instances and waive in others.

Finally, after about four hours of conversation, Omarov also said that he wanted to talk to his lawyer before speaking further on a subject, saying, "*Let's do this. I will see my lawyer over there . . . . I don't know the answer for this today.*" (Full Transcript, at 151). This is consistent with an understanding that he had a right to consult with an attorney before answering the Agents' questions. And at that point the agents ceased questioning him.

The Court credits Agent Keiper's testimony that he witnessed Omarov "engaging with" the Advice of Rights Form during the period of relative quiet in the Audio Recording. Of course, Agent Keiper could not know what was in Omarov's mind while he appeared to be reading the form; it is for precisely this reason that courts consistently find it "better police practice to advise every defendant of his rights both orally and in writing where possible." *Suarez*, 2006 WL 3543616, at *5 n.8. Evidence of an oral administration of Omarov's *Miranda* rights would have short-circuited the need for this more extensive inquiry.

But in the end, the totality of the circumstances indicates that Omarov was advised of his *Miranda* rights; that he knowingly and voluntarily waived those rights by signing the Advice of Rights Form, about which he had no questions; and that he responded to the Agents' questions in a manner consistent with understanding those rights.

### B. Invocation of Right to Counsel

Omarov also argues that the post-arrest statements should be suppressed because they were obtained after he "unequivocally and unambiguously invoked his right to counsel," which he alleges the Agents "refused to honor." (Dkt. # 97 at 1).

14

Pursuant to *Miranda* and its progeny, a defendant has a right to counsel when he is subject to custodial interrogation.[3] *See Miranda*, 384 U.S. 436, 470-71 (1966); *Edwards v. Arizona*, 451 U.S. 477, 481 (1981). In order to invoke the right to counsel, a suspect must "unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). This clear statement rule exists to provide "a bright line that can be applied by officers in the real world of investigation and interrogation without unduly hampering the gathering of information." *Davis*, 512 U.S. at 461.

Determining whether a suspect has invoked his right to counsel is an objective inquiry, and a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* at 459. Absent that "level of clarity," the officers need not stop questioning the suspect. *Id.* Therefore, "[i]f an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' . . . the police are not required to end the interrogation, . . . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (*quoting Davis*, 512 U.S. at 459, 461-62).

Once a defendant has unequivocally invoked his right to counsel, interrogation must cease. However, "If, after receiving *Miranda* warnings and invoking the right to counsel, the accused himself initiates further communication, exchanges, or conversations with the police, those unsolicited statements are admissible." *United States v. Miller*, 116 F.3d 641, 680 (2d Cir. 1997). Statements in response to questioning after a defendant invokes his right to counsel may be admitted "only on finding that [the defendant] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.* That waiver must be assessed under "the totality of the circumstances, including the necessary fact that the accused, not

---

[3] Again, the Government does not dispute that Omarov was in custody at the time of questioning. *See supra*, at 9.

the police, reopened the dialogue." *Edwards*, 451 U.S. at 486 n.9. Reinitiation of dialogue by the defendant can be found where a defendant has "evinced a willingness and a desire for a generalized discussion about the investigation," as opposed to more discrete or "routine" inquires "such as a request for a drink of water or a request to use a telephone." *Oregon v. Bradshaw*, 462 U.S. 1039, 1045 (1983).

Omarov relies primarily on the following exchange, which began at the 00:03:41 timestamp in the Audio Recording. This was after the Government alleges that Omarov had read and signed the Advice of Rights Form:

**Mardakhayev**:    *Do you have questions about this?*

**Omarov**:    *About this thing, you mean do I have questions? How do you say it, there is no question. But I can speak with you.*

**Mardakhayev**:    *Yes. Okay.*

**Omarov**:    *I am not going to formally respond to all your questions.*

**Mardakhayev**:    *Okay.*

**Omarov**:    *Because I can just talk to you, we'll have the time. This issue has nothing to do with me, really. I just really want to see a lawyer cause I don't know your laws. But to speak that's no problem. I don't want you to think that I am hiding something. I can talk. Like I am talking with you.*

**Mardakhayev**:    *Yes, yes, yes.*

**Omarov**:    *But as for an official questioning, like an interrogation, I am ready for that questioning. I have been ready for a long time. But I just want to see an attorney so, that tomorrow in the process…*

