UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                  :
UNITED STATES OF AMERICA                          :
                                                  :
    - v. -                     :          S8 22 Cr. 438 (CM)
                                                  :
RAFAT AMIROV,                                     :
  a/k/a "Farkhaddin Mirzoev,"              :
  a/k/a "Рим,"                             :
  a/k/a "Rome," and                       :
POLAD OMAROV,                                     :
  a/k/a "Araz Aliyev,"                     :
  a/k/a "Novruz Novruzzade,"              :
  a/k/a "Polad Qaqa,"                      :
  a/k/a "Haci Qaqa,"                       :
                                                  :
              Defendants.    :
                                                  :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**GOVERNMENT'S SENTENCING MEMORANDUM**

JAY CLAYTON
United States Attorney
Southern District of New York

Jacob H. Gutwillig
Matthew J.C. Hellman
Michael D. Lockard
Assistant United States Attorneys
   *Of counsel*

## TABLE OF CONTENTS

Page

Background ...................................................................................................................................3

   I.   The Offenses ....................................................................................................................3

      A. Amirov and Omarov's roles in the *Gulici* Clan of the Russian Mob ..............................3

      B. The Iranian Regime's Targeting of Masih Alinejad .............................................5

      C. The IRGC Pays Amirov to Assassinate Ms. Alinejad ..........................................7

      D. Amirov Engages Omarov and Omarov's Associates, Including Khalid Mehdiyev, to Carry Out the Assassination ...........................................................................8

      E. The Assassination Plot is Disrupted .................................................................11

   II.  Amirov and Omarov's Arrests ......................................................................................13

   III. Trial and Verdict ..........................................................................................................13

   IV. Unlawful Conduct at MDC ..........................................................................................14

   V.  The PSRs .......................................................................................................................14

Discussion .................................................................................................................................15

   I.   The Seriousness of the Offenses ...................................................................................16

   II.  The Need to Afford Adequate Deterrence and to Protect the Public ...............................22

Conclusion ...............................................................................................................................27

# TABLE OF AUTHORITIES

<u>Page</u>

**Case Law**

*United States v. Batchelder*, 442 U.S. 114 (1979) ....................................................................18

*United States v. Farahani, et al.*, 21 Cr. 430 (RA) (S.D.N.Y.) ...............................................6, 7

*United States v. Graham*, 632 Fed App'x 4 (2d Cir. 2015)......................................................18

*United States v. Shakeri, et al.*, 24 Cr. 670 (LJL) (S.D.N.Y.) .................................................22

*United States v. White*, 240 F.3d 127 (2d Cir. 2001)................................................................18

*United States v. Williams*, 216 Fed. App'x 67 (2d Cir. 2007) .................................................18


**Statutes**

18 U.S.C. § 924..........................................................................................................................20

18 U.S.C. § 1791........................................................................................................................14

18 U.S.C. § 1958....................................................................................................................17, 19

18 U.S.C. § 1959........................................................................................................................19

18 U.S.C. § 3553........................................................................................................................17

The Government respectfully submits this memorandum in connection with the sentencing of Rafat Amirov and Polad Omarov, two leaders in the *Gulici* clan of the *Vory v Zakone*, or Russian Mob, who sought to carry out the assassination of a journalist, author, and human rights activist at the behest of, and payment by, the Islamic Republic of Iran.  The defendants are leaders within a violent and powerful organized crime group who sought to use that violence and power to carry out a murder of geopolitical proportions, and to do so here on American soil.

Every characteristic of this crime, and of the defendants themselves, demands a substantial penalty that matches the dangerousness of the offense and of the offenders.  The defendants partnered with the Islamic Revolutionary Guard Corps ("IRGC"), a designated Foreign Terrorist Organization ("FTO").  Amirov, Omarov, and their IRGC paymasters sought to soak the Brooklyn streets with the victim's blood.  The IRGC and the leaders of the Islamic Republic intended, through this murder, to simultaneously silence one of the regime's most vocal, internationally recognized, and effective critics; steal hope from millions of Iranians suffering under the regime's corruption and oppression; and drive the cold blade of fear into the hearts of its adversaries across the globe.  Amirov and Omarov, in turn, intended to cement and advance their places in the *Gulici* clan in the midst of a violent power struggle to fill the vacuum left by the internecine murder of one of the Russian Mob's most charismatic and powerful Thieves, Lotu Guli.  With the $500,000 in blood money promised by the Islamic regime for the victim's murder, Amirov and Omarov would have the notoriety and resources to win and buy support to fight and overcome other contenders for Guli's crown.  And the more power and influence Amirov and Omarov had in the Russian Mob, the more power and wealth they could amass through extortion, kidnapping, and murder.

The intended target of this murder plot, Masih Alinejad, has dedicated her life to exposing the cruelty, corruption, and tyranny of the Islamic Republic; mobilizing the people of Iran to stand up for their rights and dignity against the regime's brutal squads of morality police and paramilitary thugs; and awakening the international community to the danger the regime poses to its citizens, the region, and the world.  For this dedication, Ms. Alinejad has earned international recognition from Governments, human rights groups, and policy institutes around the world, including being named one of Time Magazine's Women of the Year.  She has also earned exile from her home, separation from her family, and decades of persecution from the regime.  The regime has sought to lure Ms. Alinejad out of the country for kidnapping and rendition to Iran; plotted to kidnap her from her Brooklyn home; and attempted to procure her murder—more than once—in New York.

When Amirov and Omarov were presented with a $500,000 bounty to assassinate Ms. Alinejad, they pursued the assignment quickly and relentlessly.  It is unclear whether Amirov and Omarov knew who Ms. Alinejad is and why she is hated by the Iranian regime, though it would have taken no more than a few minutes' internet searching to learn.  It is, however, perfectly clear that they knew Ms. Alinejad is a journalist, that she has a family, that one of the world's most repressive theocracies wants her dead, and that she posed no threat whatsoever to the defendants themselves.  Indeed, Amirov and Omarov appeared completely incurious about who they were plotting to murder or why.  Ms. Alinejad's life, her family, and her importance to the cause of freedom for the Iranian people were meaningless to the defendants.  Amirov and Omarov were interested in one thing only: their own power and wealth.  Ms. Alinejad's murder would be a means to increase both, and that was all that Amirov and Omarov cared to know.

Amirov and Omarov's murder plot came chillingly near success.  It was foiled by providence—Ms. Alinejad's timely travel out of town for several days while Amirov and Omarov's

triggerman, Khalid Mehdiyev, sought persistently, but unsuccessfully, to locate her—and by the diligence and tenacity of American law enforcement, which detected and disrupted the plot in time. That same tenacity brought Amirov and Omarov from the seeming impunity of their overseas safehouses to the United States to face arrest, public trial, and conviction.