**Mardakhayev**:    *Wait, I'll explain it to them. If you want an attorney, we can stop this.*

|              | *Whatever you want.* |
|--------------|----------------------|
| **Omarov**:  | *I can speak.* |
| **Mardakhayev**: | *Yes.* |
| **Omarov**:  | *But not like if it were an official interrogation.* |
| **Mardakhayev**: | *I understand. Let's do it like this.* |
| **Omarov**:  | *We can have an easy-going conversation.* |
| **Mardakhayev**: | Exactly. *If you won't like something tell me and I'll tell them.* |
| **Omarov**:  | *Yes.* |
| **Mardakhayev**: | *Okay?* |
| **Omarov**:  | *We can discuss all questions, I can respond to some questions and not respond to others. So, just if they don't think that it is disrespectful.* |
| **Mardakhayev**: | He is having a little reservation formally answering questions without a lawyer. And his approach is going to be if we have a conversation if he feels uncomfortable at any point [unintelligible]. |
| **Agent**:   | Stop at any point. |
| **Mardakhayev**: | But he is… |
| **Omarov**:  | *I just don't know the law, that's why. In [sic] have nothing to hide.* |
| **Mardakhayev**: | Okay. |
| **Omarov**:  | *Tell them that I want to get to know their laws. I have nothing to hide.* |
| **Mardakhayev**: | He has nothing to hide, he is just interested in knowing the laws of America. |
| **Agent**:   | So, just out of curiosity, so we are clear, he wants to talk with us without a lawyer? |

| | |
|---|---|
| **Agent**: | *Do you want to talk to them without a lawyer now?* |
| **Omarov**: | *I can.* |
| **Mardakhayev**: | Yes. He can. |
| **Agent**: | He can? |
| **Mardakhayev**: | Without a lawyer, he can. |
| **Agent**: | Tell him [unintelligible] at any point when we are talking to him he wants us, he wants to envoke [sic] his rights to an attorney we will stop talking and ask him questions. |
| **Mardakhayev**: | *If you want to stop, you can tell them if you don't want to speak anymore they will stop it. He is just explaining that.* |
| **Omarov**: | *So, I'll see how the questions will go and if I see something that I don't like then I can stop?* |
| **Mardakhayev**: | *That's how it is*, perfect. |

(Full Transcript, at 4-7).

Omarov argues that he unambiguously and unequivocally requested counsel by saying, "I just really want to see a lawyer," and "I just want to see the lawyer, the attorney."[4] (Dkt. # 97, at 16). The Government disagrees. It argues that Omarov's statements can only be read as stating his intent to proceed with the interview – while reserving his right to stop the questioning if he doesn't want to speak any longer – and talk with a lawyer later. (*See* Dkt. # 114, at 20).

Devoid of context, Omarov's two statements above would be convincing invocations of the right to counsel. But in this case we have context – over four hours of it. In the same

---

[4] Also translated as "*I just want to see an attorney.*" (Full Transcript, at 5).

breath as his requests to speak with an attorney, Omarov said, "*Because I can just talk to you,*" and "*But to speak that's no problem. I don't want you to think that I am hiding something. I can talk. Like I am talking with you.*" (Full Transcript, at 5). Faced with ambiguity as to whether Omarov was invoking his right to counsel, SA Mardakhayev first says to Omarov, "*Wait, I'll explain it to them. If you want an attorney we can stop this. Whatever you want,*" (*id.*), to which Omarov responded, "*I can speak,*" (*id.*). Mardakhayev later tells the Agents, "He is having a little reservation formally answering questions without a lawyer," (*id.* at 6), and one of the Agents asked to clarify, "So, just out of curiosity, so we are clear, he wants to talk with us without a lawyer?" (*id.*). When asked to clarify again, Omarov's response was the same as it had been throughout the exchange, "*I can.*" (*Id.*). To emphasize the point, Mardakhayev once again told Omarov, "*If you want to stop, you can tell them if you don't want to speak anymore they will stop it.*" (*Id.* at 7). This entire exchange occurred before Omarov was asked a single substantive question.