For these reasons, and those discussed more fully below, the defendants each should be sentenced in accordance with the sentencing range provided by the United States Guidelines and, the Government submits, required by the needs of sentencing: 55 years' imprisonment for both Amirov and Omarov.

## **BACKGROUND**

The Court is well-familiar with the underlying background of this case from the detailed allegations in the superseding indictments, motions *in limine*, and trial. That background, drawn from these same sources, is described briefly below, and enlarged upon as relevant to particular sentencing considerations.

## I.    **The Offenses**

### A.    **Amirov and Omarov's roles in the *Gulici* Clan of the Russian Mob**

The defendants are high-ranking members of the *Gulici*, a faction of the Russian Mob that carried out murders, assaults, extortions, kidnappings, robberies, and arsons, in the United States and abroad. (Amirov PSR ¶ 28.)[1]  The *Gulici* formed under the authority of a particularly powerful *vor*, now deceased, named Nadir Salifov, a/k/a "Lotu Guli" or "Guli."  Amirov was elevated to *vor* status, or "crowned," under Guli's patronage.  Omarov, Guli's cousin, committed crimes under

---

[1] As used in this memorandum, "Probation" refers to the United States Probation Office; "PSR" refers to the Presentencing Investigation Reports for Amirov and Omarov, respectively; "Guidelines" refers to the United States Sentencing Guidelines; and "Amirov Sentencing Memorandum" and "Omarov Sentencing Memorandum" refer to the defendants' sentencing submissions; "Tr." refers to the Trial Transcript; and "GX" refers to Government Exhibits entered into evidence at trial.

3

Guli's "name," or authority, paid him respect and monetary tribute, and hoped eventually to receive his blessing and be crowned a *vor* himself. After Guli's assassination in August 2020 following a bloody war with a rival Russian Mob clan, Guli's followers and acolytes, the *Gulici*, continued to associate with each other while also vying for power in the vacuum left by Guli's death.

Both defendants sought to cement and increase their status in the *Gulici* through criminal exploits. Amirov was crowned by Guli, who described Amirov as "my *vor*," in 2013. (Tr. 159, 358.) Omarov aspired to similar criminal heights by establishing his own name. Omarov joined with other members of the *Gulici*, including Mehdiyev and Zialat Mamedov, a/k/a "Ziko," to commit a series of violent crimes across Eastern Europe and in the United States. Omarov and Mehdiyev procured the murder of a Ukrainian named Hasrat, who had insulted Omarov and disputed a debt with him. (Tr. 190-91.) Omarov gave Hasrat a 26-day deadline to flee Ukraine or be killed. After 25 days, a Russian Mob associate of Omarov's named Elmuraz murdered Hasrat. (Tr. 191-92.) Omarov, Mehdiyev, and Mamedov also attempted to extort an individual named Namik from the Ukraine (Tr. 196-198); attempted to murder Amirov's lieutenant, Rafael, in the Ukraine when Rafael interfered with the extortion of Namik (Tr. 198-201); murdered an enemy Russian Mob member named Ado in Georgia (Tr. 246-47, 262-263); and attempted to murder another enemy Russian Mob member Turkey (Tr. 272-73).

Mehdiyev came to New York in approximately 2018 as Guli's representative in the United States to establish a Russian Mob base and to finance Guli through extortion. After Guli was murdered, Mehdiyev continued extorting in partnership with Omarov, first acting on behalf of Guli's brother, Namik Salifov, and then independently of Namik to build Omarov's name. Omarov and Mehdiyev orchestrated the firebombing of a restaurant in Brooklyn whose owner refused to pay an extortion demand (Tr. 174-181); and extorted a grocery store owner in Brooklyn, including

by burning his car and then shooting the vehicle in the grocery store parking lot. (Tr. 216-17, 219-225.) Amirov also joined in the grocery store-owner extortion, offering to "resolve" Omarov's million-dollar extortion demand for $200,000, which he would have shared with Omarov. (Tr. 356.)

In July 2022, Omarov, Mehdiyev, and Amirov's targeting of the grocery-store owner was put on pause when the IRGC hired Amirov to arrange the assassination of Masih Alinejad, as described below.

### B.    The Iranian Regime's Targeting of Masih Alinejad

The Government of Iran actively targets dissidents and nationals of the United States and its allies living in countries around the world for kidnapping and/or execution, in order to repress and silence critics of the Iranian Government regime. (PSR ¶ 25.) As part of this campaign of terror, for at least approximately several years, the Government of Iran targeted, on U.S. soil, Ms. Alinejad. (*Id.*) Ms. Alinejad is a prolific journalist, author, human rights activist, and prominent critic of the Iranian regime. (*Id.*) Through social media, public speeches, interviews, and online campaigns, Ms. Alinejad has publicized the Government of Iran's corruption, human rights abuses, discriminatory treatment of women; suppression of democratic participation and expression; use of arbitrary imprisonment, torture, and execution to target its political opponents; and has sought to mobilize public opinion in Iran and around the world to bring about changes to the regime's laws and practices, including in connection with mass protests against the Iranian Government regime in Iran. (*Id.*)

The Government of Iran's efforts to target Ms. Alinejad, as well as Ms. Alinejad's family members, date back several years. (PSR ¶ 32.) For example, in approximately 2018, Iranian government officials attempted to induce relatives of Ms. Alinejad, who reside in Iran, to invite Ms. Alinejad to travel to Turkey, for the apparent purpose of having Ms. Alinejad arrested or

detained and transported to Iran for imprisonment.  (*Id.*)  Subsequently, on or about July 29, 2019, the Chief of the Revolutionary Courts in Iran publicly stated that anyone who sends videos considered against the regime—particularly videos contrary to the Government of Iran's criminal laws punishing women and girls who fail to wear mandatory head coverings ("hijab") in public— to Ms. Alinejad is committing the crime of cooperating with a hostile foreign government and will be sentenced to up to 10 years' imprisonment.  (PSR ¶ 33.)  Ms. Alinejad responded with a defiant video posted to social media calling the regime frightened and repressive, and promoting her White Wednesdays campaign against the regime's compulsory hijab laws. (GX 212, 212A.)  The video prompted even more women in Iran to share videos challenging compulsory hijab.  (Tr. 1014-1015.)  Later that year, in approximately September 2019, a relative of Ms. Alinejad was arrested on charges based on the relative's purported support for Ms. Alinejad's advocacy, and the regime attempted to hack Ms. Alinejad's phone and online accounts.  Ms. Alinejad's relative was later sentenced to eight years' imprisonment, before being released on bail conditions.  (PSR ¶ 34; Tr. 1019-1022.)