This was a consistent pattern throughout the questioning. During a conversation about how an iPhone's iCloud functionality works at the 3:53:00 timestamp of the Audio Recording, Omarov said, "*I wanted to talk to a lawyer about it. I didn't want to talk to them. But, if the conversation went in this direction, I can answer.*" (Full Transcript, at 130). Despite Omarov's claim that he could continue answering, Mardakhayev informed him, "*If you want to stop, tell me,*" (*id.*), to which Omarov responds, "*No, I don't want to stop. I want to know this. Listen, I don't want to stop. They shouldn't think that I'm afraid of something. I have been talking for 8 hours here, I am not going to say 'no' at the end,*" (*id.*). After a further reference to speaking with a lawyer about a similar iPhone issue at the 4:17:25 timestamp of the Audio Recording, Mardakhayev asked, "*Do you want to stop here?*" (*id.* at 151), and Omarov replied, "*Yes, we*

*can stop this conversation, because I don't have an answer yet.*" (*id.*). Mardakhayev then told the Agents that Omarov "wants to stop," (*id.*), and asked Omarov, "*You want to stop altogether, or just stop this one?*" (*id.*). Omarov confirmed that he wanted to stop, "*Just the conversation*" about the iPhone. (*Id.*) Nonetheless, the Agents decided instead to "seize [sic] questioning him" entirely and ask "no more question [sic] regardless." (*Id.* at 152).

But Omarov was not finished. He then reinitiated the conversation to ask the Agents if they could answer one of *his* questions about how the iPhone's iCloud functionality worked, and a brief exchange followed. (*Id.* at 153-54).

"The purpose of the *Miranda-Edwards* guarantee" – and hence the purpose of invoking it – "is to protect . . . the suspect's desire to deal with the police only through counsel." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). In context, Omarov's mentions of his desire to consult with counsel cannot be said to have evinced such a clear desire. Instead, his case is far closer to those in which a defendant's requests for an attorney are made "in passing" accompanied by his "continu[ing]—without interruption—to engage in friendly banter with the agents." *United States v. Morris*, 2024 WL 4699712, at *2 (S.D.N.Y. Nov. 6, 2024); *see also United States v. Brathwaite*, 2018 WL 1787943, at *3 (E.D.N.Y. Mar. 27, 2018), *report and recommendation adopted*, 2018 WL 1785484 (E.D.N.Y. Apr. 13, 2018). As the Government argues in its brief, Omarov presents as a "self-confident defendant who knew whether and when he wanted an attorney." *United States v. Scarpa*, 897 F.2d 63, 70 (2d Cir. 1990).

Omarov appears to have drawn some sort of distinction in his own mind between having a conversation with the agents on the plane and a formal interrogation. There is, obviously, no such distinction – as any criminal defense lawyer would have told him. However, Omarov had been advised that he had a right to remain silent and that anything he said to the

20

agents could be used against him. I have concluded that he understood his rights in this regard. He nonetheless chose to talk to the agents without an attorney, boasting – as so many other criminal defendants have done – that he could do so because he had nothing to hide.

To the extent the language barrier between the Agents and Omarov could have introduced ambiguity into Omarov's desire to invoke his right to counsel, the Agents repeatedly followed what the Supreme Court has described as "not required," but "good police practice . . . to clarify whether a suspect making an ambiguous statement really wants an attorney." *Davis*, 512 U.S. at 461. These clarifying questions not only "help protect the rights of the suspect by ensuring that he gets an attorney if he wants one," but "will minimize the chance of a confession being suppressed due to subsequent judicial second-guessing as to the meaning of the suspect's statement regarding counsel." *Id.* Every time Omarov was given the opportunity to  clarify his request for counsel, he chose to continue speaking, "sometimes even talking over the agents when they attempted to interrupt him." *Morris*, 2024 WL 4699712, at *2. That is not the type "unambiguous or unequivocal request for counsel" that is required to justify excluding statements at trial. *Davis*, 512 U.S. at 462.

## CONCLUSION

The Clerk of Court is directed to close out all the following open motions: Dkt. Nos. 97, 98, 99, 100, 101, 102, 103, 104, 128.

This constitutes the decision and order of the Court. It is a written decision.

Dated: March 6, 2025

_____
U.S.D.J.

BY ECF TO ALL COUNSEL

21