In approximately 2020 and 2021, Iranian intelligence services plotted to kidnap Ms. Alinejad from within the United States for rendition to Iran and likely execution, part of a kidnapping campaign that successfully targeted other dissidents living in France and California. (PSR ¶ 35; Tr. 1015-1017, 1009; GX 227, 227-T.)  In July 2021, following an FBI investigation of that plot, an indictment was unsealed in this District charging an Iranian intelligence officer and three Iranian intelligence assets with kidnapping conspiracy and other offenses. *See United States v. Farahani, et al.*, 21 Cr. 430 (RA) (S.D.N.Y.).  Between at least June 2020 and 2021, the defendants conducted online research regarding Ms. Alinejad's residence; hired a New York private investigator under false pretenses to procure photographs and video surveillance of Ms.

Alinejad, Ms. Alinejad's home, and Ms. Alinejad's household members on numerous occasions; and researched methods and routes of exfiltration out of New York to Venezuela and Iran.

Following the exposure of the *Farahani* kidnapping plot, an IRGC-linked intelligence network began pursuing Ms. Alinejad's murder inside the United States. (Amirov PSR ¶¶ 27, 40-41). In July 2021, that group—Ruhollah Bazghandi,[2] a Brigadier General in the IRGC who previously served as chief of an IRGC-Intelligence Organization ("IRGC-IO") counterintelligence department; FNU LNU, a/k/a "Haj Taher," a close contact of Bazghandi; and Iranian intelligence assets Hossein Sedighi and Seyed Mohammad Forouzan (collectively, the "Bazghandi Network")—continued to research and monitor Ms. Alinejad. (*Id.*; Amirov PSR ¶¶ 53-54). For example, shortly after the *Farahani* charges were unsealed in July 2021, Bazghandi searched for information related to that plot, and he viewed a YouTube video, titled in Farsi, "The Islamic Republic of Iran plans to transfer [Masih Alinejad] to Iran" and a second video titled "A report into the details of the Intelligence Ministry's plot to kidnap [Masih Alinejad]." (Amirov PSR ¶¶ 41, 53).

### C.    The IRGC Pays Amirov to Assassinate Ms. Alinejad

In 2022, Ms. Alinejad spearheaded several efforts to call international attention to the Iranian regime's repression of women and targeting of political activists (Tr. 1022-1024), which increased the regime's fear of her influence. In June of that year, Ms. Alinejad received the Moral Courage Award from the American Jewish Committee, and gave a public address asking the U.S. Secretary State to not take it easy on the Government of Iran and referring to the Bloody November

---

[2] Bazghandi is designated by the U.S. Treasury Office of Foreign Assets Control ("OFAC") as a Specially Designated Global Terrorist, in connection with his involvement with the IRGC-IO, and, in particular, his participation in the detention of foreign prisoners held in Iran and involvement in the IRGC-IO's operations in Syria. (Amirov PSR ¶ 40).

protests in Iran in 2019, when government forces killed approximately 1,500 protesting Iranians; Ms. Alinejad also described the regime's past efforts to target and kidnap her and to harass and arrest her family members, and promised to "make my oppressors feel miserable" by continuing to be the voice of the Iranian people. (*See, e.g.*, Tr. 1039.) In an Instagram video Ms. Alinejad released later that month, filmed from her home, she described the Iranian regime as "the ISIS that has taken Iran hostage" and called upon the international community to "isolate the Islamic Republic and punish it so much that we can extricate Iran from that, until we rescue Iran from the evil Islamic Republic which has taken it hostage." (GX203, 203-T.)

In July of that year, Ms. Alinejad organized a call to action, encouraging Iranians to publicly protest the regime. (Tr. 1024-1025.) The Iranian government raided a house where mothers of protestors killed by the IRGC during Bloody November were gathered to help organize the day of action. (Tr. 1025.) The Supreme Leader of Iran, the Ayatollah Ali Khamenei, made public statements attacking the call to action, attacking Ms. Alinejad, and defending compulsory hijab laws. (Tr. 1025-1028; GX 222, 222-T.) The Ayatollah attacked Ms. Alinejad again in a speech he delivered later that year to graduating cadets from Iran's military university, characterizing challenges to compulsory hijab laws as challenges to the independence, resistance, power, and might of the regime. (Tr. 1042-48; GX 223 & 223-T.)

The very next day after Ms. Alinejad's call to action, the Bazghandi Network activated Amirov and his network to assassinate Ms. Alinejad, offering Amirov $500,000 for her murder. (Tr. 354.)

### D.    Amirov Engages Omarov and Omarov's Associates, Including Khalid Mehdiyev, to Carry Out the Assassination

On July 13, 2022, a chain of communications activated the assassination plot against Ms. Alinejad. Mohammad Seyed Forouzan, Amirov's principal contact in the Bazghandi Network, ran

nearly two dozen internet searches for Ms. Alinejad. Shortly afterwards, Amirov repeatedly reached out to Omarov and then forwarded to Omarov pictures Amirov had received from Forouzan showing Ms. Alinejad, her residence in Brooklyn, and the address. (GX 701-T, 414-T, 414-54, 414-56, 414-57, 414-58.) Omarov, in turn, contacted Mehdiyev and dispatched him to take surveillance videos of the residence.[3] Omarov told Mehdiyev that they had a contract from the Government of Azerbaijan to murder a journalist in the United States as a favor for the Government of Iran, which would pay $160,000.[4] (Tr. 232-234.) After receiving those videos from Mehdiyev in the early morning hours of July 14, Omarov sent them to Amirov. (Tr. 243-245, GX 414-T, -56, -64, -65.)

The next day, Omarov told Mehdiyev that the people who were giving them the murder-for-hire contract were impressed that surveillance videos had been obtained so quickly and were prepared to pay $30,000 up front, with the remaining $130,000 to be paid after the job was finished. (Tr. 245-246.) Amirov and Omarov arranged for Mehdiyev to collect $30,000 in cash from a money launderer in Brooklyn on July 18, 2022. (Tr. 246-252, 263-265; GX 414-T, 414-71, 413-T, 413-291.) At Omarov's request, Mehdiyev wired $10,000 of that money to Omarov's girlfriend in Bulgaria, which Omarov said would be used to help the Russian Mob associate who carried out the Ado Georgia murder. (Tr. 265-66.)[5] From the remaining $20,000, Mehdiyev purchased an AK-47-style assault rifle for approximately $2,000. (Tr. 268-271; GX 51, 51P.)

---

[3] Omarov did not tell Mehdiyev that Amirov had arranged for the murder-for-hire contract. Mehdiyev learned of Amirov's role later, when Amirov talked to Mehdiyev about it in an MDC holding cell. (Tr. 352-361.)

[4] As noted above, the actual contract amount was $500,000. Omarov lied so that he would be able to keep more of the payment for himself.

[5] Omarov kept this $10,000 for himself. Amirov later told Mehdiyev that Omarov had "dirt[ied] up the dirty business" by stealing part of Mehdiyev's payment for the murder-for-hire. Omarov was supposed to send Mehdiyev $20,000 in addition to the $30,000 that Amirov had arranged, but

Forouzan sent Amirov more pictures of Ms. Alinejad, which Amirov sent to Omarov who in turn sent them to Mehdiyev.  (GX 414-95, -96, -97, -98, -99, -100, -101, -102, -103, -104.) Beginning on July 21, 2022, Mehdiyev drove to the Brooklyn residence every day, bringing the assault rifle with him.  He typically spent hours waiting for a sight of Ms. Alinejad and sending Omarov pictures and videos of the residence and surrounding neighborhood. (Tr. 273-274.)  Ms. Alinejad, unknown to would-be killers, had left town to visit a friend for the week.  (Tr. 1031.) Over the course of several days of staking out Ms. Alinejad's home, Mehdiyev, Omarov, and Mamedov talked about whether they had the right house; tried to ascertain whether any of the people in the neighborhood were Ms. Alinejad's husband, Kambiz Forouhar; and talked about ways to try to lure Ms. Alinejad out of her home so Mehdiyev could kill her.  (Tr. 273-299; GX 313-T, 413-T-R.)  Omarov had the same conversations with Amirov, providing updates on the stakeout and forwarding surveillance photographs and videos from Mehdiyev.  (GX 414-T.)

Forouzan found pictures of Mr. Forouhar for Amirov, who sent them to Omarov, who in turn sent them to Mehdiyev, to assist with the stakeout. (GX 701-T, 414-T, -142, -143, -144, -145, -146, -147.)  Forouzan also sent Amirov still images from Ms. Alinejad's June 2022 Instagram video, *supra* at 8, showing the front porch and garden of the residence, so Mehdiyev could verify he had the right location.  Amirov sent these to Omarov, who sent them to Mehdiyev.  (GX 414-106, -155, -156, -157.) Amirov also received location information about Ms. Alinejad, apparently derived from Iranian intelligence.  Amirov received this information on the evening of July 26, 2022, after her return from her trip, and promptly shared it with Omarov.  (GX 414-T.)  When

---

instead Omarov kept the $20,000 and further induced Mehdiyev to send Omarov $10,000 out of Amirov's $30,000 payment.  (Tr. 353-354.)

Mehdiyev learned that this information was based on Iran's time zone, he realized that it was the Iranian government behind the murder plot, rather than the Azerbaijan government. (Tr. 299-301.)

Under increasing pressure from Omarov to finish the assassination—who was under pressure himself, as their IRGC clients were losing trust in the defendants' ability or willingness to finish the job—Mehdiyev started inventing developments to try to buy himself more time for Ms. Alinejad to appear. (Tr. 316-325.) Mehdiyev saw Ms. Alinejad on her porch once while he was walking around the neighborhood, but by the time he was able to make his way back to his car to retrieve the assault rifle, she had gone back inside. (Tr. 309-10.) Despite his attempt to avoid drawing attention to himself, the sight of Mehdiyev alarmed Ms. Alinejad. She quickly went inside and left her house soon after to stay with a friend in Connecticut. (Tr. 1031-1033.)

E.    The Assassination Plot is Disrupted

Not long after Ms. Alinejad left for Connecticut on July 28, 2022, Mehdiyev also drove away from the Brooklyn residence. The New York City Police Department ("NYPD"), alerted by the FBI, pulled Mehdiyev over after he drove through a stop sign and found that he was driving on a suspended license. The officers arrested Mehdiyev and, during an inventory search of the car, found the assault rifle, 66 rounds of ammunition, a ski mask, gloves, and a bundle of cash. (Tr. 35-56.) The assault rifle had an obliterated serial number, and Mehdiyev was charged the following day with violating Title 18, United States Code, Section 922(k).

Amirov and Omarov initially did not know Mehdiyev had been arrested and were concerned when Omarov could not get in touch with him. Amirov and Omarov agreed that Mehdiyev's family would know where he was (GX 414-T), so Omarov and Mamedov contacted Mehdiyev's mother and father in Azerbaijan. Mehdiyev's parents did not know where he was either, and Omarov threatened to kill Mehdiyev's younger brother if he were not found. (Tr. 664-668.) Omarov told Mehdiyev's mother: "Your son Khalid is nowhere to be found. Find me

11

Khalid. You know his whereabouts. . . .  The term is short, and because there was nobody else in America, I sent him to do a job for me. But your son left me in a very bad situation with other people. . . .  Ma'am, I will tell you one word.  Ma'am, because of your bad son, your other, good son will be lost.  Find me Khalid.  You have to find Khalid for me. . . .  [T]he time is very limited." (Tr. 665-667.)  Omarov sent Amirov screenshots from his video call with Mehdiyev's parents. (GX 414-T.)

Mehdiyev gained access to a contraband cellphone at the MDC, where he was detained, and contacted Omarov and Mamedov.  Mehdiyev took photographs and videos of his prison cell and his prison ID card, and had a video call with Omarov to prove he had been arrested and had not simply fled.  (Tr. 325-337.)  Mehdiyev did not know it at the time, but Amirov was listening to Mehdiyev's and Omarov's conversations through another phone.  (Tr. 359-360.)  Omarov told Mehdiyev that the people who had given them the murder-for-hire contract were pressuring Omarov to give back the up-front payment.  (Tr. 334, 337.)  Omarov told Mehdiyev the government of Azerbaijan would help him if Mehdiyev wrote a letter falsely denying the charges against him, which Mehdiyev did and sent the letter to Omarov.  (Tr. 338-340; GX 414-253.)

In the ensuing weeks and months, Amirov and Omarov monitored news reporting about Mehdiyev's case and discussed whether they should be concerned if Mehdiyev cooperated.  (GX 414-T, 529-T.) The Bazghandi Network, meanwhile, monitored Mehdiyev's case and periodically ran internet searches on Amirov to see if he had been implicated in the assassination plot.  (GX 701-T, 702-T, 705-T, 706-16-T.)  By late September, the IRGC was pressuring the Bazghandi Network to recover the money that had already been paid to Amirov for the murder-for-hire.  (GX 704-11-T.)

## II.    Amirov and Omarov's Arrests

Omarov and Mamedov were arrested in the Czech Republic on January 4, 2023.  At the time of his arrest, Omarov had multiple fraudulent passports with his photograph and various false names.  (Tr. 89-91; GX 63, 64, 66, 1104, 1107, 1109.)  Omarov had photographs of additional fraudulent passports and identification cards in his phone.  (Tr. 87-88; GX 402-24, -34.)  Omarov was extradited to the United States on February 21, 2024; as discussed more fully below, during the extradition flight he admitted to the FBI that he was in the Russian Mob, claimed to be a *vor*, admitted involvement in extorting the Brooklyn grocery store owner, and described violent disputes he was engaged in with other Russian Mob leaders.

Amirov was taken into custody in a foreign country on January 25, 2023.  At the time of his arrest, he had a fraudulent Russian passport and an Iran residence permit with his photograph and a false name.  (Tr. 1081-1091; GX 71A, 71P, 72A, 72P, 171A.)  When asked his name by the FBI, Amirov danced around the question before ultimately admitting that he was Amirov, not the name listed in the passport.  (Tr. 1084-1086.)  Amirov said that he needed passports in a false name because they were "clean," so that he could travel because he was wanted for murder in Russia. Amirov said he did not commit a murder, but that he "resembled" the person who did.  (GX 171-T.)  Amirov said he had heard of Omarov's arrest, that he had met Omarov in Turkey, but that he did not know Omarov.  Amirov told the FBI that he had spoken with Omarov on the phone, but did not remember if they had spoken in the summer of 2022.  (*Id*.).

## III.    Trial and Verdict

Trial on the charges in the eighth superseding indictment, S8 22 Cr. 438 (CM), began on March 10, 2022.  Mehdiyev and Ms. Alinejad testified for the government, as did several law enforcement agents, an expert in computer networks, an expert on the Russian Mob, and

Mehdiyev's mother. Omarov and Amirov did not testify and called no defense witnesses. The jury returned a verdict of guilty on all counts on March 21, 2022.

## IV.    Unlawful Conduct at MDC

While Amirov and Omarov have been detained pending trial and sentencing, each has committed additional crimes of possessing contraband cellphones in a federal prison, in violation of 18 U.S.C. § 1791. A contraband prison cellphone was seized from Amirov on July 25, 2025. The file data indicates Amirov was using the cellphone since 2024. Contraband cellphones were also seized from Omarov, along with a homemade prison knife, in July and September 2024. (Tr. 104-105, 117-119.)

## V.    The PSRs

Probation determined that the total offense level for Amirov is 43, including a 4-level enhancement under the Guidelines Section 3B1.1(a) for his leadership role in the offense. (Amirov PSR ¶¶ 97-110.) With a criminal history category of I, the applicable sentencing range is life imprisonment. Pursuant to Guidelines Section 5G1.2, however, the Court should determine the range for Counts One through Four separately from Count Five; because Counts One through Four have a combined statutory maximum of 50 years, the Guidelines sentencing range for those counts is reduced to 600 months. Adding the mandatory consecutive five-year sentence for Count Five, and pursuant to § 5G1.2(a), the total Guidelines sentencing range is 660 months' imprisonment. (Amirov PSR ¶ 141.)

Probation determined that the total offense level for Omarov is 42, including a 3-level enhancement under § 3B1.1(b) for his leadership role in the offense. (Omarov PSR ¶¶ 93-105.) With a criminal history category of I, the applicable sentencing range is 360 months' imprisonment to life. Applying § 5G1.2 and the mandatory five-year consecutive sentence for Count Five, the

Guidelines sentencing range for Omarov is 420 to 660 months' imprisonment.  (Omarov PSR ¶ 141.)

Probation recommends a downward variance for each defendant, recommending a sentence of 264 months' imprisonment for Amirov (Amirov PSR at 43) and 240 months' imprisonment for Omarov.  (Omarov PSR at 43.)  As discussed below, Probation's rationale for a downward variance is flawed: the circumstances Probation describes as mitigating are, to the contrary, aggravating and demonstrate an increased need for deterrence and incapacitation.  Probation's recommended sentences further fail to adequately reflect the seriousness of the offenses, promote respect for the law, or provide just punishment for the offenses; the recommended sentences also misapply and misinterpret the history and characteristics of the defendants.

## DISCUSSION

The Government asks that the Court impose the Guidelines sentence of 660 months' imprisonment as to Amirov, and the within-Guidelines sentence of 660 months' imprisonment for Omarov.  Amirov is a crowned *vor* and had been for nearly 10 years at the time of the offenses. Amirov had also cultivated the connections to the Iranian intelligence services that resulted in the murder-for-hire contract, passed intelligence in aid of the plot from the Iranian regime to his co-conspirators and surveillance updates from his co-conspirators to the Iranian regime; and would have been the recipient of the $500,000 bounty, to be shared with his co-conspirators at his discretion.  Omarov, though not a *vor*, was a close relative of Guli and held himself out as a *vor* and Omarov sought to legitimize his claim to *vor* status through an extremely violent pattern of extortions, attempted murders, and murders.  Both defendants played indispensable roles in the assassination plot.  The Government respectfully submits that their culpability is equivalent, and a sentence of 660 months' imprisonment is warranted for both defendants.

I.      **The Seriousness of the Offenses**

The seriousness of the offenses amply supports the Sentencing Guidelines term of imprisonment for each defendant.  The defendants are both leaders within a large, powerful organized crime group—the *Gulici*—that exercises a corrosive and corrupting influence on the communities where it operates.  The defendants' organized crime group relies on violence as the basic means of extracting ransoms and payoffs from innocent victims, for enforcing loyalty, and for vying with competing groups.  Indeed, and as demonstrated in detail at trial, the *Gulici* engaged in a wave of murders, kidnappings, and extortions across Eastern Europe, before exporting their criminal enterprise to the United States.  The defendants used that network of violence to plot and take concrete steps to execute an assassination at the behest of a hostile foreign government's military and intelligence service—the Islamic Republic of Iran's IRGC.

The Government of Iran's efforts to commit targeted killings, like the defendants' participation in violent crime, are not theoretical.  The defendants' sponsor for the murder plot, the Government of Iran, has carried out a wide range of attacks and attempted attacks across the globe in recent years, including attempts to target both dissidents and current and former U.S. government officials inside the United States.  The target of the defendants' assassination plot is a journalist, author, and human rights activist targets for core First Amendment activities: free speech and political activity.  The assassination was intended not just to kill the victim, Masih Alinejad, but also to deal a harsh blow to efforts to counteract the Iranian regime's corruption, human rights abuses, and sponsorship of terrorism.  The attempt on Ms. Alinejad's life came very near completion, and the failure of that plot was by no means because of the defendants' lack of effort, intent, and diligence in pursuing it.

The number of ways in which the defendant's murder plot was dangerous is nearly without parallel.  The plot represents an emergent, extraordinary threat: the confluence of state-sponsored

terrorism and organized crime, with the latter being enlisted as mercenaries on behalf of the former. State-aligned terrorist organizations, like the IRGC, can contract with criminals with broad reach and without conscience interested in money and, in some ways worse, the status that high-profile killings can bring.  That is what happened here.  The assassination plot posed a grave threat to the victim, to the victim's family, to U.S. national security, to the rule of law, and to the cause of human dignity and political freedom in Iran.  The defendants themselves are the most unabashed, unapologetic, and indeed boastful criminals one could imagine.  The seriousness of the offense, and the need for the sentence to fully reflect that seriousness and to promote respect for the law, is extraordinary.

The defendants' meager attempts to diminish this seriousness should be rejected.  Amirov, for example, relies heavily on the 10-year maximum sentence that applies to one count of conviction, murder-for-hire under 18 U.S.C. § 1958 (Amirov Sent. Mem. at 2-4), rather than on the actual characteristics of the assassination plot.  Amirov insists that the statutory maximum for this one count is a "dispositive Congressional statement on the blameworthiness of the offense." (*Id.* at 2.)  Amirov, however, cites no case law in support of this contention.  It is, in fact, contrary to § 3553(a), the Sentencing Guidelines, and decisions of the Second Circuit.  Section 3553(a) instructs the Court to consider, among other things, the "nature and circumstances of the offense" and the need for the sentence imposed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(1), (2)(A). Congress sets statutory maximum and minimum sentences for each criminal statute, but through § 3553(a), Congress also instructs the Court to conduct its own independent, particularized assessment of the offense.  Congress also established the United States Sentencing Commission to develop the Sentencing Guidelines, which provide for a Guidelines sentencing range of 55 years

for Amirov and further require that, where the highest statutory maximum of the counts of conviction is less than the total punishment, then the sentences on each count should run consecutively as needed.  U.S.S.G. § 5G1.2(d).

As the Second Circuit has observed, "there is no constitutional right to concurrent, rather than consecutive, sentences" on multiple counts of conviction.  *See United States v. Williams*, 216 Fed. App'x 67, 69 (2d Cir. 2007) (summary order) (citing *United States v. White*, 240 F.3d 127, 135 (2d Cir. 2001)).  Where concurrent sentences would not "sufficiently reflect[] in their entirety the seriousness of [the defendant's] offenses, his criminal history, deterrence of [the defendant] and other potential offenders, and the need to protect the public from other crimes [the defendant] might otherwise commit"; consecutive sentences are substantively and procedurally reasonable. *Id.*  For example, in *United States v. Graham*, 632 Fed App'x 4 (2d Cir. 2015) (summary order), the defendant argued his 360-month sentence was unreasonable because the government could have charged the offense with a single Hobbs Act conspiracy charge carrying a 20-year statutory maximum.  The Circuit roundly rejected that argument, holding that (absent a double-jeopardy or equal-protection violation), "a defendant has no right to elect how the government charges his criminal conduct or the penalty scheme under which he is sentenced.  *Id.* at 4 (citing *United States v. Batchelder*, 442 U.S. 114, 125 (1979)).  The 30-year sentence in that case, resulting from running sentences on two counts of conviction consecutively, was substantively reasonable. So too, here, nothing restricts the Court's discretion to run counts consecutively in order to fulfill the need for a just sentence.[6]

---

[6] Amirov also asserts that he was deprived the ability to negotiate a plea bargain because the Government was "motivated by the politically charged nature of the case." (Amirov Sent. Mem. at 4-5.)  This contention is legally irrelevant and as a factual assertion does not merit a response. Moreover, nothing prevented Amirov from accepting responsibility and entering a guilty plea to the charged offenses, which would have lowered his Guidelines sentencing range.

Amirov and Omarov each argue that their role in the offense diminishes their culpability, because each participated in the assassination plot from afar; each was insulated by one or more layers of co-conspirators either from the intended triggerman, Mehdiyev, or from the plot's sponsor, the IRGC; neither man selected the target of the assassination plot; and the assassination was not carried out.  (Amirov Sent. Mem. at 4, Omarov Sent. Mem. at 2.)  None of these factors materially diminishes their culpability or the seriousness of the offense.  As noted above, the plot failed only by the intervention of fortune and federal law enforcement.  Mehdiyev, acting under the defendants' insistent commands and armed with a target location, targeting photographs, pattern-of-life information, and an assault rifle—all supplied by the defendants and their $30,000 advance payment—diligently surveilled Ms. Alinejad's house for hours at a time over the course of several days, waiting for an opportunity to carry out the murder.  Thanks to Ms. Alinejad's well-timed out-of-town travel, she was not home for most of that surveillance, leading to Amirov and Omarov's increasingly urgent goads.  Mehdiyev finally saw Ms. Alinejad when she returned home and tried to get the assault rifle out of his car without drawing attention; Ms. Alinejad, however, also saw Mehdiyev and, disturbed by his behavior, left for a friend's house.  The NYPD, alerted by the FBI, conducted a traffic stop, leading to Mehdiyev's arrest, the recovery of the assault rifle, and the disruption of the assassination plot.

But for the hand of providence and law enforcement diligence, the outcome could have been tragic.  Success would have meant the murder of an American citizen on United States soil by a hostile foreign regime of a victim who is a symbol of hope and freedom in Iran.  A murder, in other words, of geopolitical proportions.  And, if it had, the defendants would be facing mandatory life imprisonment, or the death penalty.  18 U.S.C. §§ 1958(a) (murder-for-hire resulting in death punishable by mandatory life or death), 1959(a)(1) (violence in aid of racketeering resulting in

death punishable by mandatory life or death), 924(j) (firearm offense resulting in death punishable by any term of years or life, or death).  The Guidelines range thus already accounts for the fact that the assassination plot did not succeed.  Moreover, the defendants' criminal history scores are vastly underrated by the Guidelines, which do not take into account their slew of violence abroad and explicit commitment to a life of crime.

That Amirov and Omarov engaged in this plot from afar, and used layers of their criminal organization to insulate themselves from direct participation in violence, is also not a substantially mitigating circumstance.  To the contrary, that they were able to orchestrate the murder plot from their perches in Iran and Eastern Europe is an aggravating, not mitigating, factor; one that demonstrates the broad reach and deadliness of their criminal enterprise.  Operating at layers of removal is a feature of their organized crime group.  Leaders frequently are separated from soldiers or from individuals outside the criminal network by layers of co-conspirators.  Crimes committed by organized criminal networks are more dangerous than crimes committed by individuals or by informal associations of criminals because they are harder to detect, harder to disrupt, and harder to deter.  Organized crime groups are capable of committing more sophisticated and dangerous offenses, and capable of insulating and protecting themselves from repercussion through corruption, violence, and internal discipline.  Indeed, viewed from the opposite perspective, that is the role that Amirov and Omarov played for the Government of Iran; a capable action arm that provided the IRGC with plausible deniability.  The role that each defendant played in the assassination plot highlights the seriousness of the offense and of each's participation in it.  Amirov, residing in Iran, was close with a network of Iranian intelligence assets and capable of forming a partnership with Iranian intelligence services to carry out mayhem.  Omarov, the embattled cousin of the deceased Lotu Guli, reveled in violence and commanded, as he bragged to

the FBI, a battalion of bodyguards and soldiers. The importance of their roles is illustrated by the money they would have gained from Ms. Alinejad's assassination: the price on her head was $500,000, and Amirov and Omarov would keep the lion's share.[7] And also by their other goal: for Amirov to remain a *vor* and Omarov to enhance his status within the Russian Mob to become one.

Finally, Amirov and Omarov put too much weight on the fact that they do not share the Iranian regime's hostility to Ms. Alinejad and sought to murder her for money rather than for reasons of ideology or self-preservation, like the regime. The Iranian regime's motives for targeting Ms. Alinejad are particularly reprehensible and despicable, but Amirov and Omarov's callous uncaring is hardly mitigating. The truth is that Amirov and Omarov would have killed *anyone* they were paid to kill. It did not matter to them who the victim was. Whether the victim was noble or dishonorable, powerful or meek, man or woman—Amirov and Omarov were unmoved. Because Ms. Alinejad's advocacy for human rights and political freedoms is so public and discussed so prevalently online, Amirov and Omarov may well have known who they were targeting and why. Whether they did or not, it would not have discouraged them in the slightest. Ms. Alinejad is a remarkable individual: courageous, principled, deeply compassionate to Iranians oppressed by the autocratic regime, and self-sacrificing in her advocacy for human dignity and political freedoms. She is a galvanizing and organizing figure in the Iranian people's efforts to secure for themselves liberties that Americans perceive as so basic that they easily can be taken for granted. None of that mattered to Amirov and Omarov. Masih Alinejad was worth $500,000 to them dead. That is all they cared about.

---

[7] Mehdiyev expected to receive only a fraction of the $500,000, in part because Omarov lied to him and claimed the bounty was $160,000. It is also part of the Russian Mob structure that those who carry out violence and extortion pass their earnings up to their superiors, and rely on the *vor*'s discretion for their own payment.

The role of the IRGC is also relevant to the need for deterrence. The Islamic Republic of Iran has pursued an aggressive policy of external operations for years, and, as noted above, has increasingly relied on criminal networks to carry out political assassinations and terror attacks. According to a database maintained by the Washington Institute for Near East Policy, within just the past 10 years the Government of Iran has been implicated in numerous planned and successful attacks, including the assassination of an Iranian political opposition figure in the Netherlands, the kidnapping of a Swedish-Iranian dissident, a plot to assassinate Iranian dissidents living in Maryland, attacks against synagogues in Germany, a plot to murder two journalists in the United Kingdom, an assault on another journalist in the United Kingdom, an attack against an Israeli embassy in Sweden, and a murder-for-hire plot against an Azerbaijani rabbi. *See* Matthew Levitt, *Iranian External Operations Interactive Map and Timeline*, available at https://www.washingtoninstitute.org/iranexternalops/ (visited Oct. 21, 2025). Even after Amirov and Omarov's arrest, the IRGC continued its efforts to murder Ms. Alinejad, turning to another criminal network in 2024 to attempt to kill her. *See United States v. Shakeri, et al.*, 24 Cr. 670 (LJL) (S.D.N.Y.). A substantial sentence is needed to deter criminal organizations from cooperating with the regime to carry out politically motivated violence and terrorism.

In sum, the nature and circumstances of the offense and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment all support the Government's request for sentences of 55 years' imprisonment for the defendants.

## II.    The Need to Afford Adequate Deterrence and to Protect the Public

The history and characteristics of the defendants and the related need to protect the public also warrants a Guidelines sentence.

Amirov and Omarov both are leaders in the *Gulici* clan of the Russian Mob, whose members expressly vow to live a life of crime. The very name of the group describes this defining

characteristic: *vory v zakone* means "Thieves in Law," meaning that its members earn their livelihood solely through crime. The rules of the group prohibit legitimate employment, prohibit joining the army or helping the police, and require its members to work for and under the authority of a *vor*. (Tr. 134; 647.) A Russian Mob rallying cry is "Life to *Vors*, Death to Police." (Tr. 168.)

Entry into the Russian Mob requires its members to demonstrate two qualities: a willingness to commit violence, and loyalty to *vors*. As Mehdiyev testified, to join the mob "[y]ou have to beat people up for them [Russian Mob], you have to stab people up for them, and you have to do whatever they say to do." (Tr. 135.) Working for a *vor* also means violence: "extorting people for *vor* behalf, killing people for *vor* behalf, kidnapping people for *vor* behalf." (Tr. 135-36.) *Vory* make money from professional thievery, extortion, and debt collection, and may also engage in drug trafficking, human trafficking, corruption, and money laundering. (Tr. 646.) *Vory* operate through violence: "That's how *vor* operate. That's how they operate, and how they intimidate people, as I said earlier, through the use of violence." (Tr. 657.)

Amirov has been in the Russian Mob essentially his entire life. While Amirov refused to discuss the charged offenses, he acknowledged to Probation that he got involved in organized crime as a youth. (PSR ¶ 120.) Amirov was crowned a *vor* in approximately 2013. (Tr. 358.) He reported to Probation that he was "unemployed" his entire adult life and claimed he has no assets or income and is supported by friends and family (PSR ¶¶ 137-137),[8] a false way to described being a *vor* dedicated to a life of crime. This was consistent with Amirov's lies to the FBI when he was taken into custody, when, in response to being asked what he did for work, Amirov replied,

---

[8] One of Amirov's family members, however, asserts that Amirov provided "food aid to more than 200 families" during the COVID-19 pandemic (Amirov Sent. Mem. Ex. E), clearly at odds with Amirov's claim to have no assets or income and to be dependent on friends and family.

"my relatives help me out" before explaining that he was "[t]emporarily unemployed" and "[b]efore that I was involved in sports." (Tr. 1096; GX 171D-T).

Amirov described to Mehdiyev his intentions to continue his *vor* life, despite his arrest on the charges in this case. First, Amirov expected (wrongly) to be released in a short time, based on a scheme to bribe the Azerbaijan government to bring sham charges against him and request his extradition from the United States, so he could be released in Azerbaijan. (Tr. 361.) Amirov asked Mehdiyev to develop relationships in prison and find people who have "heart," so that "when we release from jail, we stay in the United States and commit more crimes." (Tr. 360.) Amirov's intention, in other words, is to establish his own *vor* clan in the United States.

Omarov, similarly, is a dedicated, lifelong member of the Russian Mob. His cousin is Guli, the most notorious *vor* of his day until he was murdered by a rival clan. Omarov claims that his cousin crowned him as a *vor* before his death. (GX 161F-T at 5.) Omarov acknowledged to the FBI that other *vory* challenge his claim, however (*id.*), and Mehdiyev knew Omarov as a *bradiyaga* with *vor* aspirations. (Tr. 154-55, 192.) At the time of his arrest, Omarov was engaged in an active rivalry with Guli's brother, Namik Salifov, for primacy among the *Gulici* (Tr. 391, 395-96; GX 161 at 8), as was Amirov. (Tr. 187.) Omarov is so dedicated to the Russian Mob, and so boastful of his role in it, that he freely discussed his Russian Mob membership with the FBI. (GX 161A-T at 8 ("I am an influential person . . . I can give my name, or my power, or how do you say that, to guarantee to make sure there are no problems . . . . I am a Thief."); *see also* GX 161B-T at 2 ("I am an Azerbaijani Thief.").) Omarov described how, because of his role in the Russian mob and his claims to status, he had enemies who were trying to kill him. (*Id.* at 11, GX 161D-T at 3 ("I have about 20 bodyguards."); GX 161E-T at 2 ("I have a lot of bodyguards.");GX 161F-T at 2

("They want to kill me . . . [b]ecause I am blocking a way for many competitors, thieves and enemies of the family.").)

Omarov also described how he protects and seeks to increase his power: through violence.

> Guli was in jail for 23 years. 23 years in jail in Azerbaijan. He was a godfather of all thieves. He was the leader of all thieves. He was number one. All thieves…. And when there is competition between thieves, they argue, disrespect… How do you say it? Disrespect. I can become an enemy with you, God forbid, if you curse my mother, disrespect me. And I am not going to forgive people like that, I can't just say – "sorry;" "oh, it's okay." No.

> * * *

> We have dignity. That's why, we are thieves. Guli was also fighting with many thieves. They also wanted to be the number one. Yes. There was a competition. But he was the one fighting with them. It wasn't me. He was fighting. Then his enemies killed him. His enemies killed him. Then they are afraid that I will fight for him and seek revenge.

> * * *

> That's why they want to also kill me, to clear the way, so tomorrow they won't have a war. They don't want me to become powerful. Before I get all powerful, they want to kill me and destroy me. For example, I didn't hide from the police, I was hiding from the enemies to avoid being killed.

(GX 161F-T at 3-4.)

Omarov did more than describe his efforts to attain greater notoriety within the Russian Mob.  He committed a wave of murders, extortions, and kidnappings in Eastern Europe, and sought to establish, along with Mehdiyev, the *Gulici* in the United States.  And he left little doubt what he would do to those who threatened his status.  In the immediate aftermath of Mehdiyev's arrest, Omarov made clear to Mehdiyev's family the price he would exact were Mehdiyev to cooperate with law enforcement.  As Omarov told Mehdiyev's mother, "because of your bad son," meaning Mehdiyev, "your other, good son" will be killed.  (Tr. 667).  Omarov's capacity for violence is indiscriminate and without limit.

The defendants' self-serving portrayals of their history and characteristics do not diminish the need for a substantial sentence to address the need for deterrence and to protect the public from the defendants. Amirov supplies a handful of generalized character references from inmates at the MDC who have known Amirov for a short time, including some that make grandiose claims such as that Amirov has prevented riots and race wars at the detention center. (Amirov Sent. Mem. Ex. M.) The Court should consider these testimonials for whatever they are worth, but the Government submits that they are not particularly relevant to an evaluation of Amirov's history and characteristics. Similarly, Amirov provides letters from family members who appear not to be aware of, or at least do not acknowledge, Amirov's long-time status as a leading organized crime figure. Several family members refer to Amirov's morality, describing him as a "moral guide" (*id*. Ex. A), referring to his "moral impact" and "his moral guidance and upbringing" (id. Ex. H), and his "moral importance" (*id*. Ex. I); his sentencing memorandum goes so far as to ask the Court to exercise leniency in light of his "moral guidance for his wife, children, parents, and siblings." (Amirov Sent. Mem. at 6.) Amirov is a beacon, not of morality, but of depravity: he is an organized crime boss who partnered with a designated terrorist organization to murder a human rights activist and journalist for money. Amirov's moral fiber as demonstrated by his actions weighs heavily against leniency.

Omarov's submission engages in an especially curious effort to portray the Russian Mob as an admirable and socially responsible enterprise based on counsel's interviews of Guli's aunt and a handful of Georgian men with no last names. (Omarov Sent. Mem. Ex. B.) The evidentiary value is slight, if anything. The Court heard admissible, cross-examined testimony about the nature of the Russian Mob from a recognized expert, one of its own members, and from a victim of Omarov's death threats. The Russian Mob, including the *Gulici* clan, is a violent gang dedicated

26

to the power and wealth of its members, not the well-being of the community. The mob's power and wealth, in fact, comes from stealing from community members, extorting them, intimidating them, kidnapping them, burning their houses and businesses, assaulting and murdering them. The mob maintains and preserves its power, in part, by corrupting the police and government agencies that are supposed to support and protect the community. The enemies that Omarov described to the FBI—enemies requiring Omarov to enlist an enormous security detail and hide in various Eastern European countries under false-name passports—were not targeting Omarov because he was a philanthropist. They were targeting him because violent organized crimes leaders use violence against each other as well as the community to remove threats and enhance their own status.

In sum, the history and characteristics of the defendants strongly demonstrate the need for a significant sentence to protect the public from the defendants and to deter others.

## CONCLUSION

For the foregoing reasons, the Government respectfully requests that the Court sentence each defendant to 660 months' imprisonment.

Dated:  New York, New York
        October 22, 2025

                            Respectfully submitted,

                            JAY CLAYTON
                            United States Attorney


                      By: _____/s/_____
                            Jacob H. Gutwillig / Matthew J.C. Hellman /
                            Michael D. Lockard
                            Assistant United States Attorneys

cc:     Counsel of record
        (by ECF)